UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

| | |
|---|---|
| In re: | Chapter 11 |
| ROMAN CATHOLIC CHURCH OF THE DIOCESE OF GALLUP, a New Mexico corporation sole, | Case No. 13-13676-t11 |
| Debtor. | |

**MOTION FOR ENTRY OF AN ORDER AUTHORIZING
CONTINUED USE OF DEBTOR'S CASH MANAGEMENT SYSTEM, AND
AUTHORIZING MAINTENANCE OF DEBTOR'S EXISTING BANK ACCOUNTS**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Roman Catholic Church of the Diocese of Gallup, a New Mexico corporation sole, the debtor and debtor-in-possession ("**RCCDG**") in the above Chapter 11 reorganization case (the "**Reorganization Case**"), by and through its proposed attorneys undersigned, respectfully requests that the Court enter an Order authorizing the continued use of RCCDG's existing bank accounts, which were opened shortly before the filing of the Reorganization Case and proposed for use as debtor-in-possession accounts, and waiving certain of the Operating Guidelines and Reporting Requirements ("**Operating Guidelines**") promulgated by the Office of United States Trustee for Region 20 ("**Cash Management Motion**") that ordinarily require closure of all pre-petition bank accounts and maintenance of a separate account for payment of taxes. The relief requested herein does not differ materially from the Operating Guidelines and will help avoid possible disruptions and distractions that could divert RCCDG's attention from more pressing matters during the initial days of the Reorganization Case, and conserve resources for the estate, which is particularly important in a case such as RCCDG's.

This Motion presents a "core" proceeding under 28 U.S.C. § 157(b)(2) over which this Court has jurisdiction to enter a final order pursuant to 28 U.S.C. § 1334. The statutory predicate of this Motion are 11 U.S.C §§ 105(a), 345, and 363.

This Motion is supported by: (i) the following Memorandum of Points and Authorities; (ii) the "<u>Declaration Of Bishop James Wall In Support Of Chapter 11 Petition And First Day Motions</u>" (the "**Wall Declaration**"); (iii) the "<u>Declaration Of Christopher Linscott In Support Of First Day Motions</u>" (the "**Linscott Declaration**"); and (iv) the entire record before the Court in this Reorganization Case.

RESPECTFULLY SUBMITTED this 12th day of November, 2013.

/s/ *Susan G. Boswell*
Susan G. Boswell (AZ Bar No. 004791)
Lori L. Winkelman (AZ Bar No. 021400)
Elizabeth S. Fella (AZ Bar No. 025236)
*Pro Hac Vices Pending*
QUARLES & BRADY LLP
One S. Church Ave., Suite 1700
Tucson, Arizona 85701
(520) 770-8700
Fax: (520) 623-2418
susan.boswell@quarles.com
lori.winkelman@quarles.com
elizabeth.fella@quarles.com

-and-

Thomas D. Walker
WALKER & ASSOCIATES, P.C.
500 Marquette N.W., Suite 650
Albuquerque, New Mexico 87102
(505) 766-9272
Fax: (505) 722-9287
twalker@walkerlawpc.com

*Proposed Counsel for Debtor*

**MEMORANDUM OF POINTS AND AUTHORITIES**

On November 12, 2013 (the "**Petition Date**"), RCCDG commenced this Reorganization Case by filing a voluntary Chapter 11 petition. RCCDG has remained a debtor-in-possession under 11 U.S.C. §§ 1107 and 1108 since the Petition Date.

## I. BACKGROUND

**The Civil and Ecclesiastical Entities and Organization of the Entities.**

The Debtor in this Reorganization Case is RCCDG which is a New Mexico corporation sole,[1] formed under the laws of the State of New Mexico. RCCDG conducts its business/civil affairs under the laws of New Mexico and the United States and in accordance with the Code of Canon Law ("**Canon Law**"), the ecclesiastical law of the Roman Catholic Church.[2] RCCDG acquires and holds property and conducts its civil affairs for the practice of the Roman Catholic religion in the geographic area that has been decreed as the Diocese. The Bishop of the Diocese has responsibility for the Roman Catholic faithful within the geographic territory of the Diocese and carries out his duties in accordance with Canon Law. The Bishop is also the sole member of RCCDG and the Arizona entity.

According to Canon Law, a diocese is a geographic territory formed to serve the Catholic faithful and through which the mission and ministry of the Roman Catholic Church in the area

---

[1] New Mexico no longer has the corporation sole form of incorporation; however, an entity formed as a corporation sole at the time New Mexico provided for that form of incorporation was not required to re-incorporate as a non-profit corporation, but was allowed to continue its existence as a corporation sole which RCCDG has.

[2] Although there is another civil entity, Bishop of the Roman Catholic Church of the Diocese of Gallup, an Arizona corporation sole (the "**Arizona Entity**"), all of the civil business of the Diocese is conducted through RCCDG and the Arizona entity does not conduct any business. Moreover, as explained in more detail herein, the ecclesiastical diocese created in 1939 is the Diocese, the territory of which was decreed to include areas in both New Mexico and Arizona.

designated as a diocese is carried out. A diocese is administered by a Bishop who is appointed to serve by the Pope. However, a diocese is not the only Roman Catholic ecclesiastical entity within its geographic territory. Every diocese is divided into distinct parts or parishes which are separate entities under both Canon Law and civil law. There are other Catholic entities, separate from a diocese and parishes that also operate within a diocese such as foundations or schools.[3] The relationship among RCCDG, the Diocese, the Parishes and various other entities within the geographic territory of the Diocese is described in greater detail in the Wall Declaration filed contemporaneously with this Cash Management Motion.

The Diocese is the poorest diocese in the United States. There are no large metropolitan areas within the geographic area of the Diocese which includes significantly poor and underdeveloped areas where there is high unemployment and low income. Approximately sixty percent (60%) of the geographic area served by the Diocese is on Native American reservations. In many of the counties located within the geographic area of the Diocese, approximately forty-three percent (43%) of the people live below the poverty level, and the unemployment rate is approximately forty percent (40%) on the Native American reservations. The Diocese is comprised of more Native Americans than any other diocese in the United States. There are seven distinct tribes within the Diocese: the Acoma, Laguna, Zuni (Pueblo Indians), Jicarilla Apache, White Mountain Apache, Hopi, and Navajo. The remainder of the population of the Diocese is divided among approximately thirty (30) nationalities, with the largest ethnic group being Hispanic.

RCCDG obtains its operating funds from a number of sources. It receives a small portion of the Sunday collections from the Parishes, it receives grants specifically restricted by the

---

[3] A school can also be established, owned and operated by a parish or a diocese or can be a separate independent entity under Canon Law and civil law.

4

grantor for certain programs provided by the Diocese and it receives donations from donors, some of which are restricted for specific purposes as designated by the donor and others which are unrestricted and used by RCCDG to fund its operations and other needs.

There are fifty-four (54) Parishes and thirty-one (31) active Missions within the geographic area of the Diocese. Missions also serve areas within the Diocese. A mission is typically much smaller than a parish. In some cases, a mission may have been a parish at one time but because of a lack of parishioners or other reasons, is no longer a parish and has become a mission. Similarly, a mission may become a parish in the future depending on various circumstances, such as membership.

Notwithstanding the significant poverty and financial challenges of the parishioners and the Parishes, for the most part, Parishes receive sufficient donations and other funding to pay their operating expenses.[4] However, all of the Parishes require outside support, such as through grants, to sustain their programs and physical plant.[5] In addition, RCCDG provides salary subsidies for priests who serve in twelve (12) of the Parishes of between $250.00 to $350.00 per month. Also, even Parishes that obtain sufficient donations to pay most of their operating expenses do not generate sufficient funds from donations or other sources to provide substantial support to the Diocese. One Parish, St. Anthony located in McNary, Arizona does not have sufficient funds from collections, donations or other sources, to pay its operating expenses; therefore, consistent with its mission and ministry, RCCDG provides direct administrative support and subsidizes some of the expenses of the St. Anthony Parish.

---

[4] The plate collections and donations from parishioners at these Parishes are not substantial and the Parishes operate very leanly.

[5] Grants that are provided from third parties for the benefit of the Parishes are restricted by the grantor for the Parishes (and not for RCCDG) but are administered by RCCDG.

Not every Parish or Mission has a priest, so priests travel and minister among several Parishes or Missions. The services provided by the Diocese support and promote not only the Catholic religion for those within its territory but also support and promote essential services for all people within the geographic area of the Diocese, regardless of religious affiliation. In addition, consistent with its mission and ministry and its obligations under Canon Law, RCCDG provides administrative support for the priests, Parishes and Missions, including procuring and administering insurance programs and grants, providing support services for religious and other programs, recruitment and training of priests and similar services.

**Operations of RCCDG, Gallup School and Retreat Center.**

As part of its mission and ministry, the Diocese has various functions, divisions and programs, the civil affairs of which are administered by RCCDG, some of which are described below.[6]

Gallup Catholic Schools ("**Gallup School**") operates as a separate entity from RCCDG but is part of RCCDG for civil purposes and part of the Diocese for ecclesiastical purposes.[7] Prior to 2010, the Gallup School was a separate corporation organized under New Mexico law and operated as an independent entity. For a variety of reasons, it was determined that the Gallup School should be owned and operated by RCCDG and on August 4, 2010, the New Mexico Office of the Public Regulation Commission issued a certificate of dissolution for Gallup

---

[6] The following is not intended to be an exhaustive description of the activities of RCCDG.

[7] The real and personal property of Gallup School is owned by RCCDG, subject to any donor designated restrictions. There are other Catholic schools within the geographic area of the Diocese; however, these schools are either separate independent entities (not associated with a parish) or part of, owned and operated by a parish, and the real and personal property of those independent entities are owned by those entities (subject to any donor designated restrictions).

6

Catholic School, Inc. and the ownership and operation of the Gallup School became part of RCCDG.

Gallup School is pre-school through eighth (8th) grade and is dedicated to academic excellence integrating the doctrine and traditions of the Catholic Church. The school's mission is to nurture the spiritual, emotional, intellectual, cultural and physical development of its students. Gallup School is celebrating its centennial year this year. Similar to the Diocese, Gallup School provides a Catholic education to the community notwithstanding the financial challenges of its families. Historically, Gallup School has not been self-sustaining and depended upon RCCDG for additional financial support; however, Gallup School expects to break even this year.

Sacred Heart Retreat Center ("**Retreat Center**"), located near Gallup, is owned by RCCDG and is part of the ministry of the Diocese. The Retreat Center is a place of hospitality, quiet prayerfulness and desert beauty and serves the spiritual needs of those who come through prayer, retreat, and spiritual and educational programs. The Retreat Center is an integral part of the ministry of the Diocese and is open to spiritual, educational, cultural, business and civic groups. The Retreat Center is located on fifteen (15) acres of rugged land, and there are four (4) small hogans, one (1) large hogan, a bedroom hall, conference rooms and a chapel on the grounds of the Retreat Center.

RCCDG also develops and administers various Diocese-wide programs and ministries such as the Office of Native American Ministry and the Office of Religious Education. The Office of Native American Ministry was established by Bishop Wall in 2012 to assess and meet the spiritual needs of the Native American members of the Diocese. The Office of Religious Education oversees and provides administrative support to all Directors of Religious Education

throughout the Diocese and helps set standards for catechism requirements, religious classes and related activities. There are other programs and ministries that are offered and supported by RCCDG and the Diocese that serve the needs of people within the Diocese, a more complete description of which can be found on the Diocese website—www.dioceseofgallup.org.

**Additional Separate Entities That Support The Diocese's Mission.**

Among the other separate and independent entities that operate within the geographic territory of the Diocese are the Southwest Indian Foundation ("**SWIF**"), Catholic Peoples Foundation ("**CPF**") and Catholic Charities of Gallup, Inc. ("**Catholic Charities**"). SWIF is a New Mexico non-profit corporation that was incorporated in 1981. SWIF is governed by a board of directors of which the Bishop is an ex-officio member. SWIF assistance is strictly limited to Native Americans, and its services include: school grants and individual tuition assistance, homes for battered women and children, home repair and wood stove installation, Christmas food baskets for needy families, alcohol counseling, and emergency assistance in the areas of food, clothing, heating fuel, and temporary shelter.

CPF is a New Mexico non-profit corporation that was incorporated in 1998. CPF administers programs and grants that assist in promoting the mission and ministry of the Catholic Church within the geographic area of the Diocese. CPF is governed by a board of directors of which the Bishop is an ex-officio member.

Catholic Charities is also a New Mexico non-profit corporation that was incorporated in 1974. Catholic Charities is governed by a board of directors, and the Bishop does not serve on its board in any capacity. Catholic Charities administers various programs within the area of the Diocese and provides assistance and service to everyone within the geographic area, in particular the poor and vulnerable.

SWIF, CPF and Catholic Charities are self-supporting and do not receive any financial support from RCCDG.

**The Sex Abuse Crisis and the Need for Reorganization.**

Over the last half of the twentieth century a tragedy that runs contrary to the every teaching and tradition of the Roman Catholic Church has unfolded which affected the Diocese: priests and other workers in the Roman Catholic Church took advantage of their positions in the community and in their parishes, missions and schools and sexually abused children. In the Diocese, a small number of priests, primarily in the 1950's and 1960's, committed these crimes which have resulted in claims (and in some cases lawsuits) made by adults based upon acts that they assert occurred decades ago (in some cases more than fifty (50) years prior to bringing the claim or lawsuit). There are currently thirteen (13) lawsuits filed which are pending in the Coconino County, Arizona Superior Court. In addition, RCCDG has been made aware of at least another eight (8) claims which have not yet resulted in lawsuits but which are being pressed against RCCDG. Most of these claims (both in and out of active litigation) pertain to periods in which RCCDG does not appear to have been insured. Therefore, not only has RCCDG been bearing the entire cost of defense of these claims, but any settlements had to be funded solely out of Diocesan assets. For any claims that pertain to abuse that occurred between October 1, 1965 and December 1, 1977, RCCDG was insured by The Home Insurance Company which was liquidated pursuant to state receivership proceedings in New Hampshire. As a result, the New Mexico Property and Casualty Insurance Guaranty Fund Association (the "**New Mexico Fund**") provides limited coverage for certain claims that occurred within the Home Insurance policy period. For claims arising after December 1, 1977 through the present, RCCDG is insured by Catholic Mutual Relief Society of America Insurance Company ("**Catholic Mutual**").

9

However, there are very few claims that have been asserted where the abuse occurred within the Catholic Mutual coverage period. RCCDG has not yet determined whether there may be some basis for broader coverage by Catholic Mutual but intends to do so. In addition, there may be other entities against whom RCCDG may have indemnity, contribution or other claims for the abuse acts that have resulted or may result in claims being asserted against RCCDG. Among other reasons for such claims, the priests who are responsible for the majority of the claims came from one or more dioceses or orders to minister in the Diocese. RCCDG is in the process of investigating the viability of such claims. As of the Petition Date, no other entity has acknowledged potential liability or offered to participate in a resolution of any of the abuse claims.

As previously stated, the Diocese is the poorest diocese in the United States. RCCDG is simply not able to continue to shoulder the cost of defending these claims or to respond to any judgment that will likely be entered on some of the pending lawsuits. Moreover, it is clear that the universe of claims has not yet been identified or asserted. Accordingly, RCCDG filed this Reorganization Case to help focus its efforts and limited financial resources to bring healing to those who were abused, parishioners and others affected by the past acts of sexual abuse committed by clergy and others associated with the Diocese or who ministered within the geographic area of the Diocese. It is through the Reorganization Case that the Diocese seeks to finally and comprehensively address the issues resulting from the abuse crisis that has caused great harm to those who have been abused, plunged an already financially-strapped Diocese into a severe financial crisis, and affected the Catholic Church's traditional ministries in the communities within the Diocese. RCCDG seeks to accomplish these goals by reorganizing its financial affairs pursuant to a plan of reorganization that will, among other things, fairly, justly,

10
Case 13-13676-t11    Doc 18    Filed 11/12/13    Entered 11/12/13 23:21:10 Page 10 of 19

and equitably compensate those who were damaged because of sexual abuse by clergy, while allowing the Diocese to continue its ministry and mission, including providing counseling and other services to those who have been harmed and serving an underserved area and population with needed services.

### Plan of Reorganization.

It is the hope and desire of RCCDG and the Diocese that all constituencies can come together quickly and confirm a plan of reorganization for RCCDG. RCCDG will be challenged just to pay the costs of administration of the Reorganization Case and its normal operating expenses, without regard to funding a plan to compensate those who have been abused; therefore, RCCDG intends to make every effort to bring the Reorganization Case to as early a conclusion as possible to minimize costs of administration. RCCDG will file a motion for the Court to set a bar date for claims as soon as feasible after the Petition Date. RCCDG also intends to request appointment of an unknown claims representative to represent the interests of claimants who will not have filed claims but for whom a statute of limitations may not yet have run as of the claims bar date or confirmation of a plan of reorganization. RCCDG does not believe that appointment of a minors' representative is necessary in this Reorganization Case because RCCDG is not aware of any abuse that occurred for which any such claimants may still be minors.

It is the desire and intent of RCCDG to work in a collaborative and cooperative manner with all constituencies, and it is in everyone's best interests to move the Reorganization Case expeditiously to conclusion with a minimal amount of litigation. Otherwise, estate assets will be consumed with costs of administration, including professional fees as opposed to being primarily used to compensate those who have been harmed. In that regard, RCCDG would not be opposed

to commencing mediation very early in the Reorganization Case as a way to minimize professional fees and move the Reorganization Case to an early successful conclusion.

## II.   DISCUSSION AND ARGUMENT

### A.   RCCDG's Existing Bank Accounts and Cash Management System.

From a cash management perspective, RCCDG's operations have two aspects: the administrative office[8] and the Gallup School. Each operates independently and, for the most part, manages its cash separately.

RCCDG's administrative office maintains three checking accounts, the Operating Account, the Payroll Account, and the Custodial Account. Because RCCDG's former bank, Bank of Colorado doing business as Pinnacle Bank, was not an Approved Depository Institution as required by the UST's Operating Guidelines, RCCDG recently moved its bank accounts (the "**Pinnacle Accounts**") to Wells Fargo Bank (which is an Approved Depository Institution) and opened a savings account that corresponds to each checking account to obtain reduced banking fees (collectively, the "**DIP Accounts**").

Upon approval of the Court and except for the limited use of certain of the Pinnacle Accounts discussed below, RCCDG will use only the DIP Accounts going forward. There are ACH transactions and automatic deposits that are made to the Operating Account maintained by RCCDG at Pinnacle Bank so that some grant funds, pledges and other payments to RCCDG are automatically deposited or electronically transferred to the Operating Account at Pinnacle Bank. Similarly there are ACH transactions and automatic deposits that are made to the Operating Account maintained by Gallup School at Pinnacle Bank. In addition, RCCDG maintains the

---

[8] The administrative office, located at the Chancery, is where the operations of RCCDG that are not directly related to the Gallup School are administered. It contains the offices of the Bishop, the finance office, human relations and related business and ecclesiastical operations.

Payroll Account in Pinnacle Bank that is described in detail in the Employee Wage and Benefit Motion and the Linscott Declaration. As described in the Employee Wage and Benefit Motion and the Linscott Declaration, the Payroll Account is essentially a zero-balance account and when funds are deposited to cover the payroll (for RCCDG employees and Gallup School employees), it is swept by IOI.[9] Because it will take some time to notify the payors and others who remit amounts to RCCDG or Gallup School through ACH transactions or automatic deposits of the change in bank accounts and ensure that those automated payments or deposits are now made to he DIP Accounts, RCCDG wants to retain the two Operating Accounts at Pinnacle Accounts for a brief period. In addition, if the Court grants the Employee Wage and Benefit Motion, the Payroll Account at Pinnacle Bank will be left open in order to process the pre-petition payrolls for the Payroll Periods addressed in the Employee Wage and Benefit Motion.

It is beneficial for RCCDG and Gallup School that the Operating Accounts at Pinnacle Bank remain open at least for another forty-five (45) days until all agencies and individuals who are parties to ACH transactions or automatic deposits can be transitioned to the DIP Accounts with the least disruption possible. Given RCCDG's financial condition, any disruption in its cash flow will be detrimental. In addition, in order to ensure that employees are timely paid and that the necessary Withholding Obligations are made, RCCDG requests that the Payroll Account at Pinnacle Bank remain open until the November 30 payroll is processed and paid, including the processing and payment of the Withholding Obligations.

Even though the two Operating Accounts at Pinnacle Bank will remain open, checks will be written on those accounts by RCCDG or Gallup School. In addition, the Operating Accounts

---

[9] Defined terms used in this Cash Management Motion that are not otherwise defined in the Cash Management Motion shall have the same meaning ascribed to those terms in the Linscott Declaration.

will be swept on a weekly basis and any monies in the Operating Accounts at Pinnacle Bank will be deposited into the appropriate DIP Account.

Also, because the DIP Accounts (at Wells Fargo) were opened recently (approximately two weeks prior to the Petition Date), RCCDG requests authority to utilize the DIP Accounts as debtor-in-possession accounts rather than closing the DIP Accounts and opening new accounts again. Use of the DIP Accounts is appropriate, and there is no risk that any pre-petition checks will be presented for payment if the DIP Accounts are not closed. Since opening the DIP Accounts and in anticipation of the filing of the Reorganization Case, any debit activity in the DIP Accounts was either by wire transfer or cashiers' checks.

All bank accounts (both Pinnacle Accounts and Wells Fargo Accounts) described in this section are listed by entity on **Exhibit "A"**, and are collectively referred to as the "**Existing Accounts**."

### B. Maintenance of RCCDG's Existing Cash Management System is Warranted

#### 1. Use of Existing Accounts and Related Relief

Courts have long recognized that the strict enforcement of bank account closing requirements does not always serve the rehabilitative purposes of Chapter 11. Accordingly, courts regularly have waived such requirements and permitted debtors to maintain their existing bank accounts and cash management systems, treating such a request as a relatively "simple matter". *See, e.g., In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987). The Bankruptcy Court for this District has also previously granted relief substantially similar to the relief sought herein. *See, e.g.*, *In re Furrs Supermarkets, Inc.*, Case No. 01-10779 (JSS) (Bankr. D.N.M., Feb. 8, 2001).

Moreover, the Operating Guidelines (which require a debtor to close all pre-petition accounts and open new DIP accounts) do not have the force of law, and the Court may excuse

compliance with certain portions of them. *See In re Gold Standard Baking, Inc.*, 179 B.R. 98, 101-02 (Bankr. N.D. Ill. 1995) (United States Trustee lacks statutory authority to direct how a debtor should conduct its ordinary business operations).

If RCCDG is not permitted to maintain and use the DIP Accounts and its current cash management systems, the resultant prejudice will include: (a) disruption in the ordinary financial affairs and business operations of RCCDG; (b) delay in the administration of RCCDG's estate and impact on the pastoral care and services provided to third parties such as the Parishes, all of the parishioners and others who benefit from the services provided by the Diocese; and (c) cost to RCCDG and its estate to set up new systems, open new accounts, and initiate new electronic transfers. With the protections identified in this Cash Management Motion, and the oversight of the Office of the United States Trustee, and the committee that is almost certain to be formed in the Reorganization Case, there is little concern for any prejudice to any party if the requirements contained in this Cash Management Motion are approved by the Court.

Therefore, RCCDG requests authority to maintain and continue to use the DIP Accounts. RCCDG further requests authority to deposit funds in and withdraw funds from the DIP Accounts by all usual means, including, but not limited to, checks, wire transfers, automated clearinghouse transfers, electronic funds transfers and other debits, and to treat the Existing Wells Fargo Accounts for all purposes as debtor-in-possession accounts. And RCCDG requests authority to maintain the two Operating Accounts and the Payroll Account at Pinnacle Bank for the limited time and for the limited purposes discussed above.

2.  **Waiver of Guideline regarding Maintenance of Separate Tax Account**

RCCDG also seeks a waiver of the requirement of the Operating Guidelines that it establish specific bank accounts for tax payments. As a non-profit religious corporation sole,

RCCDG's tax obligations are minimal, limited to employee payroll withholding taxes and a very few property tax parcels (most of RCCDG's real property is exempt from property taxes). RCCDG believes that its tax obligations can be paid efficiently in the manner it has always paid them, and its monthly operating reports and the reports RCCDG receives from IOI regarding payroll taxes (which the United State Trustee may request or examine) will permit the United States Trustee to monitor tax payments. In addition, RCCDG is current on all of its tax obligations. RCCDG, therefore, submits that the creation of new debtor-in-possession accounts designated solely for tax obligations is unnecessary and inefficient.

## III. RELIEF REQUESTED

WHEREFORE, RCCDG respectfully requests that the Court enter an Order:

A. Granting this Cash Management Motion in its entirety;

B. Authorizing the post-petition maintenance and continued use of the DIP Accounts;

C. Subject to the limitations regarding the use of the Pinnacle Bank Accounts, authorizing and directing the banks at which RCCDG maintains Existing Accounts, subject to and in accordance with the terms of any account agreements and applicable non-bankruptcy law, to accept and honor all representations or instructions from RCCDG as to which checks, drafts, wire transfers, or other transfers (each, an "**Item**" and, collectively, the "**Items**") should be honored or dishonored and granting the banks absolute authority to follow such representations and instructions, regardless of the particular transferee named on an Item, the date of such Item (prepetition or postpetition), and the banks' knowledge or belief as to the existence of Court authorization for the transfer;

16

provided, however, that the banks are not required to honor any Item as to which there are insufficient funds in the applicable account.

D. Waiving the Operating Guidelines that would otherwise require RCCDG to close the DIP Accounts and preclude the limited use of the Pinnacle Bank Accounts as discussed herein;

E. Waiving the Operating Guidelines that would otherwise require RCCDG to maintain a separate tax payment account;

F. Allowing the two Operating Accounts and the Payroll Account at Pinnacle Bank to remain open for a forty-five (45) day period from the Petition Date; and,

G. Granting such other relief as the Court deems just under the circumstances.

RESPECTFULLY SUBMITTED this 12th day of November, 2013.

/s/ *Susan G. Boswell*
Susan G. Boswell (AZ Bar No. 004791)
Lori L. Winkelman (AZ Bar No. 021400)
Elizabeth S. Fella (AZ Bar No. 025236)
*Pro Hac Vices Pending*
QUARLES & BRADY LLP
One S. Church Ave., Suite 1700
Tucson, Arizona 85701
(520) 770-8700   Fax:  (520) 623-2418
susan.boswell@quarles.com
lori.winkelman@quarles.com
elizabeth.fella@quarles.com

-and-

Thomas D. Walker
WALKER & ASSOCIATES, P.C.
500 Marquette N.W., Suite 650
Albuquerque, New Mexico 87102
(505) 766-9272   Fax:  (505) 722-9287
twalker@walkerlawpc.com

*Proposed Counsel for Debtor*

# CERTIFICATE OF SERVICE

Pursuant to F.R.C.P. 5(b)(3), F.R.B.P. 9036 and NM LBR 9036-1(b), I hereby certify that service of the foregoing "Motion for Entry of an Order Authorizing Continued Use of Debtor's Cash Management System, and Authorizing Maintenance of Debtor's Existing Bank Accounts" was made on November 12, 2013 via e-mail, U.S. Mail or via the notice transmission facilities of the Bankruptcy Court's case management and electronic filing system on the following parties:

U.S. Trustee
P.O. Box 608
Albuquerque, NM 87103
ustpregion20.aq.ecf@usdoj.gov

Thomas D. Walker
Walker & Associates, P.C.
500 Marquette N.W., Suite 650
Albuquerque, NM 87102
twalker@walkerlawpc.com
*Proposed Co-Counsel for Debtor and Debtor-in-Possession*

Robert E. Pastor
Montoya, Jimenez & Pastor, P.A.
3200 N. Central Ave., Suite 2550
Phoenix, AZ 85012
repastor@mjpattorneys.com
*Attorneys for Tort Claimants*

John Manly
Manly & Stewart
19100 Von Karman Ave., Suite 800
Irvine, CA 92612
jmanly@manlystewart.com
*Attorneys for Tort Claimants*

Richard T. Fass
Perdue & Kidd, LLP
510 Bering Dr., Suite 550
Houston, TX 77057
rfass@perdueandkidd.com
*Attorneys for Tort Claimants*

Pinnacle Bank of Colorado
P.O. Box 147
Fort Lupton, CO 80621
*Secured Creditor*

Ally Bank
P.O. Box 380902
Bloomington, MN 55438
*Secured Creditor*

Wells Fargo Bank, N.A.
300 W. Aztec
Gallup, NM
*Party-in-Interest*

List of 20 Largest Unsecured Creditors

/s/ *Susan G. Boswell*
Susan G. Boswell

**EXHIBIT "A"**

Pinnacle Accounts having automated deposit and ACH transaction activity that RCCDG proposes to keep open and swept weekly into the DIP Accounts and the Payroll Account:[10]

| Account Designation |
|---|
| Operating (administrative) |
| Payroll |
| Operating (Gallup School) |

Wells Fargo Bank Accounts (the DIP Accounts) to be used pursuant to Court authority, as DIP Accounts:

| Account Designation |
|---|
| Chancery Checking (Operating, administrative) |
| Chancery Savings (administrative) |
| Payroll Checking |
| Payroll Savings |
| Custodial Checking |
| Custodial Savings |
| Operating Checking (Gallup School) |
| Operating Savings (Gallup School) |
| Activity Checking (Gallup School) |
| Activity Savings (Gallup School |

---

[10] The account numbers will be provided to the United States Trustee upon request.