## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW MEXICO

| | |
|---|---|
| In re: | Chapter 11 |
| ROMAN CATHOLIC CHURCH OF THE DIOCESE OF GALLUP, a New Mexico corporation sole, | Case No. 13-13676-t11 |
| Debtor. | |

### DECLARATION OF BISHOP JAMES S. WALL IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

I, Bishop James S. Wall hereby declare under penalty of perjury of the laws of the United States as follows:

**I.      INTRODUCTION.**

A.      I am the sole member and a director of the Roman Catholic Church of the Diocese of Gallup, a New Mexico corporation sole ("**RCCDG**") and the sole member and a director of the Bishop of the Roman Catholic Church of the Diocese of Gallup, an Arizona corporation sole (the "**Arizona Entity**").  RCCDG is the civil entity that conducts the business of the Roman Catholic Diocese of Gallup (the "**Diocese**") whose offices are located in Gallup, New Mexico. To the best of my knowledge, no business is conducted by the Arizona Entity, and the Arizona Entity has very limited assets.  The Diocese is the religious canonical entity that carries out the mission and ministry of the Catholic Church in the geographic area decreed as the Diocese of Gallup.

B.      Although there are two civil corporations, there is only one canonical entity, the Diocese, and its geographic territory encompasses areas in two states, Arizona and New Mexico. The territory of the Diocese is subject to the jurisdiction and administration of the Bishop.  I am

the Bishop of the Diocese. As Bishop I carry out my canonical duties in accordance with the Code of Canon Law which is the ecclesiastical law of the Roman Catholic Church ("**Canon Law**"). I am also the only member of both RCCDG and the Arizona Entity. I became a director of RCCDG on February 5, 2009 as a result of my being appointed Bishop of the Diocese. I became one of the Directors of the Arizona Entity on February 5, 2009, also as a result of my being appointed Bishop of the Diocese.

C. I was appointed by Pope Benedict XVI as the Bishop of the Diocese on February 5, 2009, and I assumed my duties on April 23, 2009. I am only the fourth bishop of the Diocese which, as discussed in more detail below, was formed in 1939 although the Catholic Church has had a presence in the region served by the Diocese for far longer.

D. I attended high school in Chandler, Arizona. I graduated from Arizona State University in 1993 with a Bachelor of Arts in History. After graduating from Arizona State University, I attended St. John Seminary in Camarillo, California, and I was ordained a priest on June 6, 1998. Prior to becoming the Bishop of the Diocese, I served in various capacities in the Diocese of Phoenix.

E. I am submitting this Declaration in support of the Chapter 11 petitions for RCCDG and the Arizona Entity that I authorized to be filed in the United States Bankruptcy Court for the District of New Mexico on November 12, 2013 (the "**Petition Date**") and in support of the motions that were filed on or about the Petition Date and which RCCDG and the Arizona Entity have requested be heard as soon as the Court's calendar permits (collectively, the "**First Day Motions**").

F. I make this Declaration based upon: (a) my personal knowledge; (b) the books and records of RCCDG and the Arizona Entity; (c) well-known historical information; or (d)

2

information obtained from persons within RCCDG to whom I, as Bishop, have delegated certain responsibilities or to whom those responsibilities are delegated pursuant to Canon Law.

## II.     THE HISTORY AND STRUCTURE OF THE DIOCESE.

A.     The area which now comprises the Diocese has a long and storied history that is closely tied to the history of the settlement of this area.

B.     In 1539, Marcos de Niza, a Spanish explorer and Franciscan friar, traveled to an area about forty (40) miles south of present-day Gallup, built a large mound of stone, placed a cross on top and dedicated the region to Saint Francis.  In the years following Marcos de Niza's arrival, many other Franciscans and other religious figures arrived in the area to begin their evangelization work and priests were assigned and churches built.

C.     In 1821, Mexico won its independence from Spain and formed its own government. During that time, many of the churches fell into ruins and the Franciscans were expelled.  Also, during the Mexican era, Santa Fe and the surrounding area were part of the Diocese of Durango, Mexico.  There were only nine (9) active priests, no schools and the parishioners were scattered in small villages across the region.  In May, 1848, New Mexico became part of the United States, and in November 1850, the Pope created the Diocese of Santa Fe, which included part of the area which is now the Diocese.

D.     Between 1890 and 1939, when the Diocese of Gallup was created, the Franciscan Fathers of Cincinnati sent missionaries to work with the Navajo in the territory that is the Diocese.  The territory of the Diocese was originally made up from counties in New Mexico and Arizona, which were previously administered by the Diocese of Tucson and the Archdiocese of Santa Fe before the formation of the Diocese.  Originally, the territory of the Diocese included all of San Juan, McKinley, and Catron counties in New Mexico, parts of Rio Arriba, Sandoval, Bernalillo and Valencia counties in New Mexico and all of Mohave, Coconino, Yavapai, Navajo

3

and Apache counties in Arizona. Today, the Diocese includes the geographic area outlined on the attached map (**Exhibit "A"**), and encompasses approximately 55,468 miles and still includes portions of Arizona and New Mexico.

E.     There are no large metropolitan areas within the Diocese, and the geographic area of the Diocese includes significantly poor and underdeveloped areas where there is high unemployment and low income. In many of the counties within the Diocese, approximately forty-three percent (43%) of the people live below the poverty level, and the unemployment rate is approximately forty percent (40%) on the Native American reservations which comprise a large part of the Diocese. As a result, in part because of geographic location and the populations it serves, the Diocese is the poorest diocese in the United States.

F.     The geographic area of the Diocese is comprised of more Native Americans than any other diocese in the United States. There are seven (7) distinct tribes within the Diocese: the Acoma, Laguna, Zuni (Pueblo Indians), Jicarilla Apache, White Mountain Apache, Hopi, and the Navajo. The remainder of the population of the Diocese is divided among approximately thirty (30) nationalities, with the largest ethnic group being Hispanic.

G.     The mission and ministry of the Diocese are extremely important to the people in this area. There are many within the territory of the Diocese (not limited to Catholics) who depend on the services that the Diocese either delivers directly or supports, some of which are material and monetary and others of which are purely spiritual. The Diocese and the workers in the Parishes within the territory of the Diocese who minister to the Catholic faithful and promote and administer programs that benefit the people in rural New Mexico and Arizona are a stable, enriching element in the lives of all the people served in these communities.

H.    There are thirty-eight (38) active priests working in the Diocese.  Twenty-seven (27) permanent deacons also serve the Diocese along with five (5) seminarians.  A deacon is not a priest, but can perform baptisms, weddings and funerals.  In areas like the Diocese, deacons are an important part of the Catholic community and are able to augment the work of priests in these outlying areas in certain functions.  RCCDG and its missions, schools and ministries employ approximately fifty (50) people, and a significant number of additional people offer their services as volunteers.

I.    While there are a number of Catholic schools in the territory of the Diocese, all but one of those schools is either associated with, owned and operated by a Parish or is private.  The one school, Gallup Catholic School, which is pre-school through high school and is open to all students, regardless of religious affiliation (the "**Gallup School**"), is owned and operated by RCCDG.

J.    The Gallup School is funded primarily through tuition and fundraising; however, the Gallup School has historically operated at a loss and received additional financial support from RCCDG resources.  This year, I understand that the Gallup School expects to break even.

K.    There are several Catholic entities that operate within the territory of the Diocese but are separate and independent and with whom the Diocese works to carry out the mission of those organizations in particular and the Diocese in general.

L.    One of those entities is the Catholic Peoples Foundation ("**CPF**") which I understand was formed as a corporation in 1998.  CPF raises funds that support the mission and ministry of the Diocese and other Catholic organizations or entities within the territory of the Diocese through, among other things, endowments and other restricted gifts that are created for a specific mission or purpose.  I am an ex-officio member of the board of directors of CPF.

5

M.    Southwest Indian Foundation ("**SWIF**") is another of those entities which was formed as a corporation in 1968.  SWIF's mission is to provide educational and cultural support to Native Americans and to provide services and programs to lessen the poverty and unemployment among Native Americans.  SWIF's primary mode of fundraising is through its catalog sales.  SWIF's assistance is limited to Native Americans--with priority given to the elderly, handicapped and families with dependent children.  SWIF serves the Navajo, Zuni, Hopi and other pueblo tribes within the territory of the Diocese.

N.    The Diocese also works with Catholic Charities of Gallup ("**Catholic Charities**") which is also a separate corporation that provides assistance to the needy within the Diocese, especially the poor and vulnerable.  Catholic Charities provides a variety of services including housing for pregnant teens and teenage mothers with their children, transitional housing for families, hot meal programs, clothing, furniture, and other benefits and services to those most in need.

III.    **THE WORK OF THE DIOCESE.**

A.    The Diocese, through the office of the Bishop, provides support and spiritual guidance to pastors, parishes, volunteers and other faithful within its geographic territory.

B.    The Diocese solicits donations and applies for grants for the various programs that are sponsored and supported by the Diocese—all of which are part of the mission and ministry of the Diocese.  The Parishes within the territory of the Diocese also raise money for these programs.

C.    Some examples of these programs are:

1.    Academic Formation--through this program classes for deacon and lay ecclesial ministry candidates are organized and which ensures that candidates

have completed the needed training, as well as securing the appropriate teachers for the classes.

    2.       Youth Evangelization--this program provides outreach to the special needs of young people of the Diocese by, among other things, coordinating youth groups and organizing retreats.

    3.       Office of Native American Ministry--this program was recently created by me to assess and meet the spiritual needs of the Native American members of the Diocese.

D.    RCCDG carries out the business functions of the Diocese and assists the Parishes and other entities that operate within the geographic territory of the Diocese with their administrative matters. While RCCDG provides certain administrative services to the Parishes (such as administering the health insurance program for employees of RCCDG and the Parishes and administering grants that are given to Parish by the grantor) and assists the Parishes in their religious functions, the Parishes are separate entities and operate as such as I explain in more detail below.

E.    The Diocese also has a publication, *The Voice of the Southwest*, which is a newspaper distributed to homes within the Diocese. The publication provides information on news and events in the community, and each issue is distributed to approximately 12,500 homes.

F.    The Diocese also supports and operates the Sacred Heart Retreat Center ("**Retreat Center**"), located near Gallup. The property is owned by RCCDG, and the Retreat Center is an integral part of the ministry of the Diocese. It exists to serve the spiritual needs of those who utilize the facilities. The Retreat Center is a place of hospitality, quiet prayerfulness and desert

beauty and serves the needs of those who come through prayer, retreat, and spiritual and educational programs.

## IV.     THE SEX ABUSE SCANDAL AND THE PENDING LITIGATION.

A.     Unfortunately, RCCDG has not been immune from the sex abuse scandal that has affected so many entities within the Catholic Church.

B.     Formal and informal claims alleging sex abuse at the hands of priests and other workers in the Church have been asserted against RCCDG.  While as of the filing of the Reorganization Case, thirteen (13) lawsuits have been filed against RCCDG, that number does not include claims that have not resulted in lawsuits at this time either because:  (i) there was a settlement of the claim; (ii) the person reported an act to RCCDG, but did not want to pursue a claim; or (iii) RCCDG has been advised of a potential claim but no lawsuit has yet been filed.

C.     The United States Conference of Catholic Bishops adopted the "Charter for the Protection of Children and Young People" in June 2002 at its meeting in Dallas (the "**Charter**").  As part of the Charter, the Office of Child and Youth Protection was established and is responsible for assisting dioceses in implementing the Charter to ensure the consistent application of guidelines and procedures to prevent sexual abuse of minors and properly deal with allegations of misconduct.

D.     The Diocese is committed to implementation of the Charter and following the guidelines and procedures to prevent sexual abuse of minors as well as dealing proactively and diligently with allegations of misconduct, regardless of when they are alleged to have occurred.

E.     Within the Diocese, the Safe Environment Program emphasizes prevention by communication to all parishioners that abuse must be reported, requiring background checks on all adults working with minors, and requiring each school and Parish in the Diocese to appoint a

local Director of Safe Environment to oversee the local program and to submit an annual compliance report to the Diocese. In addition, all who minister with minors must successfully complete the juvenile sexual abuse training awareness program VIRTUS. VIRTUS is the brand name of the program developed and provided by the National Catholic Risk Retention Group, Inc. and it identifies best-practices programs designed to help prevent wrongdoing and promote "rightdoing" within religious organizations. Juvenile Sexual Abuse Awareness training is also part of the curriculum for all grades in all Catholic schools within the territory of the Diocese.

F.     All of these programs and services provided by RCCDG are critical and must continue to be funded and maintained so that what happened decades ago cannot be allowed to happen again.

G.     In addition, RCCDG provides counseling and other support services for those who have been sexually abused by priests or other workers in the Diocese. These programs are also critical and must continue to be funded and maintained so that the Diocese can assist in meeting the critical needs of those who were abused.

## V.     THE RELATIONSHIP BETWEEN THE DIOCESE, THE PARISHES AND CERTAIN RELATED ENTITIES.

A.     There are many Roman Catholic ecclesiastical and civil entities that operate within the geographic territory of the Diocese (or any diocese). These entities include the Parishes and some of the nonprofit entities already discussed by me in this Declaration.

B.     As the Bishop of the Diocese, I am familiar with the Parishes and the relationship between the Parishes and the Diocese. I am not a civil or canon law lawyer and do not intend to render nor am I rendering any opinion as to any civil law relationship between the Diocese and the Parishes. What I describe below is the canonical relationship between the Diocese and the

9

Parishes and other Catholic entities that operate within the territory of the Diocese pursuant to Canon Law as I understand it.

C.    Parishes are separate ecclesiastical entities in their own right and consist of established stable communities of the Christian faithful whose pastoral care is entrusted to a pastor.  Although appointed by the diocesan bishop, I understand that a pastor receives his authority to function as a pastor from the office itself.  A pastor of a parish is responsible for caring for the members of the parish community as well as being the exclusive administrator of all property belonging to the parish.

D.    In particular, the pastor of a parish is charged by Canon Law to see that the property of the parish is properly protected.  Every administrator of the property of an ecclesiastical entity, such as the bishop of a diocese or the pastor of a parish, is obligated to acquire, hold, administer and alienate such property in accordance with Canon Law.

E.    Furthermore, under Canon Law, the debts of a parish must be paid from the assets of the parish, and not from the assets of the diocese or of another parish.  Similarly, the debts of a diocese must be paid from the assets of the diocese, and not from the assets of parishes within the diocese.

F.    The diocesan bishop has an oversight or monitoring role regarding the parishes within a particular diocese to ascertain that each parish is operating in accordance with Canon Law.  The diocesan bishop has the right to receive an annual financial report from the parish but the diocesan bishop does not have the right to possess, sell, encumber or otherwise dispose of parish property.

G. About sixty percent (60%) of the Parishes within the geographic territory of the Diocese are located on Native American reservations. The Parishes located on the reservations do not own the real property on which the Parish facilities are located.

H. With regard to Parish real property not located on a reservation, in many instances I understand that RCCDG is the entity listed on the deeds to Parish property as the holder of title. However, this is simply a way of holding title and does not reflect the true ownership of the property, which belongs to each of the Parishes and is held in trust by RCCDG for the benefit of a particular Parish and its parishioners.

I. While I was at the Diocese of Phoenix and after I became Bishop of the Diocese, I generally followed the various Chapter 11 cases of dioceses and, in particular, issues related to ownership of property. As I testified earlier, the property of a parish is owned by the parish and to the extent that any Parish property is titled in the name of RCCDG, RCCDG holds that property in trust for the benefit of the Parish and its parishioners. In order to avoid any confusion about the ownership of Parish property located within the geographic territory of the Diocese, and in accordance with my obligations both as Bishop of the Diocese and my duties to the Parishes and parishioners for whom RCCDG acts as trustee, shortly before RCCDG filed this Chapter 11 reorganization case, I, on behalf of RCCDG and an authorized representative of each Parish, acting in accordance with his authority and obligations as the person responsible for Parish property, executed and caused to be recorded in the public records of the county in which the real property was located a notice of the trust relationship between RCCDG and the Parish and the beneficial interest of each Parish in the related property. The purpose of this filing was to further give notice of the trust relationship between RCCDG and the Parishes.

11

J.    All but one of the Parishes within the geographic territory of RCCDG manage their own finances and all of the Parishes operate independently of RCCDG, but in accordance with Canon Law.  RCCDG provides administrative services to all the Parishes and, to the best of my understanding, provides direct financial support for St. Anthony's Parish (McNary, AZ) because it simply does not have the resources to support itself.  Except for the services provided to St. Anthony's Parish, to the best of my understanding, RCCDG does not subsidize any of the Parishes.

K.    The Diocese receives funding from various sources, some of which I describe below.  These funds are used by RCCDG to support its business functions and by the Diocese to carry on its ministry and mission as I have described it above.  As provided under Canon Law, each Parish is assessed an amount which it is to remit to the Diocese to support its operations and ministry.  Given the financial circumstances of the Parishes and the parishioners, these assessments are not substantial and are not sufficient to support all of the operating costs of RCCDG.  Throughout the year, the Diocese also receives donations from various sources and also through the Bishop's Appeal which is the annual fundraising in which the Parishes participate (and for which the Parishes receive a portion).  Many of these donations (including many received through the Bishop's Appeal) are given for a specific purpose, in other words, the donor gives the donation on condition it is used for a specified purpose.  Some of the operating funds for the Diocese come from grant awards given by Catholic organizations such as the Catholic Extension Society.  These grants are generally applied for and awarded for a specific purpose and not for the general unrestricted use of the Diocese.

L.    The Diocese and the Parishes also collect funds for specific Catholic programs, such as support of missions.  These collections are generally done on a national or international

12

basis by parishes and dioceses throughout the world. People who donate funds do so specifically for the particular cause or program. The funds are remitted to RCCDG which holds the funds for only a short period of time and then remits them to the appropriate person or agency.

M. Since June, RCCDG has been without a chief finance officer. Deacon James Hoy was the chief finance officer of the Diocese for over fourteen (14) years. RCCDG has been attempting to hire a chief finance officer but has been unable to find a suitable person. When RCCDG made the decision to file the Reorganization Case, it became necessary to seek outside financial advice which it did with the retention of Keegan, Linscott & Kenon ("**KLK**"). Also, in order to fill the gap left by the departure of Deacon Hoy, KLK has been assisting RCCDG in other financial and accounting areas as well.

## VI.    REASONS FOR FILING REORGANIZATION CASE.

A. As sole member and director of RCCDG and as the Bishop of the Diocese and a director of the Arizona Entity, I authorized the filing of the Chapter 11 reorganization cases ("**Reorganization Case**") on November 12, 2013.

B. As I have previously testified, there are a number of lawsuits that have been filed against RCCDG, many relating to times when RCCDG does not appear to have any insurance. I also have been made aware that there are other claims which are likely to result in lawsuits in the near future. I authorized the filing of the Reorganization Case because, given the limited resources of RCCDG, I believe the best way to balance the need to bring healing to those who were harmed by the sexual abuse (through compensation, continuation of the critical programs to ensure that the harm caused by those few workers in the Church never happens again and addressing the spiritual needs of those who were harmed) with the continuing mission and ministry of the Diocese is through the filing of the Reorganization Case.

C.    Many of the claims relate to acts that occurred in the 1950's, 1960's and 1970's, although most are alleged to have occurred in the 1950's and early 1960's.  At the present time, RCCDG has been unable to find any insurance policies that would cover claims in the early years.  In addition, for the period from October 1, 1965 to December 1, 1977, RCCDG appears to have been insured through Home Insurance Company which was placed into receivership some time ago (the "**Home Coverage Period**").  I understand that at this time, any claims that fall within the Home Coverage Period are covered by the New Mexico Property and Casualty Insurance Guaranty Fund ("**New Mexico Fund**").  I understand that the New Mexico Fund is limited in amount per claim and there may also be other coverage issues.  Beginning in 1977, claims for abuse that occurred after December 1, 1977 are covered by insurance through the Catholic Mutual Group.

D.    The Diocese is the poorest diocese in the United States.  The services and ministry that the Diocese provides to the communities within its territory are extremely important to those within the territory of the Diocese, including to those residents on Native American lands.

E.    Through the Reorganization Case, it is the intent of the Diocese to formulate a plan of reorganization that will provide for:  (a) financial compensation to those harmed; (b) continuation of the counseling and other services that the Diocese provides to those who have been harmed; (c) continuation of the essential programs for the protection of children; and (d) the continued mission and ministry of the Diocese.

F.    It is vital that RCCDG be able to maintain funding of programs within the Diocese which are essential to the mission and ministry of the Diocese, as well as being able to provide for the continuation of the programs that the Diocese has put in place to educate and screen people working with the Diocese, the Parishes, the schools and other programs within the

geographic territory of the Diocese, to ensure that the children in the Diocese are protected. While I know that the mission and ministry of the Church are critical to all the communities served by various dioceses, the services provided by the Diocese to the communities within its geographic territory are particularly important given the number of parishioners who are living below the poverty level, and often unable to pursue education beyond high school (or in many cases, not even that).

G.    It is the hope and desire of RCCDG and the Diocese that all constituencies can come together quickly and confirm a plan of reorganization for RCCDG.  RCCDG will be challenged just to pay the costs of administration of the Reorganization Case, without regard to funding a plan to compensate those who have been abused; therefore, I, as Bishop, intend to make every effort to bring the Reorganization Case to as early a conclusion as possible to minimize the costs of the Chapter 11.

H.    It is the desire and intent of RCCDG to work in a collaborative and cooperative manner with all constituencies.  I believe it is in everyone's best interests to move the Reorganization Case expeditiously to conclusion.  Otherwise, estate assets will be consumed with the costs of the Chapter 11 as opposed to being primarily used to compensate those who have been harmed.

I.    It is our hope that with the participation of all of these parties we can reach a resolution that will take into account the important interests of all these constituencies and provide compensation to those harmed, provide counseling and spiritual services to those who have been harmed and still allow the Diocese to continue ministering to those within its community.

## VII.   <u>SUPPORT OF FIRST DAY MOTIONS</u>

A.    I have reviewed each of the First Day Motions.

B.    I am not a civil lawyer and do not, in this Declaration, make any statements regarding the legal effect of the First Day Motions. However, with respect to the factual statements and allegations contained therein, I testify that they are correct to the best of my knowledge, information and belief.

*[BALANCE OF PAGE LEFT INTENTIONALLY BLANK]*

If called to testify in this matter, I would testify as set forth above under penalty of perjury of the laws of the United States.

RESPECTFULLY SUBMITTED this 12th day of November, 2013.

_____
The Most Reverend James S. Wall

## CERTIFICATE OF SERVICE

Pursuant to F.R.C.P. 5(b)(3), F.R.B.P. 9036 and NM LBR 9036-1(b), I hereby certify that service of the foregoing "Declaration of Bishop James S. Wall in Support of the Petition and First Day Motions" was made on November 12, 2013 via e-mail, U.S. Mail or via the notice transmission facilities of the Bankruptcy Court's case management and electronic filing system on the following parties:

U.S. Trustee
P.O. Box 608
Albuquerque, NM 87103
ustpregion20.aq.ecf@usdoj.gov

Thomas D. Walker
Walker & Associates, P.C.
500 Marquette N.W., Suite 650
Albuquerque, NM 87102
twalker@walkerlawpc.com
*Proposed Co-Counsel for Debtor*
*and Debtor-in-Possession*

Robert E. Pastor
Montoya, Jimenez & Pastor, P.A.
3200 N. Central Ave., Suite 2550
Phoenix, AZ 85012
repastor@mjpattorneys.com
*Attorneys for Tort Claimants*

John Manly
Manly & Stewart
19100 Von Karman Ave., Suite 800
Irvine, CA 92612
jmanly@manlystewart.com
*Attorneys for Tort Claimants*

Richard T. Fass
Perdue & Kidd, LLP
510 Bering Dr., Suite 550
Houston, TX 77057
rfass@perdueandkidd.com
*Attorneys for Tort Claimants*

Pinnacle Bank of Colorado
P.O. Box 147
Fort Lupton, CO 80621
*Secured Creditor*

Ally Bank
P.O. Box 380902
Bloomington, MN 55438
*Secured Creditor*

AT&T
P.O. Box 105068
Atlanta, GA 30348
*Utility Company*

AT&T
c/o CT Corporation System
123 E. Marcy Street
Santa Fe, NM 87501
*Statutory Agent for AT&T*

Century Link
P.O. Box 29040
Phoenix, AZ 85038
*Utility Company*

18

Century Link
c/o CT Corporation System
123 E. Marcy Street
Santa Fe, NM 87501
*Statutory Agent for Century Link*

Continental Divide Electric Co-Op
P.O. Box 1087
Grants, NM 87020
*Utility Company*

Williams Acres Sanitation District
P.O. Box 577
Mentmore, NM 87319
*Utility Company*

Ferrellgas
P.O. Box 88086
Chicago, IL 60680
*Utility Company*

Ferrellgas
c/o CT Corporation System
123 E. Marcy Street
Santa Fe, NM 87501
*Statutory Agent for Ferrellgas*

New Mexico Gas Company
P.O. Box 173341
Denver, CO 80217
*Utility Company*

New Mexico Gas Company
c/o Clyde F. Worthen
201 Third Street NW, Suite 1200
Albuquerque, NM 87102
*Statutory Agent for New Mexico
Gas Company*

Century Link Business Services
P.O. Box 52187
Phoenix, AZ 85072
*Utility Company*

Century Link Business Services
c/o CT Corporation System
123 E. Marcy Street
Santa Fe, NM 87501
*Statutory Agent for Century Link
Business Services*

Gallup Propane Service
P.O. Box 1870
Gallup, NM 87305
*Utility Company*

Gallup Propane Service
c/o Wendell Nicholson
507 Cabezon Ct.
Gallup, NM 87301
*Statutory Agent for Gallup
Propane Service*

City of Gallup Joint Utilities
P.O. Box 1400
Gallup, NM 87305
*Utility Company*

Waste Management of New Mexico
P.O. Box 78251
Phoenix, AZ 85062
*Utility Company*

Waste Management of New Mexico
c/o CT Corporation System
123 E. Marcy St.
Santa Fe, NM 87501
*Statutory Agent for Waste Management
of New Mexico, Inc.*

Rosemary Trimmingham
1908 A Gladden
Gallup, NM 87301
*Employee*

Nathanael Block
P.O. Box 1449
Show Low, AZ 85902
*Employee*

Gregorio Camarena
P.O. Box 1338
Gallup, NM 87305
*Employee*

Daniel Castillo
P.O. Box 1338
Gallup, NM 87305
*Employee*

Paul Estavillo
1008 S. Strong Dr., # A
Gallup, NM 87301
*Employee*

Kevin Finnegan (Fr.)
268 Church Road
Crownpoint, NM 87313
*Employee*

Wyatt Hoy
610 S. Cliff
Gallup, NM 87301
*Employee*

Waldemar J. Kuchta (Fr.)
711 S. Puerco
Gallup, NM 87301
*Employee*

Raymond Mahlmann (Fr.)
300 Mt. Carmel Ave.
Gallup, NM 87301
*Employee*

Rene Backe, C.S.A. (Sr.)
P.O. Box 1338
Gallup, NM 87305
*Employee*

Mitchell Brown
733 Gunnison
Grants, NM 87020
*Employee*

Maria Camarena
P.O. Box 1338
Gallup, NM 87305
*Employee*

Paul Endter
3071 Red Bluff Ct.
Gallup, NM 87301
*Employee*

Timothy Farrell (Rev.)
Sacred Heart
414 N. Allen Ave.
Farmington, NM 87401
*Employee*

Suzanne Hammons
504 Zecca Dr.
Gallup, NM 87031
*Employee*

Daniel F. Kassis (Fr.)
P.O. Box 1338
Gallup, NM 87305
*Employee*

Denise Lujan
P.O. Box 2612
Milan, NM 87021
*Employee*

Majorie Mares
P.O. Box 241
Gallup, NM 87305
*Employee*

Joshua Mayer
300 Mt. Carmel
Gallup, NM 87301
*Employee*

Vera Placencio
1508 Kit Carson Drive
Gallup, NM 87301
*Employee*

Maira Sauceda
3408 Blue Hill
Gallup, NM 87301
*Employee*

Peter Short (Fr.)
St. Helena Parish
P.O. Box 229
Alpine, AZ 85920
*Employee*

David Tate
P.O. Box 1338
Gallup, NM 87305
*Employee*

Chester Todicheeinie
P.O. Box 404
St. Michaels, AZ 86511
*Employee*

Anna Biava
1503 Red Rock Dr.
Gallup, NM 87301
*Employee*

Bernadette Fuhs
P.O. Box 299
Gallup, NM 87305
*Employee*

Connie Harrington
P.O. Box 4480
Gallup, NM 87305
*Employee*

Cathy McCarthy
1590 Country Club Dr.
Gallup, NM 87301
*Employee*

Ella Roanhorse
P.O. Box 721
Gallup, NM 87305
*Employee*

Peter Short (Fr.)
415 E. Green
Gallup, NM 87301
*Employee*

Jeanette Suter
110 E. Green
Gallup, NM 87301
*Employee*

Bernice Todicheeinie
P.O. Box 404
St. Michaels, AZ 86511
*Employee*

James S. Wall (Bishop)
P.O. Box 1338
Gallup, NM 87305
*Employee*

Anne Farrell
3300 Churchrock
Gallup, NM 87301
*Employee*

Christina Guerrero
323 E. Jefferson
Gallup, NM 87301
*Employee*

Jonathan Helf
P.O. Box 472
Vanderwagen, NM 87326
*Employee*

Jean Helf
P.O. Box 472
Vanderwagen, NM 87326
*Employee*

Linda Herrera
1119 Ridgecrest
Gallup, NM 87301
*Employee*

Mary James
P.O. Box 2542
Gallup, NM 87301
*Employee*

Barbara Kozeliski
1503 Red Rock
Gallup, NM 87301
*Employee*

Harry Martinez
510 S. Third Street
Gallup, NM 87301
*Employee*

Karen Pemberton
200 Western Skies, # 17
Gallup, NM 87301
*Employee*

Cynthia Ross
509 E. Princeton
Gallup, NM 87301
*Employee*

Ann Sloan
P.O. Box 157
Vanderwagen, NM 87326
*Employee*

Chrisalda Hernandez
P.O. Box 3126
Gallup, NM 87305
*Employee*

Rachael Herrera
509 W. Green
Gallup, NM 87301
*Employee*

Victoria Joe
510 S. Third Street
Gallup, NM 87301
*Employee*

Christa Laudolff (Sr.)
P.O. Box 448
Gallup, NM 87305
*Employee*

Amy Joe Mulvaney
3223 Blue Hill Ave.
Gallup, NM 87301
*Employee*

Sharlotte Rawlings-Knowles
201 Cactus Rd.
Gallup, NM 87301
*Employee*

Jeremy Silvernail
1000 South Strong Dr.
Gallup, NM 87301
*Employee*

List of 20 Largest Unsecured Creditors

*/s/ Susan G. Boswell*
Susan G. Boswell