UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

| | |
|---|---|
| In re: | Chapter 11 |
| ROMAN CATHOLIC CHURCH OF THE DIOCESE OF GALLUP, a New Mexico corporation sole, | Case No. 13-13676-t11 |
| Debtor. | |

# DECLARATION OF CHRISTOPHER G. LINSCOTT IN SUPPORT OF FIRST DAY MOTIONS

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

I, Christopher G. Linscott, hereby declare under penalty of perjury of the laws of the United States as follows:

**A. INTRODUCTION**

1. I am an adult person, and I am a resident of Tucson, Pima County, Arizona.

2. I am a certified public accountant licensed in the State of Arizona and a shareholder of Keegan, Linscott & Kenon, P.C. ("**KLK**"), located at 33 North Stone Avenue, Suite 1100, Tucson, Arizona 85701.

3. An "Application for an Order Authorizing the Employment of Keegan, Linscott, and Kenon, P.C., as Accountant and Financial Consultant for the Debtor and Debtor-In-Possession" (the "**Application**"), and my "Verified Bankruptcy Rule 2014(a) and 2016(b) Statement of Christopher G. Linscott with respect to Debtor's Application for an Order Authorizing the Employment of Keegan, Linscott, and Kenon, P.C., as Accountant and Financial Consultant for the Debtor and Debtor-In-Possession" (the "**Linscott Statement**") will be filed in the Chapter 11 reorganization case (the "**Reorganization Case**") of the Roman Catholic Church of the Diocese of Gallup ("**RCCDG**") contemporaneously with this Declaration.

4. I hold a Master's degree in Accounting from New York University and have more than 30 years of experience in the public accounting field. Prior to forming KLK, I worked at the firms of Coopers & Lybrand (now PricewaterhouseCoopers) and Peat Marwick (now KPMG). In addition to being a Certified Public Accountant, I am a Certified Fraud Examiner, and a Certified Insolvency and Restructuring Advisor.

5. Both KLK and I have substantial experience in representing and performing services for non-profit corporations. In addition, I have substantial experience with respect to corporations sole and religious non-profit corporations. KLK was retained as the financial advisor for the Roman Catholic Diocese of Tucson and the Catholic Bishop of Northern Alaska in their Chapter 11 reorganizations, and I was the primary person responsible for KLK's work. Each successfully concluded in a confirmed plan of reorganization. KLK was also retained in the case of the Roman Catholic Bishop of San Diego. Again, I was the primary person responsible for KLK's work, and the reorganization case resulted in a settlement of a large portion of abuse claims, and an ultimate consensual dismissal of the case.

6. I have extensive experience in performing services for various constituencies in bankruptcy cases and in complex Chapter 11 cases. I have also served as a trustee in Chapter 11 cases and have extensive experience in all aspects of Chapter 11.

7. In addition, pre-petition, Quarles & Brady, LLP, RCCDG's proposed restructuring counsel, hired KLK and I to assist in analyzing RCCDG's financial affairs and to assist in preparing the Schedules and Statements and other financial related pleadings.

8. RCCDG has not had a Chief Finance Officer since June, 2013, when its prior Chief Finance Officer retired and RCCDG had not yet been able to hire a Chief Finance Officer. When KLK became involved in this matter, it became clear that RCCDG was in need of

2

additional accounting expertise as a result of the departure of its Chief Finance Officer. Since its retention, KLK has also performed certain accounting functions for RCCDG.

9. I am therefore familiar with RCCDG's accounting system and operations. I also assisted in compiling the financial information from which the First Day Motions (defined below) were created and have reviewed each of the First Day Motions (defined below).

10. I therefore submit this Declaration in support of the "<u>Motion Under 11 U.S.C. § 366 for Order Determining that Utility Providers are Adequately Protected; and Prohibiting Utility Service Providers from Altering, Refusing or Discontinuing Services</u>" (the "**Utility Motion**"), "<u>Motion for an Order Under 11 U.S.C. §§ 105, 363, and 507 Authorizing Debtor to Continue to Pay Pre-Petition Wages, Compensation and Honor Employee Benefit Plans and Programs</u>" (the "**Employee Wage and Benefit Motion**"), and "<u>Motion for Entry of an Order Authorizing Continued Use of Debtor's Cash Management System and Authorizing Maintenance of Debtor's Existing Bank Accounts</u>" (the "**Cash Management Motion**" and collectively with the Utility Motion and the Employee Wage and Benefit Motion, the "**First Day Motions**") filed in the United States Bankruptcy Court for the District of New Mexico on November 12, 2013 (the "**Petition Date**") and with respect to the Reorganization Case.

11. I make this Declaration based upon: (a) my personal knowledge; and (b) the books and records of RCCDG.

B.  **FINANCIAL POSITION OF RCCDG**

12. Since early September of this year, KLK has been assisting in the day to day financial and accounting functions of RCCDG. As a result, I and the staff I supervise who have been working on RCCDG matters have gained an in depth understanding of the financial operations of RCCDG.

13. RCCDG has very limited financial resources. RCCDG has two primary functions—operation of the Gallup School and its general mission and ministry (the "**Mission and Ministry**") which it provides through Diocesan programs, ministry, outreach and services.

14. Until this year, Gallup School operated at a loss, and the shortfall was funded from other sources within RCCDG. This year, the Gallup School expects to operate at break even.

15. The Diocese obtains funds from a number of sources: (i) from a modest assessment of the Parishes that receive sufficient collections from their parishioners to pay the assessment; (ii) from donations including donations received through the annual bishop's appeal; and (iii) from grants. Donations made to the Diocese are made as either restricted donations where the donor specifies, as a condition of the donation, that it be used for a specific purpose or as unrestricted donations which allows the Diocese to use the donation for any purpose, including payment of operating expenses. Grants that the Diocese receives for its own benefit (as opposed to grants for the Parishes that are administered by RCCDG), are generally restricted for a particular purpose or program. RCCDG also receives and holds collections in Parishes that are commonly referred to as "second collections" for remittance to the program for which the collection is made. Generally these "second collections" are for national or international programs which are supported by parishes and other Catholic entities. These collections are not for the use of RCCDG or any of the Parishes or other Catholic organizations within the geographic territory of the Diocese and are merely remitted to RCCDG for ultimate transmittal to the administrator of the program or fund for which the collection is requested. Accordingly, these collections are merely in the custody but not the control of RCCDG (collectively, the "**Custodial Funds**").

16. RCCDG does not now nor has it historically had excess operating funds. RCCDG: (i) does not own any investment, commercial or significant income-producing property; (ii) does not and has not historically had investment accounts except for an account internally designated for support of nuns in the approximate amount of $35,000; and (iii) does not have substantial excess real estate assets that it has or could sell to fund its Mission and Ministry or to fund payments to sex abuse claimants. Donations to the Diocese, restricted or unrestricted, are not substantial. For example, as of June 30, 2013, the total income for the year for RCCDG was approximately $2,796,000 which included restricted donations and grants.

17. Generally RCCDG operates on a break even basis so that it does not have substantial reserves to draw upon and must be able to fund operations and its programs from funds as they are received. Therefore, any drop in donations or grants has an immediate and detrimental impact on RCCDG and the Diocese's ability to fulfill its Mission and Ministry, including funding programs for the protection of minors and counseling and other services for those who were harmed by sexual abuse within the geographic area of the Diocese.

C. **THE UTILITY MOTION**

18. In the course of its ministry and operations, RCCDG has business relationships with certain utility providers (the "**Utility Provider(s)**"). Most of these relationships are longstanding. Also, Gallup Catholic Schools ("**Gallup School**"), which is part of RCCDG, requires utility services to continue providing educational and other services to its students.

19. As of the Petition Date, the Utility Providers identified on "Schedule 1" to the Utility Motion provided utility services necessary for RCCDG to continue its operations at various locations (including Gallup School), the administrative offices for the Diocese (generally referred to

as the "**Chancery**"), the Sacred Heart Retreat Center, the residential complex where the Bishop and priests reside, residences for religious Sisters, and other residences owned by RCCDG.

20. As of the Petition Date, RCCDG was not delinquent on any of its prepetition obligations to Utility Providers who supply services to RCCDG. Furthermore, due to the longstanding relationship RCCDG has with the Utility Providers, none of the Utility Providers has required RCCDG to provide any kind of security deposit prepetition.

21. RCCDG will pay the Utility Providers for post-petition services in the ordinary course in accordance with the business practices that RCCDG and the Utility Providers have established over the years.

D. **THE EMPLOYEE WAGE AND BENEFIT MOTION**

22. RCCDG employs approximately fifty people (six of whom are part-time employees, that is, employees who work less than twenty-eight hours per week). These employees work at the Chancery, the Sacred Heart Retreat Center and the Gallup School (collectively, the "**Employees**").

23. The Employees are critical to RCCDG's ability to continue to provide the services to the Parishes and others within the geographic area of the Diocese and to carry on its mission and ministry.

   i. **Employee Wage Obligations.**

24. RCCDG's payroll beginson the first and sixteenth days of each month (each a "**Payroll Period**") and is paid in arrears; however, not all employees are paid at each Payroll Period. All employees, except clergymen, are paid during every pay period (i.e., approximately twice a month). Clergymen, including seminarians, priests, and Bishop Wall, are paid only once a month in the payroll at the beginning of the month. Therefore, as of the Petition Date, RCCDG has accrued payroll tax and other withholding obligations for the Payroll Period between October

16, 2013, and October 31, 2013 (the "**October 16 Payroll Period**") for employees (other than clergymen). In addition, RCCDG has accrued Withholding Obligations (defined below) for all its employees (including clergymen) for the Payroll Period between November 1, 2013, and the Petition Date.

25. But for the filing of the Reorganization Case, employees (other than clergymen) would receive paychecks for the October 16 Payroll Period on Friday, November 15. These employees depend upon their paychecks to pay for their basic living expenses such as food, clothing and housing. In order to ensure that employees are paid timely if the Court approves the Employee Wage and Benefit Motion, prior to the filing of the Reorganization Case, RCCDG obtained cashier's checks for all employees to be paid on November 15 and is holding those checks (the "**Employee Cashier's Checks**"). Therefore, the funds necessary to pay the employees were debited against RCCDG's funds pre-petition. However, the withholding taxes and other deductions from the employee's wages (the "**Withholding Obligations**") will not have been remitted to the appropriate payees entitled to those amounts. In addition, the Employee Cashier's Checks were not delivered to the employees prior to filing the Reorganization Case. If the Court approves the Employee Wage and Benefits Motion, RCCDG will distribute the Employee Cashier's Checks to the employees. The employees who receive the Employee Cashier's Checks for the October 16th Payroll Period are the same employees and the amounts of the Employee Cashier's Checks for each employee is approximately the same amount as stated in Exhibit "A" to the Employee Wage and Benefit Motion for each employee. Because of the confidential information contained in Exhibit "A," RCCDG has requested permission to file Exhibit "A" under seal.

26. In addition, if the Court approves the Employee Wage and Benefit Motion, RCCDG will also remit the Withholding Obligations by wire transfer to transfer to RCCDG's payroll processor, Interlogic Outsourcing, Inc. ("**IOI**"). A summary of the pre-petition Withholding Obligations that will be paid if the Employee Wage and Benefit Motion is approved are detailed in Exhibit "A" to the Employee Wage and Benefit Motion.

27. Furthermore, in the ordinary course, RCCDG uses IOI for payroll services and transmits all amounts owed for payroll to IOI. IOI processes the payroll for the applicable period and (i) remits appropriate amounts to various federal and state taxing agencies for federal and state taxes, social security, and Medicare; and (ii) issues paychecks or completes ACH transactions for each employee's net payroll to each employee. Once the funds are transferred from RCCDG to IOI, they are no longer property of the estate. IOI issues checks (or ACH transactions) to RCCDG's employees from an IOI account; therefore, any pre-petition payroll checks that have been debited against IOI's accounts as of the Petition Date should be honored without interruption because any funds remaining in IOI's account of the Petition Date to cover those checks are not property of the estate.

28. RCCDG intends to use IOI post-petition to process its payroll and manage the various payroll-related transactions and reports that an employer is required to file or pay.

### ii. Employee Benefit Programs.

29. RCCDG provides certain benefits to its forty-four full-time employees, which differ depending on whether the employee is (i) a clergyman, or (ii) a non-clergyman working in (a) the Chancery or (b) the Gallup School. RCCDG desires to keep these benefits in place post-petition, in the ordinary course of RCCDG's operations and to honor any such benefits which accrued pre-petition. Such benefits can broadly be characterized as insurance-related or retirement-related

8

benefits that recur regularly, and employee leave-related benefits that do not recur on a predictable or regular basis.

### a) Regularly-Recurring Benefits

30. The first category of benefits recurs regularly. The cost of such benefits is divided between RCCDG and its employees. The percentage of the costs paid by RCCDG are set forth in Exhibit "B" to the Employee Wage and Benefit Motion which RCCDG is also requesting be filed under seal. These benefits are ongoing, and include medical insurance, dental insurance, term life and accidental death and dismemberment insurance, long-term disability insurance, workers' compensation insurance, and retirement plans with the portion paid by RCCDG described in Exhibit "B." In addition to offering these programs to RCCDG employees, employees of the Parishes, St. Joseph School in San Fidel, New Mexico, and CPF may also participate in the medical and related insurance. However, the costs for these employees are paid in whole by the applicable Parish, St. Joseph's School, or CPF, and the applicable employee. RCCDG does not fund any portion of those costs for the Parishes, St. Joseph's School or any other schools (other than Gallup School), CPF, or their employees. KLK is finalizing the monthly amount paid by RCCDG for RCCDG's own employees participating in these programs as well as any pre-petition amounts that need to be paid to keep such programs in effect. When those amounts are determined, they will be provided to the Court and other interested parties.

### b) Other Benefits: Vacation Time and Sick Time.

31. In addition to the foregoing, RCCDG provides its employees with certain paid leave, a benefit that does not necessarily recur regularly for each pay period, but rather is used as necessary or in the employees' discretion. For clergymen and the other employees of RCCDG's

9

administrative offices, RCCDG implements certain leave policies that are different from those applicable to employees that work at the Gallup School.

### 1. Policies Applicable to Chancery Employees.

32. Chancery employee benefits consist of sick leave and vacation time. Each clergyman and other employee receives the annual allocation of his or her vacation time on January 1 of each year.

33. Employees who have been employed by RCCDG for five years or less are entitled to ten days vacation. Employees who have been employed by RCCDG for more than five years but less than ten are entitled to fifteen days vacation. Clergymen and other employees who have been employed by RCCDG more than ten years are entitled to twenty days vacation.

34. Vacation time does not roll over from year to year. Each clergyman or other employee must use his or her allotted time before the end of the year, or it is forfeited. If a clergyman or other employee terminates employment on or before December 31, 2013, the priest or other employee will receive any unused vacation time for that year as a cash payment.

35. With respect to sick time, sick leave is earned at the rate of seven hours per month for all clergymen and other employees of the Chancery regardless of years of service.

36. Sick leave hours do roll over from year to year, and may be accumulated indefinitely up to termination of employment. Sick time may not, however, be "cashed out" if employment is terminated.

37. Even when the monetary value of the pre-petition accrued wages, vacation, and sick leave are totaled for each employee, such totals do not exceed $12,275.00 for any single employee.

## 2. Policies Applicable to Employees of the Gallup School.

38. Full-time employees of the Gallup School receive five days of paid "personal time" per school year instead of sick leave or vacation.

39. In the event a Gallup School employee requires additional time off, such time is unpaid and teachers must reimburse the school $50 per day for such time to defray the cost of a substitute teacher. Use of such time is counted in increments of whole days and half days. For example, if an employee is gone for an hour or two, the absence is counted as a half day absence.

40. The five days of personal time accrue at the beginning of the school year and do not roll over from year to year.

41. If an employee of the Gallup School terminates employment prior to the end of the school year, the employee is not entitled to receive any vacation time remaining to him or her as a cash payment.

42. Currently, the employees of the Gallup School are owed $7,618.60 collectively for personal leave that accrued pre-petition but would be used post-petition by the employees of Gallup School; therefore, the amount of personal leave to be used by any one employee does not exceed $12,275.

### E. THE CASH MANAGEMENT MOTION

43. RCCDG utilizes different cash management systems for the Chancery and for Gallup School.

44. The Chancery maintains three checking accounts, the Operating Account, the Custodial Account, and the Payroll Account.

45. Until very recently, RCCDG maintained accounts at Bank of Colorado doing business as Pinnacle Bank ("**Pinnacle Bank**"). However, Pinnacle Bank is not an Approved Depository Institution as required by the UST's Operating Guidelines, and it is my understanding

that Pinnacle Bank did not desire to become an Approved Depository Institution. Therefore, in anticipation of the filing of the Reorganization Case and for other reasons, RCCDG moved its bank accounts (the "**Pinnacle Accounts**") to Wells Fargo Bank (which is an Approved Depository Institution) shortly before the Petition Date and opened a savings account that corresponds to each checking account to obtain reduced banking fees (collectively, the "**DIP Accounts**"). The Pinnacle Accounts and the DIP Accounts are listed by entity on **Exhibit 1** to the Cash Management Motion.

46. RCCDG had instituted ACH transactions with respect to the Pinnacle Accounts so that grant funds, pledges and other payments to RCCDG are automatically deposited or electronically transferred to one or more of the Pinnacle Accounts. In addition, RCCDG had established certain automatic payment activity out of the Pinnacle Accounts. Because it will take some time to notify the payors of the change in bank accounts and ensure that the automated deposits are now made to the DIP Accounts, RCCDG left one or more of the Pinnacle Accounts open. However, RCCDG is in the process of moving the automated deposit and payment activity into the DIP Accounts from the Pinnacle Accounts, and will close the Pinnacle Accounts as soon as all automated deposit and payment activity has been transferred.

47. The Operating Account is the account through which substantially all of RCCDG's administrative deposit and payment activity occurs.

48. The Custodial Account is the centralized account into which the Custodial Funds are deposited which RCCDG accounts for by source and destination. I previously testified in this Declaration regarding the nature of the Custodial Funds.

49. As I previously testified, the Diocese also receives restricted donations or grants which it utilizes for the purpose designated by the donor or granting agency ("**Restricted**

12

**Funds**"). Restricted Funds are deposited into the Operating Account but accounted for on the books and records of RCCDG and amounts reserved in the Operating Account.

50. The Payroll Account serves the Chancery and the Gallup School and, as I previously testified, is controlled by IOI. RCCDG and the Gallup School deposit funding for their third-party payroll service, IOI into the Payroll Account to sweep.

51. IOI provides a website and database into which each of the administrative offices and the Gallup School input their payroll information. After the information is input, the payroll amounts due to employees and various federal and state taxing agencies are calculated. The administrative offices and the Gallup School then deposit their respective shares of the payroll into the Payroll Account, which is automatically swept by IOI.

52. Except for payroll, which is centralized using the Payroll Account, and any grants or restricted gifts (which are centralized using the Operating Account), the Gallup School operates its cash management system separately from RCCDG's administrative office. The Gallup School also maintains an Activities account which is also maintained at Wells Fargo Bank and is included in the definition of the DIP Accounts in this Declaration.

53. The Operating Accounts and the Payroll Account for RCCDG and Gallup School at Pinnacle Bank remain open and it is beneficial for RCCDG and Gallup School that those Pinnacle Bank Accounts remain open at least for another forty-five days until all agencies and individuals who are parties to ACH transactions or automatic deposits or withdrawals can be transitioned to the DIP Accounts with the least disruption possible. Given RCCDG's financial condition, any disruption in its cash flow will be detrimental. Even though these three Pinnacle Bank Accounts will remain open, the accounts will be swept on a weekly basis and any monies

in the Pinnacle Bank Accounts will be deposited into the appropriate DIP Account, and no checks will be written on the Pinnacle Bank Accounts.

54. There is a checking account that is used by the Sisters Council of the Diocese in performing their mission and ministry on behalf of the Diocese. It is an account that is maintained at Bank of America (the "**Sisters Account**"). The Sisters Account will be closed and a new account opened so there is no relief requested with respect to the Sisters Account.

55. In anticipation of the filing of the Reorganization Case, all withdrawals and payments made out of the DIP Accounts has been by wire transfer or cashier's checks. Therefore, there are no checks or other payments that are outstanding and unpaid as of the Petition Date.

56. Although RCCDG does not have a complicated cash management system, it has limited staff and limited funds. Because of its limited staff, because Pinnacle Bank did not want to become an Approved Depository Institution and for other reasons, it was determined that it would be better for RCCDG to move the Pinnacle Accounts before filing the Reorganization Case and open the DIP Accounts than waiting until after filing the Reorganization Case. Therefore, it would be disruptive to RCCDG and more expensive if it was required to now close the DIP Accounts and open new DIP Accounts. In addition, since there are no pre-petition checks written on the DIP Accounts that are in transit and which might erroneously be paid, one of the significant reasons for requiring that bank accounts be closed upon filing of a Chapter 11 case has already been dealt with.

If called to testify in this matter, I would testify as set forth above under penalty of perjury of the laws of the United States.

RESPECTFULLY SUBMITTED this 12th day of November, 2013.

_____
Christopher Linscott

# CERTIFICATE OF SERVICE

Pursuant to F.R.C.P. 5(b)(3), F.R.B.P. 9036 and NM LBR 9036-1(b), I hereby certify that service of the foregoing "Declaration of Christopher G. Linscott in Support of First Day Motions" was made on November 12, 2013 via e-mail, U.S. Mail or via the notice transmission facilities of the Bankruptcy Court's case management and electronic filing system on the following parties:

U.S. Trustee
P.O. Box 608
Albuquerque, NM 87103
ustpregion20.aq.ecf@usdoj.gov

Thomas D. Walker
Walker & Associates, P.C.
500 Marquette N.W., Suite 650
Albuquerque, NM 87102
twalker@walkerlawpc.com
*Proposed Co-Counsel for Debtor
and Debtor-in-Possession*

Robert E. Pastor
Montoya, Jimenez & Pastor, P.A.
3200 N. Central Ave., Suite 2550
Phoenix, AZ 85012
repastor@mjpattorneys.com
*Attorneys for Tort Claimants*

John Manly
Manly & Stewart
19100 Von Karman Ave., Suite 800
Irvine, CA 92612
jmanly@manlystewart.com
*Attorneys for Tort Claimants*

Richard T. Fass
Perdue & Kidd, LLP
510 Bering Dr., Suite 550
Houston, TX 77057
rfass@perdueandkidd.com
*Attorneys for Tort Claimants*

Pinnacle Bank of Colorado
P.O. Box 147
Fort Lupton, CO 80621
*Secured Creditor*

Ally Bank
P.O. Box 380902
Bloomington, MN 55438
*Secured Creditor*

AT&T
P.O. Box 105068
Atlanta, GA 30348
*Utility Company*

AT&T
c/o CT Corporation System
123 E. Marcy Street
Santa Fe, NM 87501
*Statutory Agent for AT&T*

Century Link
P.O. Box 29040
Phoenix, AZ 85038
*Utility Company*

Century Link  
c/o CT Corporation System  
123 E. Marcy Street  
Santa Fe, NM 87501  
*Statutory Agent for Century Link*

Williams Acres Sanitation District  
P.O. Box 577  
Mentmore, NM 87319  
*Utility Company*

Ferrellgas  
c/o CT Corporation System  
123 E. Marcy Street  
Santa Fe, NM 87501  
*Statutory Agent for Ferrellgas*

New Mexico Gas Company  
c/o Clyde F. Worthen  
201 Third Street NW, Suite 1200  
Albuquerque, NM 87102  
*Statutory Agent for New Mexico Gas Company*

Century Link Business Services  
c/o CT Corporation System  
123 E. Marcy Street  
Santa Fe, NM 87501  
*Statutory Agent for Century Link Business Services*

Gallup Propane Service  
c/o Wendell Nicholson  
507 Cabezon Ct.  
Gallup, NM 87301  
*Statutory Agent for Gallup Propane Service*

Waste Management of New Mexico  
P.O. Box 78251  
Phoenix, AZ 85062  
*Utility Company*

Continental Divide Electric Co-Op  
P.O. Box 1087  
Grants, NM 87020  
*Utility Company*

Ferrellgas  
P.O. Box 88086  
Chicago, IL 60680  
*Utility Company*

New Mexico Gas Company  
P.O. Box 173341  
Denver, CO 80217  
*Utility Company*

Century Link Business Services  
P.O. Box 52187  
Phoenix, AZ 85072  
*Utility Company*

Gallup Propane Service  
P.O. Box 1870  
Gallup, NM 87305  
*Utility Company*

City of Gallup Joint Utilities  
P.O. Box 1400  
Gallup, NM 87305  
*Utility Company*

Waste Management of New Mexico  
c/o CT Corporation System  
123 E. Marcy St.  
Santa Fe, NM 87501  
*Statutory Agent for Waste Management of New Mexico, Inc.*

17

Rosemary Trimmingham
1908 A Gladden
Gallup, NM 87301
*Employee*

Nathanael Block
P.O. Box 1449
Show Low, AZ 85902
*Employee*

Gregorio Camarena
P.O. Box 1338
Gallup, NM 87305
*Employee*

Daniel Castillo
P.O. Box 1338
Gallup, NM 87305
*Employee*

Paul Estavillo
1008 S. Strong Dr., # A
Gallup, NM 87301
*Employee*

Kevin Finnegan (Fr.)
268 Church Road
Crownpoint, NM 87313
*Employee*

Wyatt Hoy
610 S. Cliff
Gallup, NM 87301
*Employee*

Waldemar J. Kuchta (Fr.)
711 S. Puerco
Gallup, NM 87301
*Employee*

Raymond Mahlmann (Fr.)
300 Mt. Carmel Ave.
Gallup, NM 87301
*Employee*

Rene Backe, C.S.A. (Sr.)
P.O. Box 1338
Gallup, NM 87305
*Employee*

Mitchell Brown
733 Gunnison
Grants, NM 87020
*Employee*

Maria Camarena
P.O. Box 1338
Gallup, NM 87305
*Employee*

Paul Endter
3071 Red Bluff Ct.
Gallup, NM 87301
*Employee*

Timothy Farrell (Rev.)
Sacred Heart
414 N. Allen Ave.
Farmington, NM 87401
*Employee*

Suzanne Hammons
504 Zecca Dr.
Gallup, NM 87031
*Employee*

Daniel F. Kassis (Fr.)
P.O. Box 1338
Gallup, NM 87305
*Employee*

Denise Lujan
P.O. Box 2612
Milan, NM 87021
*Employee*

Majorie Mares
P.O. Box 241
Gallup, NM 87305
*Employee*

Joshua Mayer
300 Mt. Carmel
Gallup, NM 87301
*Employee*

Vera Placencio
1508 Kit Carson Drive
Gallup, NM 87301
*Employee*

Maira Sauceda
3408 Blue Hill
Gallup, NM 87301
*Employee*

Peter Short (Fr.)
St. Helena Parish
P.O. Box 229
Alpine, AZ 85920
*Employee*

David Tate
P.O. Box 1338
Gallup, NM 87305
*Employee*

Chester Todicheeinie
P.O. Box 404
St. Michaels, AZ 86511
*Employee*

Anna Biava
1503 Red Rock Dr.
Gallup, NM 87301
*Employee*

Bernadette Fuhs
P.O. Box 299
Gallup, NM 87305
*Employee*

Connie Harrington
P.O. Box 4480
Gallup, NM 87305
*Employee*

Cathy McCarthy
1590 Country Club Dr.
Gallup, NM 87301
*Employee*

Ella Roanhorse
P.O. Box 721
Gallup, NM 87305
*Employee*

Peter Short (Fr.)
415 E. Green
Gallup, NM 87301
*Employee*

Jeanette Suter
110 E. Green
Gallup, NM 87301
*Employee*

Bernice Todicheeinie
P.O. Box 404
St. Michaels, AZ 86511
*Employee*

James S. Wall (Bishop)
P.O. Box 1338
Gallup, NM 87305
*Employee*

Anne Farrell
3300 Churchrock
Gallup, NM 87301
*Employee*

Christina Guerrero
323 E. Jefferson
Gallup, NM 87301
*Employee*

Jonathan Helf
P.O. Box 472
Vanderwagen, NM 87326
*Employee*

Jean Helf
P.O. Box 472
Vanderwagen, NM 87326
*Employee*

Linda Herrera
1119 Ridgecrest
Gallup, NM 87301
*Employee*

Mary James
P.O. Box 2542
Gallup, NM 87301
*Employee*

Barbara Kozeliski
1503 Red Rock
Gallup, NM 87301
*Employee*

Harry Martinez
510 S. Third Street
Gallup, NM 87301
*Employee*

Karen Pemberton
200 Western Skies, # 17
Gallup, NM 87301
*Employee*

Cynthia Ross
509 E. Princeton
Gallup, NM 87301
*Employee*

Ann Sloan
P.O. Box 157
Vanderwagen, NM 87326
*Employee*

Interlogic Outsourcing, Inc.
4300 N. Miller Rd., Ste. 151
Scottsdale, AZ 85251
*Payroll Service*

Chrisalda Hernandez
P.O. Box 3126
Gallup, NM 87305
*Employee*

Rachael Herrera
509 W. Green
Gallup, NM 87301
*Employee*

Victoria Joe
510 S. Third Street
Gallup, NM 87301
*Employee*

Christa Laudolff (Sr.)
P.O. Box 448
Gallup, NM 87305
*Employee*

Amy Joe Mulvaney
3223 Blue Hill Ave.
Gallup, NM 87301
*Employee*

Sharlotte Rawlings-Knowles
201 Cactus Rd.
Gallup, NM 87301
*Employee*

Jeremy Silvernail
1000 South Strong Dr.
Gallup, NM 87301
*Employee*

Wells Fargo Bank, N.A.
300 W. Aztec
Gallup, NM 87301
*Party-in-Interests*

List of 20 Largest Unsecured Creditors

/s/ *Susan G. Boswell*
Susan G. Boswell