# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW MEXICO

| | |
|---|---|
| In re:<br><br>ROMAN CATHOLIC CHURCH OF THE DIOCESE OF GALLUP, a New Mexico corporation sole,<br><br>                        Debtor.<br><br>Jointly Administered with:<br><br>BISHOP OF THE ROMAN CATHOLIC CHURCH OF THE DIOCESE OF GALLUP, an Arizona corporation sole.<br><br>This pleading applies to:<br><br>   ☒   All Debtors.<br>   ☐   Specified Debtor. | Chapter 11<br><br>Case No. 13-13676-t11<br><br>**Jointly Administered with:**<br><br>Case No. 13-13677-t11 |

### DEBTORS' RESPONSE TO "ORDER TO SHOW CAUSE AND NOTICE OF HEARING" [DKT. NO. 441]

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

The Roman Catholic Church of the Diocese of Gallup, a New Mexico corporation sole ("**RCCDG**"), and the Bishop of the Roman Catholic Church of the Diocese of Gallup, an Arizona corporation sole (the "**Arizona Entity**"), the debtors and debtors-in possession (collectively the "**Debtors**") in the above-captioned jointly administered cases (the "**Reorganization Cases**"), by and through their attorneys undersigned, hereby respond to the Court's requests for additional information in the "Order to Show Cause and Notice of Hearing" [Dkt. No. 441] (the "**OSC**").

As detailed below, the Debtors conducted, in accordance with the "Amended Order Granting Motion to (I) Retain Brokers; (II) Sell Property Under 11 U.S.C. § 363(b), (f), and (m); and (III) Approve Sale Procedures" [Dkt. No. 394] (the "**Sale Order**"), two real estate auctions

("**Auctions**") to sell all property identified in Exhibit A to the "<u>Amended Notice of Auction of Property</u>" (the "**Sale Assets**"). The Auctions should not be invalidated. They were publicly announced and marketed to encourage bidders to attend and bid on the Sale Assets; no <u>bidders</u> were excluded from the Auctions, and (3) the results of the Auctions (and all information about the Auctions prior to their occurrence) were filed publicly by the Debtors or made available to the public by the Accelerated Marketing Group, Inc. The Auctions were more successful than the Debtors had hoped in that all Sale Assets were sold, and sold for prices in excess of what the Debtors believed could be achieved. For these and other reasons, as detailed below, the Auctions should not be invalidated.[1]

## I. <u>FACTUAL BACKGROUND</u>.

On November 12, 2013 (the "**Petition Date**"), the Debtors commenced these Reorganization Cases by filing voluntary Chapter 11 petitions. The Debtors have remained debtors-in-possession under 11 U.S.C. §§ 1107 and 1108 since the Petition Date. The Debtors filed the Reorganization Cases in order to reorganize their financial affairs pursuant to a plan of reorganization that will, among other things, fairly, justly and equitably compensate the victims of sexual abuse by clergy or others associated with the Debtors while allowing the Debtors to continue their ministry and mission and attempt to finally bring healing to victims, parishioners and others affected by the past acts of sexual abuse committed by clergy and others.

As the Court is aware, there is limited insurance for the claims of sexual abuse and there is very little property owned by the Debtors. Throughout the Reorganization Cases, the Debtors have attempted to maximize the value of such assets for creditors. The Auctions were one facet

---

[1] In all events, the persons who complained to the Court about the Auctions complained only about the September 19, 2015 Auction conducted in Albuquerque, New Mexico, and not the prior September 12, 2015 Auction conducted in Phoenix, Arizona. Therefore, to the extent any Auction is questioned, such questions should apply only to the New Mexico Auction.

of the Debtors' ability to realize value for creditors. The Debtors therefore requested, and the Court issued, the Sale Order. The Sale Order did not require the Debtors to allow anyone who was not bidding to attend the Auctions. (Such procedure is not standard; non-bidders are routinely prohibited from attending real estate auctions, as they cannot enhance bidding and have potential to disrupt the process or chill bidding. *See* "Declaration of Todd Good," attached hereto as **Exhibit "1"** ("**Good Declaration**") at ¶ 20.

Prior to filing the Sale Motion, the Debtors consulted with the Committee both with respect to the property to be included as well as the process for the Auctions. *See* "Declaration of Susan G. Boswell," attached hereto as **Exhibit "2"** ("**Boswell Declaration**"). The properties were challenging to sell due to their remote locations. *Id.* at ¶ 6. Moreover, some of the locations of the properties were uncertain. *Id.* The Debtors lacked comprehensive asset schedules at the beginning of the reorganization cases, and significant time was spent by Debtors' counsel in identifying and locating properties owned by the Debtors and not held in trust for third parties. *Id.* This was done by telephone and "on paper" by Debtors' counsel, but, as described further below, was physically verified by Mr. Todd Good. *Id.*

In accordance with the Sale Order, the Debtors remitted $45,000 to the Accelerated Marketing Group for the purpose of marketing the Auctions. *See* Good Declaration at ¶ 13. These funds were used for a variety of purposes, including physically posting signs on each of the Sale Assets and purchasing advertising for the Auctions. Mr. Good personally visited each of the Sale Assets to verify its existence and location (which required additional visits to county assessor and recording office) and to post signs regarding the Auctions at each of the Sale Assets. *Id.* at ¶ 8.

The Auctions were extensively marketed regionally and locally and even appeared in some national publications. *Id.* at ¶ 9. In addition to the press release regarding the Auctions, which was picked up by numerous media outlets, the Tucson *Daily Star* newspaper ran a special story on the Auctions. *Id.* and Exs. B and C thereto.

All advertising for the Auctions, including the press releases, advised interested persons to contact the Accelerated Marketing Group for information. *Id.* at p. ¶ 10. Potential bidders were advised that a cashier's check would be required upon arrival at the Auctions as proof of financial wherewithal for bidding. *Id.* at ¶ 11. The amount of the cashier's check required was set forth in the information packet provided to potential bidders, as was the fact that bidders had to pre-register. *Id.* and Ex. D thereto.

Ultimately, the Debtors received more than $45,000 worth of marketing funding, because the Auctions were conducted at the same time and place scheduled for the auction of other properties that were more valuable than the Sale Assets. *Id.* at ¶ 13. Because of Mr. Good's efforts to maximize the value of the Sale Assets that could be obtained at Auction, the timing and the marketing conducted for the other, more desirable properties, benefitted the Auctions by drawing in bidders that may not have otherwise been attracted if the Sale Assets were the only properties being auctioned. *Id.* at ¶ 14; *see* list of third-party owned properties at Ex. D.

Bidders were required to provide proof of financial wherewithal (in the form of a cashier's check) to avoid waste of time and unclosed sales. *Id.* at ¶ 16. All persons wishing to bid on the Sale Assets, and who arrived with cashier's checks in the appropriate amounts, were admitted to the Auctions. *Id.* at ¶ 17. No one appeared at the Arizona Auction except bidders. *Id.* at ¶ 18. The only two people who were turned away from the Auction conducted in New Mexico were two people who stated they were not going to bid on the Sale Assets. *Id.* at ¶ 19. It

is customary for the auctioneer not to admit non-bidders to an auction. *Id.* at ¶ 20. It is the auctioneer's experience that non-bidders do not increase bid prices. *Id.* Rather, they have the potential to distract legitimate potential buyers or to chill bidding. *Id.* It is therefore the auctioneer's standard policy not to admit persons that do not intend to bid at an auction. *Id.*

Mr. Good advised counsel for the Debtors that two non-bidders were being turned away from the New Mexico Auction. After the New Mexico Auction had concluded, counsel for the Debtors advised counsel for the Committee that two non-bidders had been turned away from the Auction. To date, the Committee has not raised any issue with this process. *See* Ex. 2 at ¶ 10.

The Debtors also filed notices with the Court regarding the Sale Assets and the time and place of the Auctions. *See* Dkt. Nos. 426 and 433.

The Debtors also filed a report after each Auction stating the amounts received by the Debtors for each of the Sale Assets. Dkt. Nos. 435 and 436.

## II. LEGAL ARGUMENT.

### A. The Auctions Complied with the Sale Order; No Bidders Were Excluded.

The Auctions complied with the Sale Order and were public auctions, in that anyone wishing to bid on the Sale Assets was permitted to bid. All advertising for the Auctions notified bidders that they needed to contact Accelerated Marketing Group for more information about the sale. Ex. 1 at ¶ 10. Accelerated Marketing Group's website specifically notes as follows:

> **Q. What happens on auction day?**
> **A.** Arrive one-half to one hour early on auction day to register to bid. Bring a Cashiers Check in the correct amount and made payable as instructed, in order to bid. The winning bidder will be required to sign the Purchase and Sale Contract immediately following the auction.

*See http://amgre.com/faq.php#b1* (last accessed October 5, 2015). Additionally, the information packet provided to all potential bidders expressly noted the requirement to register and to bring a

cashier's check to the Auctions. *Id.* at ¶ 11. Bidders are required to provide proof of financial wherewithal to avoid waste of time and unclosed sales. *Id.* at ¶ 16.

In questioning whether the Auctions were public auctions, the Court cited the case of *In re Aloha Airlines, Inc.*, 2009 WL 1065162. In that case, the court stated that, "It appears that there was selective exclusion of certain persons who wished to observe [the auction] and selective admission of others." *Id.* at p. 2. That apparent discrimination appeared to be the factor most concerning to the *Aloha* court, which characterized the fault as "selective exclusion of the press" rather than "exclusion of the press." *Id.* In this case, there was no "selective" exclusion. Everyone who wished to bid on the Sale Assets was admitted to the Auction. No one that did not intend to bid was admitted. (Only two people did not intend to bid at the Auctions and therefore only two people were not admitted; these are presumably the two people who wrote the letters attached to the OSC as Exhibit "A.") Therefore, the "selective" or discriminatory exclusion that concerned the *Aloha* court was not present in this case, and the Auctions do not need to be invalidated.

### B. The Sale Results Likely Cannot Be Replicated.

Another important reason for not invalidating the Auctions is that the good results obtained at the Auctions likely cannot be replicated. As noted, the Auctions benefitted from synergy with third-party-owned properties that were slated for auction at the same time as the Sale Assets. Absent these third party-owned properties, fewer bidders would likely have attended the Auctions. Additionally, the Auctions received publicity from the marketing of the time and place for auction of the third-party-owned properties that the Debtors could not otherwise have afforded to purchase, over and above the Debtors' marketing funds. Were the Auctions to be invalidated, it is speculative at best that these synergies could be achieved again.

6

QB\36889432.2

Case 13-13676-t11    Doc 444    Filed 10/06/15    Entered 10/06/15 17:58:05 Page 6 of 12

And without these beneficial circumstances, it is possible that either (1) not all Sale Assets will be sold, and/or (2) the Sale Assets will be sold for lower prices due to fewer bidders and less marketing.

### C. The Auctions Should Not Be Invalidated.

It is important to keep in mind that creditors are the only parties that will be harmed if the Auctions are invalidated. No creditors have complained about the Auctions to date. Indeed, counsel for the Official Committee of Unsecured Creditors ("**Committee**") was informed after the Auctions that non-bidders had been excluded from the Auctions, but the Committee took no action on that information, nor did it make any complaints to Debtors' counsel after receiving the information. *See* Ex. 2 at ¶ 10. The proceeds from the Auction were solely for purposes of funding a plan of reorganization and are being segregated as such. Indeed, if the Auctions were to be conducted again, they might not benefit from the synergy that the third-party sellers' properties provided for the Sale Assets by providing additional marketing above and beyond that purchased with the Debtors' marketing dollars, and by attracting additional bidders. This would be detrimental to the creditors because re-auctioning the Sale Assets would likely attain a worse sale result than did the Auctions.

Creditors are the only persons the Auctions were intended to benefit; the Bankruptcy Code and Rules do not include any policy that bankruptcy sales should benefit the public at large—not even unsuccessful bidders at such sales. "[S]tatutes governing the sale of assets of bankruptcy estates are intended to protect the creditors of such estates and not prospective purchasers." *In re HST Gathering Co.*, 125 B.R. 466, 468 (W.D. Tex. 1991). For this reason, standing to challenge auction sales is tightly circumscribed. Prospective purchasers that were unsuccessful in their auction bids lack standing to challenge such sales, even though they are

arguably interested in the results. *Id.*; *see also In re Broadmoor Place Investments, L.P.*, 994 F.2d 744, 746 n.2 (10th Cir. 1993) (noting that an unsuccessful bidder is not an aggrieved person and therefore lacks standing to appeal from sale); *In re NEPSCO, Inc.*, 36 B.R. 25, 27 (Bankr. D. Maine 1983) ("The Court finds nothing to indicate that prospective purchasers are within the zone of interests intended to be protected through this statutory scheme. The purposes of these statutes would be hindered, not furthered, by permitting a stranger to the estate to object to a sale to which no party in interest objected.").

Finally, there was nothing "secret" or opaque about the Auctions. Indeed, the Debtors have been transparent in all aspects of this case, providing extensive information to the Committee and their insurers. Additionally, the Debtors provided the Committee with extensive information about the Sale Assets and other property. Ex. 2 at ¶ 7. The Committee's counsel spoke with Mr. Good prior to his retention and were involved and informed throughout the process as to how the properties would be marketed. *Id.* Counsel for the Committee had access to Mr. Good (as did all potential bidders) if they had questions. Moreover, Mr. Good sent Debtors' counsel marketing updates prior to the Auction, which were forwarded to Committee counsel. *Id.* at ¶ 8. All potential bidders were required to provide proof of financial wherewithal; all qualified bidders were admitted and permitted to bid at the Auctions; and the Auction results were filed with the Court. No creditors appeared at the Auctions (nor did counsel for the Committee, any creditor, or the Debtors). The Auctions provided a better-than-expected result for creditors, and, given the lack of standing of any person other than a creditor to appeal the Auction results, the absence of non-bidding persons should not invalidate the Auctions because it lacks any legal significance.

### III. CONCLUSION.

Based upon the foregoing, the Debtors respectfully request that the Court quash its OSC.

RESPECTFULLY SUBMITTED this 6th day of October, 2015.

/s/ *Elizabeth S. Fella*
Susan G. Boswell (AZ Bar No. 004791)
Lori L. Winkelman (AZ Bar No. 021400)
Elizabeth S. Fella (AZ Bar No. 025236)
*Admitted Pro Hac Vice*
QUARLES & BRADY LLP
One S. Church Ave., Suite 1700
Tucson, Arizona 85701
(520) 770-8700
Fax: (520) 623-2418
susan.boswell@quarles.com
lori.winkelman@quarles.com
elizabeth.fella@quarles.com

-and-

Thomas D. Walker
WALKER & ASSOCIATES, P.C.
500 Marquette N.W., Suite 650
Albuquerque, New Mexico 87102
(505) 766-9272
Fax: (505) 722-9287
twalker@walkerlawpc.com

*Counsel for the Debtors*

# CERTIFICATE OF SERVICE

Pursuant to F.R.C.P. 5(b)(3), F.R.B.P. 9036 and NM LBR 9036-1(b), I hereby certify that service of the foregoing "Debtors' Response to "Order to Show Cause and Notice of Hearing" [Dkt. No. 441]" was made on October 6, 2015 via e-mail and the notice transmission facilities of the Bankruptcy Court's case management and electronic filing system.

Ronald E. Andazola
Leonard Martinez-Metzgar
Office of the U.S. Trustee
P.O. Box 608
Albuquerque, NM 87103
ustpregion20.aq.ecf@usdoj.gov
ronald.andazola@usdoj.gov
leonard.martinez-metzgar@usdoj.gov

Thomas D. Walker
Stephanie L. Schaeffer
Walker & Associates, P.C.
500 Marquette N.W., Suite 650
Albuquerque, NM 87102
twalker@walkerlawpc.com
sschaeffer@walkerlawpc.com
*Local Counsel for Debtor
and Debtor-in-Possession*

James I. Stang
Gillian N. Brown
Jonathan J. Kim
Pachulski Stang Ziehl & Jones
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
jstang@pszjlaw.com
gbrown@pszjlaw.com
jkim@pszjlaw.com
*Counsel for the Official
Committee of Unsecured Creditors*

Kenneth H. Brown
Pachulski Stang Ziehl & Jones
150 California Street, 15th Floor
San Francisco, CA 94111
kbrown@pszjlaw.com
*Counsel for the Official
Committee of Unsecured Creditors*

Robert E. Pastor
Montoya, Jimenez & Pastor, P.A.
3200 N. Central Ave., Suite 2550
Phoenix, AZ 85012
repastor@mjpattorneys.com
*Counsel for Tort Claimants*

John Manly
Manly & Stewart
19100 Von Karman Ave., Suite 800
Irvine, CA 92612
jmanly@manlystewart.com
*Counsel for Tort Claimants*

Richard T. Fass
Donald H. Kidd
Perdue & Kidd, LLP
510 Bering Dr., Suite 550
Houston, TX 77057
rfass@perdueandkidd.com
dkidd@perdueandkidd.com
*Counsel for Tort Claimants*

Dennis Jontz
Lewis Roca Rothgerber
201 Third Street, NW, Ste. 190
Albuquerque, NM 87102
djontz@lrrlaw.com
*Local Counsel for Catholic Peoples Foundation and Parish Steering Committee of Roman Catholic Church of the Diocese of Gallup*

Robert M. Charles, Jr.
Susan M. Freeman
Justin J. Henderson
Lewis Roca Rothgerber LLP
201 E. Washington St., Suite 1200
Phoenix, AZ 85004
rcharles@lrrlaw.com
sfreeman@lrrlaw.com
jhenderson@lrrlaw.com
*Counsel for Catholic Peoples Foundation and Parish Steering Committee of Roman Catholic Church of the Diocese of Gallup*

Christopher R. Kaup
J. Daryl Dorsey
Tiffany & Bosco
Camelback Esplanade II
2525 E. Camelback Rd., Ste. 300
Phoenix, AZ 85016
crk@tblaw.com
jdd@tblaw.com
*Counsel for Southwest Indian Foundation, Inc.*

Charles R. Hughson
Rodey, Dickason, Sloan,
Akin & Robb, P.A.
P.O. Box 1888
Albuquerque, NM 87103
chughson@rodey.com
*Counsel for St. Bonaventure Indian Mission & School*

Edward A. Mazel
James A. Askew
Daniel A. White
Askew & Mazel, LLC
320 Gold Ave. S.W., Suite 300 A
Albuquerque, NM 87102
edmazel@askewmazelfirm.com
jaskew@askewmazelfirm.com
dwhite@askewmazelfirm.com
*Counsel for New Mexico Property and Casualty Insurance Guaranty Association*

Rodney L. Schlagel
James H. Johansen
Butt Thornton & Baehr P.C.
P.O. Box 3170
Albuquerque, NM 87190
rlschlagel@btblaw.com
jhjohansen@btblaw.com
*Counsel for the Roman Catholic Diocese Of Corpus Christi*

Douglas R. Vadnais
Modrall, Sperling, Roehl,
Harris & Sisk, P.A.
P.O. Box 2168
Albuquerque, NM 87103
drv@modrall.com
*Counsel for The Bank of Colorado d/b/a Pinnacle Bank*

George M. Moore
Bonnie B. Gandarilla
Moore Berkson & Gandarilla P.C.
3800 Osuna Rd., NE, Ste. 2
Albuquerque, NM 87109
mbglaw@swcp.com
bbg11usc@swcp.com
*Local Counsel for Southwest Indian Foundation, Inc.*

Steven D. Jerome
Snell & Wilmer, LLP
One Arizona Center
400 E. Van Buren St., Ste. 1900
Phoenix, AZ 85004
sjerome@swlaw.com
*Counsel for The Roman Catholic Church of the Diocese of Phoenix*

Randy S. Bartell
Victor R. Ortega
Sharon T. Shaheen
Montgomery & Andrews, P.A.
P.O. Box 2307
Santa Fe, NM 87504
rbartell@montand.com
vortega@montand.com
sshaheen@montand.com
*Counsel for Catholic Mutual Relief Society of America*

David Spector
Everett Cygal
Schiff Hardin LLP
233 S. Wacker Dr., Suite 660
Chicago, IL 60606
dspector@schiffhardin.com
ecygal@schiffhardin.com
*Counsel for Catholic Mutual Relief Society*

Alyson M. Fiedler
Schiff Hardin LLP
666 Fifth Avenue, 17th Floor
New York, NY 10103
afiedler@schiffhardin.com
ldelucia@schiffhardin.com
*Counsel for Catholic Mutual Relief Society*

Francis H. LoCoco
Bruce G. Arnold
Whyte Hirschbeck Dudek S.C.
555 E. Wells St., Suite 1900
Milwaukee, WI 53202
flococo@whdlaw.com
barnold@whdlaw.com
*Counsel for Roman Catholic Diocese
of Corpus Christi*

John C. Kelly
Coppersmith Brockelman PLLC
2800 N. Central Ave., Suite 1200
Phoenix, AZ 85004
Jkelly@csblaw.com
*Counsel for The Province of Our Lady of
Guadalupe of the Order of Friars Minor*

Michael Murphy
Young Kim
AlixPartners, LLP
580 California Street
San Francisco, CA 94104
mmurphy@alixpartners.com
ykim@alixpartners.com
*Unknown Claims Representative*

Timothy J. Hurley
Theresa H. Vella
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202
hurley@taftlaw.com
vella@taftlaw.com
*Counsel for the Province of St. John the
Baptist of the Order of Friars Minor*

VIA U.S. Mail:
Michael Bazley
FBN 2237467
650 I Street
Sacramento, CA 95814

              /s/ *Elizabeth S. Fella*
              Elizabeth S. Fella