## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW MEXICO

| | |
|---|---|
| In re: | Chapter 11 |
| ROMAN CATHOLIC CHURCH OF THE DIOCESE OF GALLUP, a New Mexico corporation sole, | Case No. 13-13676-t11 |
| | **Jointly Administered with:** |
| Debtor. | |
| Jointly Administered with: | Case No. 13-13677-t11 |
| BISHOP OF THE ROMAN CATHOLIC CHURCH OF THE DIOCESE OF GALLUP, an Arizona corporation sole. | |
| This pleading applies to: | |
| ☒  All Debtors. ☐  Specified Debtor. | |

## <u>DISCLOSURE STATEMENT TO ACCOMPANY DEBTORS' PLAN OF REORGANIZATION DATED MARCH 21, 2016</u>

# TABLE OF CONTENTS

I.      Introduction ........................................................................................................... 1

II.     Information About This Disclosure Statement And Plan Confirmation Process ............ 2

III.    Overview Of The Plan ........................................................................................... 6

IV.     The Debtors............................................................................................................ 7

V.      Significant Events Prior To The Reorganization Case.................................................. 12

VI.     Significant Events In Chapter 11 ............................................................................. 16

VII.    Description Of The Plan ......................................................................................... 20

VIII.   Means For Execution Of The Plan........................................................................... 39

IX.     Conditions Precedent To Effective Date................................................................... 42

X.      Reorganization Of The Debtors And Parishes. ........................................................ 43

XI.     Post-Effective Date Events And Performance By The Reorganized Debtor................. 44

XII.    Post-Confirmation Management .............................................................................. 46

XIII.   Liquidation Of Tort Claims And Unknown Tort Claims.............................................. 46

XIV.    Non-Monetary Commitments ................................................................................. 47

XV.     Insurance Matters.................................................................................................. 47

XVI.    Treatment Of Executory Contracts ......................................................................... 50

XVII.   Effect Of Confirmation ......................................................................................... 51

XVIII.  Federal Tax Consequences..................................................................................... 56

XIX.    Modification Of Plan ............................................................................................. 58

XX.     Acceptance And Confirmation ................................................................................ 59

XXI.    Alternatives To The Joint Plan ............................................................................... 65

XXII.   Recommendations Of The Debtors And Conclusion.................................................. 65

i

QB\38986160.5

# I.  **INTRODUCTION**

The Roman Catholic Church of the Diocese of Gallup, a New Mexico corporation sole ("**RCCDG**") and the Bishop of the Roman Catholic Church of the Diocese of Gallup, an Arizona corporation sole (the "**Arizona Entity**"), each a debtor in the above-captioned, jointly-administered Chapter 11 reorganization cases (the "**Reorganization Cases**"), have prepared this Disclosure Statement (the "**Disclosure Statement**") in connection with soliciting acceptances of Debtors' Plan of Reorganization Dated March 21, 2016 (the "**Plan**").  The purpose of their Disclosure Statement is to provide creditors with adequate information about the Plan as RCCDG and the Arizona Entity (the "**Debtors**") solicit acceptances of the Plan from the creditors.  A copy of the Plan is attached as **Exhibit 1** to this Disclosure Statement.  Certain settlement agreements defined in the Plan as Insurance Settlement Agreements and Participating Party Agreements are exhibits to the Plan and are integral parts of the Plan.  Those agreements, to the extent not filed with the Plan, will be filed separately with the Bankruptcy Court on or before March 25, 2016.

It is impossible to overstate the tragedy of the Abuse[1] that was inflicted on the children and teenagers of the Diocese.  Such Abuse was perpetrated by priests or others purporting to do the missionary work of the Roman Catholic Church.  Instead of fulfilling their missions, such perpetrators inflicted harm and suffering on the children and teenagers of the Diocese.  Much of this harm was inflicted at a time when the Debtors did not have insurance that covered such claims, or had insurance with an insurer that is now insolvent.

The Debtors propose the Plan in order to use their limited resources to pay compensation to survivors of Abuse perpetrated by individuals associated with the Diocese.  The Debtors have worked since the Reorganization Cases were filed to obtain funding for a Plan from their Insurers and others who may have some liability for some of the claims because of their relationship with the Debtors, or others who were simply willing to assist the Debtors.  Through their efforts, the efforts of the Official Committee of Unsecured Creditors (the "**Committee**"), and through their settlements with Insurers, other religious orders and dioceses, the Debtors have assembled a cash fund and an allowed claim in the insurance receivership of one of the Debtors' Insurers which will either be liquidated or paid in through distributions from the receivership in the same amount as claims in a similar class in the receivership.  The contributions and commitments from third parties together with the funding provided by the Debtors from their Assets will be used to pay the creditors and perform the Debtors' obligations under the Plan.

Through the Plan, the Debtors will also restructure their financial affairs to continue critical programs intended to protect children and vulnerable adults, address the spiritual needs of those who were harmed, and preserve current ministries and develop the ministries and missions facilitated by the Debtors that are so critical to many underprivileged people living well below the national poverty line in northwestern New Mexico, northeastern Arizona, and the several sovereign nations that exist in the geographical area of the Diocese.

---

[1] Capitalized terms not otherwise defined herein have the meaning given to them in the Plan.

Through this Disclosure Statement, the Debtors have provided adequate information for creditors to evaluate the Plan and decide whether to vote to accept it as well as the process by which creditors will vote to accept or reject the Plan. In addition to summarizing the Plan itself, the Disclosure Statement provides creditors with information about the Debtors, their history, Assets, liabilities, property that they hold in trust for others, insurance, events that have occurred in the Reorganization Cases, and business plans for future operations. The Disclosure Statement also provides information regarding the problem of Abuse perpetrated by individuals associated with the Diocese, the steps taken by the Diocese to address the injuries inflicted by those individuals, and steps taken to prevent such Abuse from occurring both now and in the future. Further, this Disclosure Statement provides information about the information provided to the Committee regarding Assets owned by the Debtors and those held in trust for the benefit of the Parishes and missions and about sources of compensation for Tort Claimants.

This Disclosure Statement also describes the circumstances under which the Bankruptcy Court may approve the Plan even if some creditors do not vote to accept it.

## II.     INFORMATION ABOUT THIS DISCLOSURE STATEMENT AND PLAN CONFIRMATION PROCESS

### A.     Definitions And Plan Supremacy.

The capitalized terms used in this Disclosure Statement have the same definitions given to them in the Plan, unless it is expressly stated that a capitalized term will have a different meaning when used in this Disclosure Statement. In addition, unless otherwise stated, terms used in this Disclosure Statement will have the same meanings as in the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules of the Bankruptcy Court. Terms defined in this Disclosure Statement which are also defined in the Plan or the other sources described above, are solely for convenience when reading this Disclosure Statement; the Debtors do not intend to change the definitions of those terms from the Plan or from the otherwise applicable sources. Furthermore, in the event of any inconsistency between the Plan and this Disclosure Statement, the Plan will control. The exhibits attached to this Disclosure Statement are incorporated into and are a part of this Disclosure Statement.

### B.     Limited Representations.

This Disclosure Statement is submitted in accordance with Bankruptcy Code § 1125 for the purpose of soliciting acceptances of the Plan from holders of certain Claims. This Disclosure Statement has been approved by the Bankruptcy Court as containing information of a kind, and in sufficient detail, which is adequate to enable you to make an informed judgment whether to vote to accept or to reject the Plan.

In determining whether the Plan should be confirmed, the Bankruptcy Court will consider whether the Plan satisfies the requirements of the Bankruptcy Code, including whether it is feasible, and whether it is in the best interests of the holders of Claims. The Bankruptcy Court also will receive and consider a ballot report prepared by the Debtors, concerning the votes for acceptance or rejection of the Plan by parties entitled to vote. Only holders of Allowed Claims that are impaired under the Plan will be allowed to vote to accept or reject the Plan.

2

THIS DISCLOSURE STATEMENT IS NOT THE PLAN. THE PLAN IS THE OPERATIVE DOCUMENT. THIS DISCLOSURE STATEMENT, TOGETHER WITH THE PLAN, WHICH IS ATTACHED HERETO AS EXHIBIT 1, SHOULD BE READ COMPLETELY. FOR THE CONVENIENCE OF CREDITORS, THE PLAN IS SUMMARIZED IN THIS DISCLOSURE STATEMENT, BUT ALL SUMMARIES AND OTHER STATEMENTS REGARDING THE PLAN ARE QUALIFIED IN THEIR ENTIRETY BY THE PLAN ITSELF, WHICH IS CONTROLLING IN THE EVENT OF ANY INCONSISTENCY.

The Bankruptcy Court will hold a hearing on confirmation of the Plan on _____, 2016, commencing at _____ Mountain Daylight Time (the "**Confirmation Hearing**") and continuing thereafter until conclusion of the Confirmation Hearing. The Confirmation Hearing may be adjourned from time to time without further written notice.

Information contained in this Disclosure Statement was obtained from knowledgeable personnel at the Debtors or from the books and records of the Debtors. Financial information developed for purposes of this Disclosure Statement was developed by personnel at RCCDG working with the Debtors' Professionals. Certain materials contained in this Disclosure Statement are taken directly from other, readily accessible documents or are digests of other documents. While every effort has been made to retain the meaning of such documents, you are urged to rely upon the contents of such documents and only after a thorough review of the documents themselves.[2]

NO REPRESENTATIONS OR ASSURANCES CONCERNING THE DEBTORS, INCLUDING, WITHOUT LIMITATION, THE DEBTORS' OPERATIONS, THE VALUE OF THE DEBTORS' ASSETS, OR THE FUTURE OPERATIONS OF THE REORGANIZED DEBTOR ARE AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. UNLESS OTHERWISE EXPRESSLY STATED, PORTIONS OF THIS DISCLOSURE STATEMENT DESCRIBING THE DEBTORS HAVE NOT BEEN SUBJECT TO A CERTIFIED AUDIT, BUT HAVE BEEN PREPARED FROM INFORMATION COMPILED BY THE DEBTORS FROM RECORDS MAINTAINED IN THE ORDINARY COURSE OF THE DEBTORS' BUSINESS. EVERY EFFORT HAS BEEN MADE TO BE AS ACCURATE AS POSSIBLE IN THE PREPARATION OF THIS DISCLOSURE STATEMENT.

THIS IS A SOLICITATION BY THE DEBTORS AND IT IS NOT A SOLICITATION BY THE DEBTORS' ATTORNEYS OR ANY OTHER PROFESSIONALS EMPLOYED BY THE DEBTORS. THE REPRESENTATIONS MADE HEREIN ARE THOSE OF THE DEBTORS AND NOT OF THE DEBTORS' ATTORNEYS OR ANY OTHER PROFESSIONAL.

---

[2] Such documents include, but are not limited to, pleadings and Proofs of Claim filed in the Bankruptcy Court and Superior Court for the State of Arizona, public real property records, and corporate formation documents and records, among other things.

QB\38986160.5

REASONABLE EFFORTS HAVE BEEN MADE TO ACCURATELY PREPARE ALL UNAUDITED FINANCIAL STATEMENTS OR OTHER FINANCIAL INFORMATION WHICH MAY BE CONTAINED IN THIS DISCLOSURE STATEMENT FROM THE INFORMATION AVAILABLE TO THE DEBTORS. HOWEVER, AS TO ALL SUCH FINANCIAL STATEMENTS OR OTHER FINANCIAL INFORMATION, THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED THEREIN IS WITHOUT ERROR.

APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE CERTIFICATION BY THE COURT THAT THIS DISCLOSURE STATEMENT IS WITHOUT INACCURACY.

 **C.** <u>**Voting Procedures.**</u>

In accordance with Bankruptcy Code § 1122(a), the Plan classifies Claims into different Classes based on similarities and differences between the legal rights associated with the Claims and provides for how each Class of Claims will be treated. Specifically, the Plan classifies Claims against the Debtors into the following Classes:

  Class 1 – Priority Employee Unsecured Claims (Unimpaired; Not Entitled to Vote; Deemed to Accept)

  Class 2 – Prepetition Date Secured Tax Claims (Impaired; Entitled to Vote)

  Class 3 – Secured Claims of Ally Bank (Impaired; Entitled to Vote)

  Class 4 – Secured Claim of Pinnacle Bank (Impaired; Entitled to Vote)

  Class 5 – General Unsecured Convenience Claims (Impaired; Entitled to Vote)

  Class 6 – Phoenix Diocese Unsecured Claims (Impaired; Entitled to Vote)

  Class 7 – General Unsecured Claims (Impaired; Entitled to Vote)

  Class 8 – Other Tort and Employee Claims (Impaired; Entitled to Vote)

  Class 9 – Tort Claims (Impaired; Entitled to Vote)

  Class 10 – Unknown Tort Claims (Impaired; Entitled to Vote)

  Class 11 – St. Bonaventure Claims (Impaired; Entitled to Vote)

  Class 12 - Insurance and Benefit Claims (Impaired; Entitled to Vote)

  Class 13 – Penalty Claims (Impaired; Not Entitled to Vote—Deemed to Reject)

In order to confirm the Plan, at least one Class of Claims impaired by the Plan must vote to accept the Plan. In order for a Class of Claims to vote to accept the Plan, votes representing at least two-thirds (2/3) in amount of the Claims in that Class that vote and more than one-half (1/2)

4

in number of the Claims in that Class that vote must be cast in favor of accepting the Plan. The Plan's treatment of a Class will either "impair" the Claims in that Class or leave them "unimpaired." Claims are impaired if the Plan in any way alters the legal, equitable, or contractual rights associated with the Claims or if the Plan provides for paying less than the full amount of the Allowed Claims. Holders of Claims in Classes which are impaired under the Plan may vote to either accept or reject the Plan; however, unless specifically noted in the Plan with respect to a particular Class, the act of voting and the substance of the vote will not alter a creditor's treatment. As more fully described below, the Debtors are seeking acceptances from holders of Allowed Claims in the Classes designated above as "Impaired; Entitled to Vote." If you are the holder of an impaired Claim, it is important that you vote.

The following Classes of Claims are not impaired under the Plan, or are deemed to vote in favor or against the Plan, for the reason indicated: [3]

| Class | Description | Status |
|---|---|---|
| Unclassified[4] | Administrative Claims | Unimpaired – Deemed to Accept |
| Unclassified | Priority Unsecured Claims | Unimpaired – Deemed to Accept |
| Unclassified | Priority Tax Claims | Unimpaired – Deemed to Accept |
| Class 1 | Priority Employee Unsecured Claims | Unimpaired – Deemed to Accept |
| Class 13 | Penalty Claims | Receive $0.00 – Deemed to Reject |

The specific treatment of each Class under the Plan is set forth in the Plan and is summarized in Article VII of this Disclosure Statement. It is possible that one or more Classes of Claims will have no creditors in that Class. In that event, under the terms of the Plan, that Class will be deemed to be automatically deleted from the Plan.

Bankruptcy Code § 1129(b) provides that, if the Plan is rejected by one or more impaired Classes of Claims, the Plan nevertheless may be confirmed by the Bankruptcy Court, if: (i) the Bankruptcy Court determines that the Plan does not discriminate unfairly and is fair and equitable with respect to the rejecting Class(es) of Claims; and (ii) at least one Class of impaired Claims has voted to accept the Plan.

**THE DEBTORS RECOMMEND THAT THE HOLDERS OF ALLOWED CLAIMS VOTE IN FAVOR OF THE PLAN.**

---

[3] Holders of Claims which are unimpaired, that is their rights are not altered and they will be paid or satisfied in full, are deemed to have accepted the Plan without voting. *See* Bankruptcy Code § 1126(f). Similarly, holders of Claims who will receive nothing under the Plan are deemed to reject the Plan without voting. *See* Bankruptcy Code § 1126(g).

[4] The treatment of Unclassified Claims is prescribed by the Bankruptcy Code and, accordingly, the holders of those Claims do not get to vote.

5

## III.   OVERVIEW OF THE PLAN

As discussed above, the Debtors filed these Reorganization Cases in order to resolve creditors' Claims for Abuse (known and unknown), and, while achieving that goal within the limits of the Debtors' Assets, to restructure their financial affairs to preserve and develop the ministries and missions that are facilitated by the Diocese.  These ministries and missions are critical to Catholics and non-Catholics alike in northeastern Arizona and northwestern New Mexico.  The Debtors have proposed the Plan, which has been negotiated with various constituencies, to accomplish these ends.  The Plan will be funded by the Debtors as well as contributions from the Parishes, Insurers, and various Catholic religious orders and entities.  In addition, certain professionals whose fees would be paid as Administrative Expenses have agreed to forego portions of their fees in order to provide additional funds for the benefit of the creditors.  The approximately $24 million fund, which will consist of cash plus the distributions or proceeds from an allowed claim in the Home Liquidation, represents the significant support of others and sacrifice by one of the poorest dioceses in the United States.  Of these funds, $_____ will be used to fund the Trust that will pay the Tort Claimants pursuant to the Tort Claims Allocation Protocol that was developed by the Committee and the attorneys representing the majority of the Tort Claimants.  The Unknown Tort Claimants will be compensated pursuant to the Unknown Tort Claims Allocation Protocol and the Unknown Claims Certificate that will be issued by CM (defined below).   The Debtors believe that the Plan provides greater compensation to the Tort Claimants and the Unknown Tort Claimants than they would likely receive outside Chapter 11 because of, among other things:  (i) limited or no insurance for the period during which some of the Tort Claims arose; (ii) exhaustion of limits of insurance in those instances where insurance has been available; and (iii) the limited resources of the Debtors to respond to judgments outside the Reorganization Cases.

**The Plan incorporates a number of settlement agreements through which the Debtors will obtain a significant amount of the money committed to the Plan with the Debtors' Insurers and with other Entities that might have liability for some of the Tort Claims or against which the Debtors may have Claims for contribution, indemnity, allocation of fault or any other basis upon which the Debtors may have rights against such other Entities.  The Plan therefore provides settlements with Catholic Mutual Relief Society of America and Catholic Relief Insurance Company of America (collectively, "CM"), the New Mexico Property and Casualty Insurance Guaranty Association ("NMPCIGA"), and the Home Insurance Company ("Home Insurance").  The terms of those settlements involve, in some instances, a sale of certain Insurance Policies or rights of the Settling Insurers.**

**The other Entities with which the Debtors have agreements for funding of the Plan (defined as Participating Parties under the Plan) consist of the Parishes, certain religious orders (and/or their Insurers), the Phoenix Diocese, and certain non-profit corporations that work with the Diocese in carrying out the mission and ministry of the Catholic Church within the territory of the Diocese and otherwise.  Although the Participating Parties dispute any liability to the Debtors or Tort Claimants, each of the Participating Parties will pay a lump sum to the Debtors in exchange for various releases and being included as a Protected Party for purposes of the Channeling Injunction provided under the Plan and, in the case of St. Bonaventure, to settle disputes over ownership of real property as well.**

6

To fund the Plan, the Debtors have also sold numerous parcels of real property which were not used in or critical to the mission and ministry of the Debtors. To further generate funds for the Debtors' contribution to the Plan, the Debtors may sell certain real property or use real property as collateral for a loan. In those cases, the Debtors will be utilizing property that is critical to their mission or ministry but also are committed to being able to consummate a plan that is supported by the Committee and the other interested parties.

Under the Plan, a Trust will be created from which Tort Claims and Unknown Tort Claims will be paid. The Tort Claims and Unknown Tort Claims will receive distributions based on the respective Tort Claims Allocation Protocol an the Unknown Tort Claims Allocation Protocol that is part of the Plan and will be approved by the Court prior to the Effective Date of the Plan. The Tort Claims and the Unknown Tort Claims will be determined by an Abuse Claims Reviewer who will be proposed by the Committee and approved by the Court as part of confirmation of the Plan.

## IV.   THE DEBTORS

### A.   The Civil Law Debtors And Their Relationship To The Diocese And Other Religious Entities.

Bishop James Wall (the "**Bishop**") is the sole member of RCCDG and the Arizona Entity. The Bishop became a director of RCCDG and of the Arizona Entity on February 5, 2009 as a result of being appointed Bishop of the Diocese. Each of the civil entities operates as a 501(c)(3) organization. RCCDG, which is the operating civil entity, maintains its offices in Gallup, New Mexico.

RCCDG and the Arizona Entity are the civil entities incorporated under certain statutes that exist or at one time existed under Arizona and New Mexico law. These entities also hold and administer property for the benefit of the Parishes and certain other religious entities and functions that exist within the territory of the Diocese.

The Diocese is the religious canonical entity that carries out the mission and ministry of the Roman Catholic Church in the geographic area decreed as the Diocese, subject to the jurisdiction and administration of the Bishop. The Bishop must carry out his canonical duties in accordance with the Code of Canon Law, which is the ecclesiastical law of the Roman Catholic Church ("**Canon Law**").[5] He serves as the principal teacher, sanctifier, and governor of the Roman Catholic faith and the Catholic faithful within the territory of the Diocese, which encompasses approximately 55,468 square miles.

---

[5] The Roman Catholic Church is a hierarchical religious organization governed by its own laws and customs. These laws are codified in the Code of Canon Law. The Code of Canon Law applicable to the Roman Catholic Church is, for the most part: (1) a set of norms created to bring order to the life of the ecclesial community; (2) articulated and promulgated by those who are entrusted with the community's care; and (3) to serve the common good, thus imposing obligations and establishing legal bonds from which certain rights, duties, and interests flow.

QB\38986160.5

Many Roman Catholic ecclesiastical entities operate within the Diocese. Under Canon Law, such entities are referred to as "juridic persons." The most prominent of these ecclesiastical entities are Parishes, but other juridic persons include the various religious orders (including without limitation the Franciscans) that minister or have at one time ministered within the Diocese's territory.

Under Canon Law, parishes are defined as established stable communities of the Christian faithful whose pastoral care is entrusted by the diocesan bishop to a pastor. A parish pastor is the priest responsible for the members of the parish community as well as being the exclusive administrator of parish property, subject to the bishop's power to replace the parish pastor. The pastor, and for that matter, the bishop, is required to acquire, hold, administer and alienate such property in accordance with Canon Law. Canon Law mandates that the debts of a parish be paid with assets from that particular parish; and that the debts of the diocese be paid with the assets of the diocese.

The bishop of a diocese oversees and/or monitors the parishes within the diocese to ascertain whether or not each parish is operating in accordance with Canon Law. Part of this role means that the bishop has the right to request an annual accounting report from each parish. However, although the bishop's role is to oversee the parish, a bishop does not have the right to possess, sell, encumber or dispose of parish property, although a bishop must approve the sale of parish property if the sale exceeds a certain dollar amount.

Although in many parts of the United States parishes are separately incorporated, in the Diocese, parish communities function for civil law purposes as unincorporated associations typically known as "_____ Catholic Church." Many of the Parishes therefore list RCCDG or the Arizona Entity as the entity of record that holds title to their real property. The Debtors contend that they hold title to certain church and related properties in trust for such Parishes and certain other religious entities and functions, and the practice of the Roman Catholic religion and that to the extent a Debtor's name appears on a deed, the Debtor holds mere legal title and not the beneficial interest in that property. The Committee disputes that contention. The Plan resolves those disputes. Additionally, several of the Parishes within the geographic territory of the Diocese are located on Native American reservations, and, therefore, under federal law, those Parishes do not, and cannot, own the real property on which they are located.

Before the Petition Date, and as described in more detail below, the Bishop and the pastors of the various Parishes, acting on behalf of the Diocese, RCCDG, the Arizona Entity, and the Parishes, executed and caused to be recorded in the public records of the county in which the real property is located a notice of the trust relationship between RCCDG or the Arizona Entity and the Parish, and the beneficial interest the Parish holds in the related property. The Committee does not acknowledge that Canon Law has any applicability to the Reorganization Cases or that the subject real property is held in trust and contends that the recordation of the notices was a fraudulent conveyance. The deadline for commencing an action to avoid these notices has been tolled by order of the Bankruptcy Court. The Plan resolves this dispute.

QB\38986160.5

**B.      The Ministries And Activities Of The Debtor And The Diocese.**

The Diocese and Parishes seek to provide the people that live in rural New Mexico and Arizona with a stable and enriching element in the lives of all those—both Catholic and non-Catholic—that live in these communities.  The Diocese provides not only spiritual guidance to the missions, Parishes, volunteers, and faithful individuals within its geographic territory, but also material assistance in the form of charitable activities.   The Diocese also provides administrative services to the Parishes that require assistance, such as financial services, a pension plan, and insurance programs.

The Diocese is a "mission" diocese, meaning that it (and many of the missions and Parishes within its territory) are not financially self-sustaining and rely on the generosity of others for grants and other assistance.  The areas that comprise the Diocese are overwhelmingly rural and underdeveloped, with high instances of unemployment, and low income.  In fact, there are no large metropolitan areas within the territory of the Diocese.  Therefore, not only does the Diocese provide religious and spiritual support to the Catholics who live in the area, but many non-Catholics also depend on the social services the Diocese provides, some of which are material and monetary, and others which are spiritual as well.  These services are discussed in more detail below.

There are approximately forty-three (43) active priests working in the Diocese.  There are also approximately twenty-eight (28) deacons and several seminarians.  A deacon is not a priest; however, he can perform baptisms, weddings, and funerals.  Because the Diocese comprises a large area, but has few active priests to serve this expansive area, deacons are an integral part of the Catholic community and are able to augment the work of the priests.  RCCDG also employs approximately fifty (50) people who work in its missions, schools, and other ministries.  There are also a significant number of people who offer their services as volunteers.

The Diocese supports a number of programs within its territory and funds these programs through direct donations, by applying for grants, and from Parish collections on behalf of the Diocese.  Though there are many programs the Diocese supports, one notable example is the Office of Native American Ministry.  The mission of the Office of Native American Ministry is to better determine how to serve the spiritual needs of the Native American population within the Diocese.  Additionally, the Diocese provides physical support for this population (and other populations within its territory) as well, including by subsidizing or providing utilities, meals, and water for those in need.

There are also a number of Catholic schools in the territory of the Diocese, but only one school, Gallup Catholic School ("**Gallup School**") is owned and operated by RCCDG.  The rest of the Catholic schools are either owned and operated by Parishes or are private endeavors.  As discussed in more detail below, the Gallup School is funded through tuition and fundraising; however, it has historically operated at a loss and required additional financial support from RCCDG.

The Diocese also operates the Sacred Heart Retreat Center (the "**Retreat Center**"), located near Gallup.  RCCDG owns the Retreat Center.  The Diocese considers the Retreat Center to be an integral part of the ministry of the Diocese, offering a place of hospitality, quiet

prayerfulness, and desert beauty to serve the needs of those who come through prayer, retreat, spiritual and educational programs.

### C.      History And Formation Of The Diocese.

The current geographic make-up of the Diocese stretches over 55,468 square miles throughout New Mexico and Arizona. Much of this area includes Native American reservations. There are at least seven (7) tribes within the Diocese: the Acoma, Laguna, Zuni (Pueblo Indians), Jicarilla Apache, White Mountain Apache, Hopi, and the Navajo. The remainder of the population is divided among approximately thirty (30) other nationalities, with Hispanic being the largest ethnic group.

Although it was formed in 1939, the Diocese has had a presence in the region since approximately 1539, when a Spanish explorer and Franciscan friar named Marcos de Niza dedicated the region to St. Francis. Thus began the long tradition of Franciscan service in the geographic area that would become the Diocese. In 1850, the Pope created the Diocese of Santa Fe, which at that time included portions of the region that now is the Diocese. The remainder of the region that is now the Diocese was served by the Diocese of Tucson, which was created in 1897. In 1898, the Franciscans established the parish known as St. Michael's Mission (then a mission), in Navajo Nation. By 1902, the Franciscans had established St. Michael's School, a boarding school for Native American children.[6]

In 1939, the Diocese was created. At its formation, the Diocese included all of San Juan, McKinley, and Catron counties in New Mexico, parts of Rio Arriba, Sandoval, Bernalillo, and Valencia counties in New Mexico, and all of Mohave, Coconino, Yavapai, Navajo, and Apache counties in Arizona. Since its inception, the Diocese has been a mission diocese. Additionally, since its inception, the Diocese has been staffed by Franciscan priests, particularly in the more northern regions of the Diocese including the Navajo Nation.

In 1969, the Diocese ceded some of its territory (the western and central parts of northern Arizona) to the newly created Diocese of Phoenix, leaving the Diocese with its present territory.

### D.      The Financial Structure And Operations Of RCCDG.

Every Parish in the geographic territory of the Diocese, except for one, manages its own finances and, the Debtors contend, operates independently from the Debtors. The exception to this general rule is St. Anthony's Parish in McNary, AZ, which is administratively supported by RCCDG because it does not have a resident or full-time pastor to manage its own affairs, although the Debtors contend St. Anthony's Parish is a separate entity from the Debtors. The Committee disagrees that the Parishes operate independently from the Debtors. The Plan resolves this dispute.

Canon Law requires each Parish to be assessed an amount which it is to remit to the Diocese. However, given the poor financial circumstances of almost every Parish, the assessments are insubstantial and often are not enough to support all of RCCDG's operating

---

[6] In 1993, St. Michael's School became incorporated as a separate, civil, non-profit entity.

QB\38986160.5

costs. The Diocese also receives donations from various sources, and through an annual fundraising event (the "**Bishop's Appeal**") the Parishes help facilitate (and from which the Parishes receive a portion). Many donations received through the Bishop's Appeal are conditioned on being used for a certain purpose.

However, as noted above, the Diocese has been a mission diocese since its inception. RCCDG therefore receives funding from the several non-profit entities described below, in addition to grants from the United States Conference of Catholic Bishops and other Roman Catholic entities. RCCDG uses the funds to support its business functions and the Diocese uses them to carry on the ministries and missions described above. Many of the Parishes are not self-sustaining, either. These also rely on grants from non-profit entities.

The Diocese and its mission are also served by several non-profit entities that are Roman Catholic, are separately incorporated and have historically and continue to operate independently from the Diocese. The Diocese relies to some extent on these independent organizations to carry out is mission. The Catholic Peoples Foundation ("**CPF**") is one such entity, which provides funding to support the ministry of the Diocese in the form of endowments and gifts that are restricted to a specific enumerated purpose. Southwest Indian Foundation ("**SWIF**") is another independent entity that provides education and cultural support to Native Americans, and primarily assists the elderly, the handicapped, and families with dependent children, to provide necessary services for the diocesan mission that the Diocese cannot afford to provide. Similarly, Catholic Charities of Gallup also provides services necessary for the diocesan mission to assist the needy within the Diocese, including housing for pregnant teens and teenage mothers, transitional housing, hot meals, clothing, furniture, and other services.

Typical with other Catholic entities throughout the world, the Diocese and the Parishes also collect funds from parishioners and others for specific Catholic programs, such as missions outside the Diocese. The funds are held by RCCDG, solely as custodian, for a short period of time after which RCCDG remits the funds to the appropriate person or agency.

Between June of 2013 and September 2015, the Debtors did not have a chief finance officer. Prior to June 2013, Deacon James Hoy was the chief finance officer for over fourteen (14) years. Therefore, when the Debtors filed their Reorganization Cases in November, 2013, it became necessary to seek outside assistance from financial advisors. The Debtors retained Keegan, Linscott & Kenon, P.C. ("**KLK**") for this purpose. KLK has also been assisting the Debtors in other financial and accounting areas. In 2015, after many months of searching with the assistance of KLK, the Debtors hired a new chief finance officer to assist the Debtors in emerging from Chapter 11 and continuing post-confirmation operations.

### E. Disputes Over Property Ownership And Associated Risk.

Similar to other diocesan reorganization cases, RCCDG and the Arizona Entity scheduled property that they hold in trust for the benefit of Parishes as property held for the benefit of others, under line 14 of their Statements of Financial Affairs. Pursuant to Bankruptcy Code § 541(d), property that a debtor holds in trust (a trustee holds bare legal title) for the benefit of another (who holds the equitable interest in the property) does not constitute property of the debtor's bankruptcy estate and cannot be used to pay the debtor's creditors.

11

A summary of line 14 of the Statement of Financial Affairs that was filed with RCCDG's and Arizona Entity's schedules is attached to this Disclosure Statement as **Exhibit 2**. The property identified on Exhibit 2 includes: (1) Parish real property which is held by the Debtors as trustees for the benefit of the Parishes; and (2) custodial funds held by the Debtors primarily resulting from consolidating "second collections" at church services for payment of a single check to the national charity. Since the filing of their Statement of Financial Affairs, the Debtors, working with the Committee, have conducted extensive diligence relating to their real property, in part because of the sale of much of that property. Through this process, the Debtors have identified several additional properties whose legal descriptions the Debtors listed on their Schedule A, but which they since have been able to match with physical properties that they contend are held in trust for the Parishes using such properties. By way of example, one such property is a cemetery; the other is the land on which St. Francis of Assisi Parish School sits. These properties, which should have been listed in line 14 on the Statement of Financial Affairs, are also identified on Exhibit 2 to this Disclosure Statement. Finally, Exhibit 2 includes a list of certain bank accounts maintained, under the Debtors' tax identification number, by certain Parishes. Such accounts are described further in Section VI.C below.

The Committee's counsel has asserted at various times (although not in any action filed in the Reorganization Cases) that the Parish real property should be available for use in funding a plan of reorganization. The Debtors dispute the Committee's position for a number of reasons, including without limitation because the Debtors and the Parishes share no liabilities or assets, and, as noted above, to the extent the Debtors hold property for the Parishes, such property is held in trust. Nevertheless, as noted elsewhere in this Disclosure Statement, the Debtors and Parishes have entered into a settlement agreement (which is supported by the Committee) in order to resolve these and other claims that each may have against the other, under which the Parishes will contribute money to fund the Trust.

## V.    SIGNIFICANT EVENTS PRIOR TO THE REORGANIZATION CASE

### A.    The Sexual Abuse Crisis And The Diocese's Response.

The Catholics of the Diocese have not been immune from the sex abuse tragedy that has sadly affected so many others within the Roman Catholic Church. Formal and informal claims alleging Abuse at the hands of priests and other workers in the Roman Catholic Church have been asserted against the Debtors. At the filing of the Debtors' cases, thirteen (13) lawsuits alleging such Abuse had been filed against the Debtors. Fifty-seven (57) Tort Claimants filed Proofs of Claim alleging Abuse in the Debtors' Reorganization Cases; the Unknown Claims Representative also filed a Proof of Claim on behalf of Unknown Tort Claimants.

The inexcusable harm caused by the abusers to the survivors of the Abuse, their families, and their communities cannot be underestimated. The abusers also betrayed and harmed the Catholic faithful and the Roman Catholic Church through their violation of the fundamental principles and mission of the Roman Catholic Church. A list of certain individuals associated with the Diocese who are known to the Debtors to have been credibly accused of Abuse is displayed on the Diocese's website at http://www.dioceseofgallup.org/youth-protection/credibly-accused-list/. This list may be supplemented from time to time.

12

Although the Diocese cannot change the tragedies of the past, it has long been committed to combating Abuse of minors in the present. The Diocese was one of the first in the United States to adopt its own guidelines and procedures to prevent Abuse of minors. In 1993, it promulgated a policy to protect the children of the Diocese and promulgated the policy to its deanery and Parishes. It later began requiring background checks for both religious and lay people working in the Diocese, even before such measures were standard.

In June 2002, the United States Conference of Catholic Bishops adopted the "Charter for the Protection of Children and Young People" (the "**Charter**"). The Charter, among other things, established the Office of Child and Youth Protection (the "**OCYP**"). OCYP assists dioceses in implementing the Charter to ensure consistent application of guidelines and procedures to prevent Abuse of minors and properly address allegations of misconduct. The Diocese adopted the Charter and remains committed to the implementation of the Charter and following the procedures and guidelines to prevent Abuse of minors, as well as dealing proactively and diligently with allegations of misconduct, regardless of when they were alleged to have occurred.

Within the Diocese, the "Safe Environment Program" emphasizes prevention by communication to all parishioners that Abuse must be reported, requiring background checks on all adults working with minors, and requiring each school and Parish in the Diocese to appoint a local Director of Safe Environment to oversee the local program and to submit an annual compliance report to the Diocese. Additionally, all individuals that minister with minors must successfully complete the juvenile sexual abuse training awareness program VIRTUS. VIRTUS was developed by National Catholic Risk Retention Group, Inc. and it identifies best-practices programs designed to help prevent wrongdoing and promote "right-doing" within religious organizations. Additionally, the Bishop has been a leader in the various dioceses in which he has served, including the Diocese, in protection of children and young people.

> ### B.      The State Court Abuse Litigation.

As mentioned in the preceding paragraphs, thirteen (13) lawsuits were filed against the Debtors prior to the Reorganization Cases. Many of those cases related to times when the Debtors either had no insurance or limited coverage. Numerous other claims were settled out of court over the years. Due to the limited resources of the Debtors, the number of pending lawsuits and other claims of which the Debtors had been advised (but had not yet resulted in lawsuits) and the Debtors' inability to continue paying claims indefinitely, the Debtors determined that the best way to balance healing to those harmed by the Abuse with the continuing mission and ministry of the Diocese was through the filing of the Reorganization Cases.

Many of the claims in the lawsuits which originated in state court relate to acts that occurred in the 1950's, 1960's, and 1970's, with the majority of the alleged acts to have occurred in the 1960's and 1970's. At the filing of the Reorganization Cases, the Debtors were unaware of any insurance policies that would cover Claims that occurred in the early years. In addition, for the period from October 1, 1965 to December 1, 1977, the Debtors were insured by Home Insurance (the "**Home Coverage Period**"), which was placed into receivership (defined in the Plan as the Home Liquidation) some time ago. Any Claims which fall within the Home

13

Coverage Period are covered by the NMPCIGA as well as the Home Liquidation. Although the Debtors also contend that the Arizona Fund is liable to them for Claims falling within the Home Coverage Period, the Arizona Fund has denied coverage. Due to the uncertainty regarding the extent and scope of potential sources of insurance coverage for the claims asserted against the Debtors, on April 1, 2014, the Debtors filed an employment application to authorize the employment of the Insurance Archaeology Group ("**IAG**"). The employment of IAG is discussed more fully below.

Despite a thorough search by IAG, the Debtors appear to lack coverage beyond the limited funds they may receive from Claims against Home Insurance, NMPCIGA, and the coverage provided by CM, which began in 1977. Although the Arizona Fund disputes coverage, the Debtors have preserved their Arizona Fund Claims under the Plan as Retained Claims, but the Arizona Fund Claims may be assigned to the Trust upon the written request of the Trustee.

The Debtors also explored recovery from Co-Defendants named in, or potentially implicated by, the lawsuits and Claims filed against them. These include various religious orders or other dioceses that may have provided abusive priests to the Diocese. Certain of those parties are contributing funds to the Trust under the Plan for payment of Tort Claims in exchange for the protection of an injunction that will channel all present and future Tort Claims to the Trust.

Others, however, such as the Sisters of the Blessed Sacrament (defined in the Plan as the "**Sisters**"), were named as defendants in the lawsuits but will not receive injunctive relief under the Plan because the Debtors were unable to reach an agreement with them that would allow them to become a Participating Party under the Plan. The Diocese of Corpus Christi (defined in the Plan as "**Corpus Christi**") is another Entity with whom the Debtors were unable to reach an agreement that would allow them to become a Participating Party. Corpus Christi, from whence came one of the worst abusive priests ever to afflict the Diocese, is implicated by the Tort Claims arising from Abuse by Father Clement Hageman. The Diocese initiated a proceeding requesting the assistance of the United States Conference of Catholic Bishops to attempt to obtain remuneration for some of the funds the Debtors have paid (and will pay pursuant to the Plan) as a result of Father Hageman's Abuse. The proceeding is currently pending. The Claims against the Sisters and Corpus Christi are Retained Claims under the Plan.

### C. <u>Clarification Of Fiduciary Relationships</u>.

As is discussed extensively above, the Debtors have always believed that they served in the capacity of a trustee holding the legal but not the beneficial interest in certain property belonging to the Parishes and others. As the Debtors became aware of decisions in other diocesan reorganization cases, it became clear that unnecessary confusion and litigation about the debtor-parish/trustee-beneficiary relationships could arise with respect to these longstanding trustee-beneficiary relationships under the corporation sole statutes. Indeed, in the Diocese of Davenport's reorganization case where the parishes are separately incorporated and directly hold title to their land, the controversy over parish property that was so time consuming and costly in other diocesan reorganization cases was completely avoided. As fiduciaries, the Bishop and the Debtors believed it to be important to try to avoid any confusion about property that the Debtors hold as trustees for the Parishes in the geographic territory of the Diocese. Therefore, in the three (3) months prior to the Petition Date, each Parish recorded a "Notice of Beneficial Interest"

14

to further give notice of the trust relationship of which third parties already had actual notice by virtue of each Parish's signage, physical occupation, and/or other use of their respective real properties. In the absence of the agreements contained in the Plan, the Committee and Debtors would likely have litigated these issues; however, the Plan settles this dispute.

### D. **Diocesan Property.**

Upon filing the Reorganization Cases, the Debtors also identified a number of parcels of real property that the Debtors believe they owned outright, not in trust for any third parties. Those properties were scheduled on the Debtors' Schedule A. Certain of those properties were determined not to be critical to the Debtors' mission and ministry. Those were sold, as further described below in Section VI.D.

Another group of properties listed on RCCDG's Schedule A located in and near Thoreau, New Mexico is used by a separate non-profit organization known as Saint Bonaventure Indian Mission and School, Inc. ("**St. Bonaventure**"). St. Bonaventure filed a complaint, initiating Adversary Proceeding Number 14-01014-t in the United States Bankruptcy Court for the District of New Mexico against RCCDG, alleging that the real property scheduled by RCCDG actually belongs to it, but later withdrew the action without prejudice. As part of the Plan, the Debtors have settled this dispute with St. Bonaventure. In exchange for a payment of $550,000 from St. Bonaventure, mutual releases, and other consideration, the Debtors will quit claim the disputed property to St. Bonaventure and St. Bonaventure will benefit from the channeling injunction set forth in the Plan.

The Debtors' most valuable properties are the Gallup School, the Chancery, the Retreat Center, and the Catholic Indian Center which are also vital to the continued mission and ministry of the Diocese.

In order to fund the Plan, however, the Debtors will obtain a loan from the Catholic Order of Foresters ("**Foresters**") that will be secured by the Gallup School and the Retreat Center. The Debtors have a loan commitment from Foresters for a loan to the Debtors in the principal amount of at least $2,300,000. For the first five years, the loan will bear interest at a rate of four percent (4%) per annum, computed on a 360-day year. Beginning on the sixth (6th) anniversary of the loan origination the interest rate will increase to five and one-half percent (5.5%); and beginning on the eleventh (11th) anniversary of the loan origination, the interest rate will increase to seven percent (7%). The loan will mature on the fifteenth (15th) anniversary of the loan origination date. The Debtors will request the Court approve such financing under Bankruptcy Code § 364 as part of the Confirmation Order.

The Debtors will sell the Catholic Indian Center to SWIF, and will then lease space back from SWIF where the Debtors may also move all or part of their operations. Catholic Charities and CPF also provide their services and operate their functions at the Catholic Indian Center. This sale is part of an agreement with SWIF whereby SWIF will also become a Participating Party. Through this transaction, the Debtors will realize value from a property that is essential to their mission and ministry.

15

The Debtors may sell other property in order to meet their obligations under the Plan although confirmation of the Plan does not depend on such sales.

## VI.    SIGNIFICANT EVENTS IN CHAPTER 11

Certain significant events that have occurred since the Petition Date are summarized as follows:

### A.    First Day Motions.

The Court granted the Debtors' "first day" motions and entered orders approving, among other things:

1.    A motion to jointly administer the Debtors' Reorganization Cases in order to save substantial time and expense by eliminating the need to prepare, replicate, file and serve duplicative notices, motions and orders. ["Motion for Entry of Order Directing Joint Administration" Dkt. No. 9; Arizona Entity Dkt. No. 11.]

2.    A motion to limit service in order to avoid the impractical and significant administrative and economic burden upon the Debtors' Estates by sending notices to more than a thousand recipients each time notice to all creditors and other parties in interest is required. ["Motion for an Order Limiting Notice and Establishing a Limited Notice List" Dkt. No. 17; Arizona Entity Dkt. No. 16.]

3.    A motion to file certain documents and creditor lists under seal. Because of the sensitive nature of the Tort Claims and the Debtors' desire to protect the privacy of the Tort Claimants, the Debtors requested that certain information regarding the Tort Claimants be filed and maintained under seal. ["Motion for an Order Under 11 U.S.C. § 107 and Fed. R. Bankr. P. 1007(j) and 9018 Authorizing Debtor to File Portions of Schedule F, the Master Mailing List and Other Pleadings and Documents Under Seal and Related Relief" Dkt. No. 13; Arizona Entity Dkt. No. 14.]

4.    A motion to pay certain pre-petition wages, compensation and honor employee benefit plans and programs under 11 U.S.C. §§ 105, 363 and 507 in order to retain current employees. ["Motion for an Order Under 11 U.S.C. § 107 and Fed. R. Bankr. P. 9018 Authorizing Debtor to File Under Seal Exhibits to Motion for an Order Under 11 U.S.C. § 105, 363, and 507 Authorizing Debtor to Continue to Pay Pre-Petition Wages, Compensation and Honor Employee Benefit Plans and Programs" Dkt. No. 16.]

### B.    Motions To Employ Professionals.

The Debtors filed applications to employ certain professionals to assist them with the Reorganization Cases. The Bankruptcy Court has entered orders approving the employment of the following professionals by the Debtors:

16

1.      An application to employ Quarles & Brady LLP as general reorganization and restructuring counsel for Debtors.  ["Debtor's Application for an Order Authorizing the Employment of Quarles & Brady LLP as General Reorganization and Restructuring Counsel for the Debtor and Debtor-in-Possession" Dkt. No. 10; Arizona Entity Dkt. No. 12.]

2.      An application to employ KLK as accountant and financial consultant for Debtors.   ["Application for an Order Authorizing the Employment of Keegan, Linscott & Kenon, P.C. as Accountant and Financial Consultant for the Debtor and Debtor-in-Possession" Dkt. No. 11; Arizona Entity Dkt. No. 13.]

3.      An application to employ Walker & Associates, P.C. as bankruptcy counsel for Debtors.  ["Application to Employ Walker & Associates, P.C. as Bankruptcy Counsel for Debtor" Dkt No. 14, Arizona Entity Dkt. No. 15.]

4.      An application to employ Stelzner, Winter, Warburton, Flores, Sanchez & Dawes, P.A. as special litigation counsel for RCCDG.  ["Debtor's Application for an Order Authorizing the Employment of Stelzner, Winter, Warburton, Flores, Sanchez, & Dawes, P.A. as Special Counsel for the Debtor and Debtor-in-Possession" Dkt. No. 27.]

5.      The Bankruptcy Court entered an order approving the employment of the law firm of Pachulski Stang Ziehl & Jones, LLP by the Committee. ["Order Authorizing Employment of Pachulski Stang Ziehl & Jones LLP as Counsel for the Official Committee of Unsecured Creditors" Dkt. No. 185.]

6.      An application to employ IAG as insurance archaeologist for the Debtors in order to assist in the determination whether liability coverage exists for certain periods of time and to assist with other historical insurance issues.  ["Debtors' Application for an Order Authorizing the Employment of Insurance Archaeology Group as an Insurance Archaeologist for the Debtors and Debtors-in-Possession" Dkt. No. 211.]

7.      An application to appoint a legal representative for Unknown Tort Claimants and to employ Michael P. Murphy as the Unknown Claims Representative, and his firm, AlixPartners, LLP to assist him in this undertaking.  ["Motion for Order Appointing a Legal Representative to Represent the Interests of Unknown Tort Claimants, Including Minors, in the Reorganization Cases and Application to Employ Michael P. Murphy as Unknown Claims Representative" Dkt. No. 348.]  Later, Mr. Murphy and AlixPartners, LLP resigned as Unknown Claims Representative, and the Hon. (Ret.) Michael R. Hogan took over the role of Unknown Claims Representative.   ["Order Approving Debtors' Motion for an Order Substituting Michael R Hogan as Legal Representative to Represent the

17

Interests of Unknown Tort Claimants, Including Minors, in the Reorganization Cases and Application to Employ Michael R. Hogan as Unknown Claims Representative; and Motion for Order Authorizing the Resignation of Michael P. Murphy" Dkt. No. 526.]

8.    An application to employ brokers Tucson Realty and Trust Company and the Accelerated Marketing Group to assist in the sale of certain real property.  ["Motion to (I) Retain Brokers; (II) Sell Property Under 11 U.S.C. § 363(b), (f), and (m); and (III) Approve Sale Procedures" Dkt. No. 383.]

## C.    Parish Use of Debtors' Tax Identification Numbers.

In approximately January 2014, the Debtors became aware that at least some of the Parishes were using the Debtors' tax identification number.  Although the Debtors contend this usage had no proprietary or financial implications for the Debtors, a contention the Committee disputed in the Bankruptcy Court, the Debtors disclosed it to the Bankruptcy Court and various parties in interest.  *See* Dkt. Nos. 147, 151, 153 and 166.  In all events, even if the use of the tax identification numbers could be contended to have proprietary or financial implications for the Debtors, the accounts using the tax identification numbers would be held in trust by the Debtors for the Parishes.  Since that time, the Debtors have attached the bank statements of such Parishes to their monthly operating reports for reference.  Any issues related to this matter are resolved pursuant to the agreement with the Parishes whereby they become a Participating Party.

## D.    Real Property Sale.

1.    The Debtors owned numerous parcels of real property that they acquired, or which were donated to them, over many years.  Many of these properties were in remote or inaccessible areas, and the real property records maintained by the counties in which the properties sat were often incomplete.  After undertaking extensive work with the assistance of counsel to identify the properties that could be sold without harming the mission or ministry of the Diocese, the Debtors filed a motion requesting the Court to approve certain auction and sale procedures to monetize the excess real property.  *See* "Motion to (I) Retain Brokers; (II) Sell Property Under 11 U.S.C. § 363(b), (f), and (m); and (III) Approve Sale Procedures" [Dkt. No. 383].  The Court approved the motion, and the real property was auctioned in Arizona and New Mexico on September 12 and September 19, 2015, respectively, after extensive marketing campaigns. All of the real property was sold; however, the sale of one auction lot consisting of numerous parcels, commonly known as La Vega Estates (Item 71 on RCCDG's Schedule A) did not close.  Therefore RCCDG continues to own that property.  The Debtors realized approximately $162,000 in net income from the sales.

2.    A newspaper reporter from the *Gallup Independent* raised a concern with the Court that she was unable to attend the New Mexico auction.  The

18

Court conducted a hearing on the matter and ultimately concluded that the sales would not be overturned.

### E. Stay Relief Proceedings.

1. On July 8, 2015, three Tort Claimants filed motions for relief from the automatic stay in order to conduct jury trials of their Tort Claims, and the Committee filed a memorandum of law in support of the motions. The Debtors objected, as did CM and NMPCIGA. The Court conducted a preliminary hearing on the motion on August 13, 2015, and held status hearings in the matter on October 15, 2015, November 10, 2015 and December 16, 2015.

2. Later, another group of Tort Claimants filed a motion for relief from the automatic stay also seeking to conduct one or more trials on their Tort Claims. Status hearings were conducted in this matter on November 10, 2015 and December 16, 2015, after which proceedings on both stay relief motions were stayed. All issues related to all stay relief motions are resolved pursuant to the Plan.

### F. Claims Bar Date And Plan And Disclosure Statement.

1. To determine the universe of claims that would be dealt with in a plan of reorganization, the Debtors filed a motion (the "**Bar Date Motion**") requesting the Court set August 11, 2014 as the deadline by which claims against the Debtors must be filed and approving claim forms, form of notices and procedures for giving notice of the deadline to file proofs of claim (the "**Bar Date**"). ["Motion for an Order Fixing Time for Filing Proofs of Claim, Approving Claim Forms, and Approving Manner and Form of Notice" Dkt. No. 192.] The Court approved the Bar Date Motion and the Debtors undertook an extensive publicity and publication program to alert the public and their creditors of the Bar Date. The program was formulated with the Committee's input and assistance and was completed. The Bar Date passed on August 11, 2014.

2. The Court granted the Debtors' motions to extend their exclusive period to solicit acceptances of a plan of reorganization in order to facilitate negotiations with key creditors and creditor constituencies and allow additional time to reach a resolution and attempt to file a consensual plan of reorganization. Ultimately, however, the exclusivity periods expired without a consensual plan having been filed. Therefore, the Committee and Debtors stipulated that to allow them to continue negotiating, neither would file a unilateral plan of reorganization without first giving the other at least sixty (60) days' notice. Both the Committee and Debtors gave each other notice on August 28, 2015, that they may file competing plans of reorganization. As a result of the mediations ordered by the Court, the constituencies in the Reorganization Cases were able to reach a mediated

19

settlement, obviating the need for what would otherwise be significantly expensive confirmation litigation or the potential of competing plans.

**G.      Other Motions And Applications.**

In addition to the foregoing, the following have also occurred:

1.      The Debtors filed their Schedules of Assets and Liabilities and their Statements of Financial Affairs.  [Dkt. Nos. 66-67; Arizona Entity Dkt. Nos. 44-45.]

2.      The Debtors have filed all required monthly operating reports and paid all quarterly fees as they are assessed or become due to the United States Trustee's office.  [Dkt. Nos. 125, 142, 183, 209, 227, 239, 254, 263, 281, 295, 308, 333, 338, 339, 350, 353, 359, 385, 393, 423, 434, 440, 473, 496, 501, 510, and 539; Arizona Entity Dkt. Nos. 57, 58, 60, 61, 63, 64, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 79, 80, 81, 82, 83, 84, 85, 86, and 87.]

**H.      Mediation And Settlement Negotiations.**

As part of the Debtors' ongoing efforts to present a consensual resolution of the Reorganization Cases and facilitate confirmation of a plan of reorganization that could be supported by all significant creditor constituencies, the Debtors engaged in ongoing mediation in June, August, and December 2015 with parties essential to their Plan.  The June mediation session was unsuccessful, and in August and December, the mediations were conducted by a different mediator, Frank "Dirk" Murchison.  Ultimately, the parties were able to reach a settlement as part of the December 2015 mediation session, which resulted in the Plan.

**VII.   DESCRIPTION OF THE PLAN**

THE FOLLOWING DESCRIPTION OF THE PLAN IS QUALIFIED IN ITS ENTIRETY BY THE TERMS OF THE PLAN ITSELF, WHICH CONTROL.

As stated above, the Plan is premised on the contribution of approximately $24 million to fund the Plan and related expenses.  The following monetary contributions will be made to fund the Plan, pursuant to the Plan, and in some cases, the Insurance Settlement Agreements and the Participating Party Agreements (which are exhibits to the Plan and may be reviewed for further information):

| *Party* | *Commitment* |
| --- | --- |
| Debtors | $3,020,000 |
| Phoenix Diocese | $300,000 |
| SWIF | $515,000 |

20

| Party | Commitment |
|---|---|
| CPF | $665,000 |
| Parishes | $500,000 |
| Franciscans (Guadalupe) | $300,000 |
| Franciscans (St. John) | $1,850,000 (a portion of this funding will come from an Insurer of the Franciscans (St. John), the United States Fidelity and Guaranty Company. |
| CM | $11,550,000 |
| NMPCIGA | $1,850,000 |
| St. Bonaventure | $550,000 |
| Home Insurance | The Liquidator in the Home Liquidation agrees to recommend to the court supervising the Home Liquidation that the Debtors receive a $5,600,000 allowed claim in the Home Liquidation. The allowed claim in the Home Liquidation will be reduced by the subrogation claim of NMPCIGA in the amount of $1,850,000, once NMPCIGA has paid that amount in accordance with the NMPCIGA Settlement Agreement, leaving the Debtors with a claim in the amount of $3,750,000. The Debtors will receive an interim cash distribution in the Home Liquidation, in the amount of approximately 25% of the allowed claim, if and when the allowed claim is approved in the Home Liquidation. |
| CM | In addition to the Cash sum stated above, CM will issue the Unknown Claims Certificate in the amount of $1,800,000 (exclusive of administrative charges for CM) that will insure any Unknown Tort Claims that may be filed in the future. The Unknown Claims Certificate shall be for the sole purpose of paying Allowed Unknown Tort Claims and shall have a maximum term of 8 years from the Effective Date of the Plan. It will terminate on the earlier of exhaustion of the $1,800,000 in coverage or 8 years from issuance, and CM shall have no further liability, regardless of whether policy limits were exhausted, under the Unknown Claims Certificate upon its termination. Among other policy terms of the Unknown Claims Certificate, the Unknown Tort Claims shall be determined and paid in accordance with the manner and amount determined by the Abuse Claims Reviewer. The determination shall be final and non-appealable. The |

| Party | Commitment |
|---|---|
| | Unknown Claims Certificate will not contain any provisions that would allow CM to object to Claims based on ordinary defenses, and CM agrees it will not interfere with the allowance or disallowance of Claims. The payment for charges for the coverage for the Unknown Claims Certificate will be paid by the Debtors based on the Debtors' ability to pay. The coverage shall stay in place independent of the Debtors' payment of charges for the coverage. |

Each of the contributions listed above, except for those from the Debtors themselves, will be made pursuant to various settlement agreements:

A.    **Insurance Settlement Agreements.**

The settlements the Debtors reached with the Settling Insurers are integral parts of the Plan. Disputes existed between the Debtors and CM, including the extent of the Debtors' coverage. Additionally, significant disputes existed between the Debtors and NMPCIGA relating to the insurance coverage provided by the now-insolvent Home Insurance and NMPCIGA's statutory obligations. Also, as a result of the settlements, the Debtors will receive the Home Liquidation Allowed Claim (if approved in the Home Liquidation).

The Settling Insurers contend, for a variety of reasons, that the foregoing settlement amounts exceed the amounts they could be deemed obligated to pay pursuant to the Insurance Policies in connection with the Tort Claims, including any Unknown Tort Claims that might be asserted against the Debtors. The Debtors disagree, but given the substantial time and financial resources it would take for the parties to litigate the Insurance Coverage issues to completion, the extremely limited financial resources of the Debtors, the risks of litigation, and the potential for appeals to further delay recoveries to the Estates and the Tort Claimants, it is in all constituencies' best interests to resolve the Claims and disputes consensually. The negotiated resolution of the numerous Insurance Coverage related issues results in a substantial recovery for the Estates, which money will be available to fund the Plan pursuant to the negotiated settlements and the terms of the Plan including providing recovery for Tort Claimants. Therefore, the Debtors are requesting that the Court approve the Insurance Settlement Agreements as part of the Confirmation Order).

The Plan provides the ability for Insurers that are currently Non-Settling Insurers to become Settling Insurers after the Effective Date; however, the Debtors are not aware of any Non-Settling Insurers with coverage for Tort Claims who are not already Settling Parties. To the extent any Non-Settling Insurer would request to become a Settling Insurer, the Trustee would file and notice a motion for an order approving any such agreement; however, the Reorganized Debtor has standing and the right to object to any such motion. In all events, any such agreement must be approved by the Bankruptcy Court.

QB\38986160.5

Principal Terms Of The Insurance Settlement Agreements Include:

1.   Settlement Amount/Purchase Price.  The Settling Insurers will pay the amounts indicated above (or, with respect to Home Insurance, will provide the Debtors with the Home Liquidation Allowed Claim, subject to approval by the court with jurisdiction over the Home Liquidation), upon agreed notice.  The Trust will then become the entity to which all Tort Claims are channeled as the sole and exclusive source of payment of Tort Claims against the Debtors, the Settling Insurers, and other Participating Parties.

2.   Releases.  The Debtors, on the one hand, and the Settling Insurers, on the other, will grant complete mutual releases as to, among other things, any and all past, present, or future Claims in connection with, relating to, or arising out of, in any manner or fashion, the Tort Claims, the Insurance Policies and the Reorganization Cases, as set forth in their respective settlement agreements.

3.   Sale and Buyback of Policies.  The Debtors will sell all of their Interests in the Released Insurance Policies to Home Insurance and CM, respectively, free and clear of all liens, claims, encumbrances and other Interests pursuant to 11 U.S.C. § 363.  Such sale will be approved, along with the settlements themselves, as part of the Confirmation Order. Notwithstanding the sale of the Insurance Policies of Home Insurance to Home Insurance, the Debtors do not intend to waive or release, and are not waiving or releasing, any Arizona Fund Claims that stem from the Insurance Policies of Home Insurance.

4.   Supplemental Injunction.  The Settling Insurers will be entitled to receive the benefit of a supplemental injunction under the Plan and Confirmation Order pursuant to 11 U.S.C. §§ 105(a) and 363.  Any and all Entities who have held, now hold or who may in the future hold any Interests (including all debt holders, all equity holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, Tort Claimants, Unknown Tort Claimants, perpetrators, Non-Settling Insurers, and all others holding Interests of any kind or nature whatsoever, including those Claims released or to be released pursuant to the Insurance Settlement Agreements) against any of the Participating Parties, Insured Entities, or the Settling Insurers, which, directly or indirectly, relate to, any of the Insurance Policies, any Tort Claims or any Related Insurance Claims, will be permanently stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Interest against the Settling Insurers, Insured Entities, and/or the Insurance Policies.

5.   Conditions to Settling Insurers' payment.  The Settling Insurers' payments are conditioned on, among other things, entry of the Confirmation Order,

23

and such order becoming a Final Order. The Plan must be in all aspects consistent with the Insurance Settlement Agreements and contain no provisions that diminish or impair the benefits to which the Settling Insurers are entitled under the Insurance Settlement Agreements. Additionally, the Home Settlement Agreement must be approved by the court overseeing the Home Liquidation proceeding.

## B.    Participating Party Settlements.

The settlements the Debtors reached with certain Entities known, by virtue of such settlements, as Participating Parties under the Plan, are integral parts of the Plan. Certain of these Participating Parties, such as the Parishes, are separate but are related in some way to the Diocese. Others, including the Franciscans (and the Franciscans (St. Johns) insurer, United States Fidelity & Guaranty Company), the Phoenix Diocese, St. Bonaventure, SWIF, and CPF, are separately incorporated third parties. Certain of the Parishes and third parties could potentially face liability from the Tort Claims, because of certain individuals that were at some point employed by or affiliated with them. St. Bonaventure has a dispute, described elsewhere herein, with the Debtors relating to certain real property. CPF, though separate and separately incorporated from the Debtors, exists in order to fund certain programs that are important to the mission and ministry of the Diocese, or to provide fundraising services for the Debtors themselves. The Debtors lease property (the Bishop's home) from CPF, which could therefore potentially be subject to certain Avoidance Actions. Also, given the contrast between Canon Law and civil law relating to the Parishes' real property, and the Committee's position on the matter, the Parishes could potentially be subject to certain Avoidance Actions (although the Debtors and Parishes disagree).

Each of the Participating Parties contends, for a variety of reasons, that the foregoing settlement amounts exceed the amounts they could be deemed obligated to pay in connection with the Claims described above and/or the Tort Claims, including any Unknown Tort Claims that might be asserted against the Debtors, or in connection with their various other disputes with the Debtors. Many of the Participating Parties dispute that they would be liable for any amount. However, given the substantial time and financial resources it would take for the parties to litigate such issues to completion, the extremely limited financial resources of the Debtors, the risks of litigation, and the potential for appeals to further delay recoveries to the Estates and the Tort Claimants, it is in the best interests of all the constituencies to resolve these issues consensually which also assist in facilitating a resolution between the Debtors' and the Tort Claimants' and form the basis of a consensual plan. Given the foregoing, the Debtors will request the Court approve the Participating Party Agreements as part of the Confirmation Order.

The Plan provides the ability for Persons that are currently Participating Parties to become Participating Parties after the Effective Date. Among other things, the Bankruptcy Court must enter an Order approving the agreement in order for any Entity to become a Participating Party after the Effective Date.

QB\38986160.5

C. **Principal Terms Of The Participating Party Settlement Agreements Include:**

1.  Settlement Amount/Purchase Price. The Participating Parties will provide the amounts set forth above, upon agreed notice. The Trust will then become the entity to which all Tort Claims are channeled as the sole and exclusive source of payment of Tort Claims against the Debtors, the Settling Insurers, and other Participating Parties.

2.  Releases. The Debtors, on the one hand, and the Participating Parties, on the other, will grant the mutual releases set forth in their respective settlement agreements.

3.  Conditions to Participating Parties' payments. The Participating Parties' payments are conditioned on, among other things, entry of the Confirmation Order, and such order becoming a Final Order. The Plan must be in all aspects consistent with the Participating Party Agreements and contain no provisions that diminish or impair the benefits to which the Participating Parties are entitled under the Participating Party Agreements.

D. **Effective Date.**

The Effective Date will occur on the first Business Day after the conditions to effectiveness stated in Section 27.1 of the Plan have been satisfied, unless the Confirmation Order is stayed by an order of the Bankruptcy Court, the District Court, or another appellate court. Nothing in the Plan precludes the date by which the Effective Date has to occur from being extended by agreement between the Committee and the Debtors, although there is no requirement that either the Committee or the Debtors agree to any such extension.

The Effective Date triggers many of the obligations of the Parties under the Plan, including funding the Plan and payment of certain Claims. However, the Effective Date may occur before all Claims have been Allowed by the Bankruptcy Court and may occur before all Tort Claims have been determined under the Tort Claims Allocation Protocol. Accordingly, in the description of the treatment of Claims below and in the Plan, the payment of Claims is, in some cases, triggered by the Claim Payment Date, which is defined in the Plan as the later of the Effective Date or the first Business Day ten (10) days after a Claim becomes an Allowed Claim by a Final Order. Payment of Tort Claims and Unknown Tort Claims shall be governed by the Allocation Protocols, the Trust Agreement and the Unknown Claims Certificate, as applicable.

Treatment of different Classes of Claims is described below. However, whether or not any payment is made on account of a Claim under the Plan depends on whether it is a Tort Claim (the definition of which includes Unknown Tort Claim for this purpose), or, if not, whether it is Allowed by the Bankruptcy Court. Tort Claim determination and distribution will be governed by the Allocation Protocols, the Trust Agreement, and the Unknown Claims Certificate, as applicable. A Claim that is not a Tort Claim may be Allowed in one of three ways: (1) it was listed in the Debtors' Schedules as undisputed and in a liquidated amount even if no Proof of Claim was filed by the holder of the Claim; (2) a timely Proof of Claim was filed by the holder of the Claim and no objection to the Proof of Claim was timely filed in accordance with the

25

treatment the applicable Class of Claims; or (3) if an objection was filed to a Proof of Claim, then upon entry of a Final Order allowing the Claim.

### E. Unclassified And Unimpaired Claims.

The Plan identifies several types of Claims as unclassified and treats those Claims in accordance with the Bankruptcy Code and applicable law: Administrative Claims, Professional Charges, Priority Unsecured Claims, and Priority Tax Claims.

1. Unclassified Claims.

   a. Administrative Claims include any actual and necessary costs or expenses of administration under Bankruptcy Code § 503, post-petition operating expenses, certain post-petition property tax claims, and charges assessed under Chapter 123 of Title 28, United States Code. Professional Charges include those fees and expenses approved by the Bankruptcy Court under Bankruptcy Code §§ 330, 331, 503(b) and the terms of the Plan. These will be paid from the Trust subject to the Professional Charges Reduction and Professional Charges Cap, which are voluntary concessions made by certain Chapter 11 Professionals in the Reorganization Cases in order to provide additional funding for the Trust.

   b. Priority Unsecured Claims include any Claim entitled to priority under Bankruptcy Code § 507 that is not an Administrative Claim, a Professional Charge, a Priority Tax Claim or a Priority Employee Unsecured Claim. The Plan provides that Administrative Claims and Priority Unsecured Claims will be paid in Cash in full on the Claim Payment Date, or by any alternative arrangement agreed to by the Claim holder or ordered by the Bankruptcy Court.

   c. Priority Tax Claims include all unsecured Claims entitled to priority pursuant to Bankruptcy Code § 507(a)(8) and provides for the treatment authorized by Bankruptcy Code § 1129(a)(9)(C).

2. Unimpaired Claims. The following Classes of Claims are unimpaired by the Plan - that is to say that the Claims will be paid in full in accordance with the Claim holder's existing contractual rights:

   a. Class 1: Priority Employee Unsecured Claims. This Class is defined to include the Claims of RCCDG's employees for vacation or sick leave pay which are entitled to priority under Bankruptcy Code § 507(a)(4)(A). These Claims will not be paid in Cash, but will instead be honored in the ordinary course in accordance with RCCDG's policies at the time the Claims mature. However, the Plan does not alter the Debtors' ability to review the policies and procedures regarding vacation and sick leave pay and to propose modifications to those policies and procedures to become a part of

26

the Plan. To the extent the Debtors propose any changes to such policies and procedures that would be retroactive, the Debtors will modify the Plan to include such changes and give notice to the holders of any Priority Employee Unsecured Claims. In that event, the holders of the Priority Employee Unsecured Claims will be impaired and entitled to vote on the Plan.

F.     **Impaired Claims.**

The following Classes of Claims are impaired by the Plan - that is to say that the existing contractual rights of the holders of the Claims will be altered under the Plan:

1.     Class 2: Prepetition Date Secured Tax Claims - Impaired and Entitled to Vote.

a.     Definition. Class 2 is defined to include the prorated portion of a Secured Tax Claim arising before and up to the Petition Date. Secured Tax Claims include the Claims of any federal, state, or local governmental unit secured by Estate property by operation of applicable non-bankruptcy laws, including, but not limited to, unpaid real property taxes, unpaid personal property taxes, or unpaid sales taxes or leasing taxes, but only to the extent of the validity, perfection, and enforceability of the claimed lien or security interest.

b.     Allowance and Liquidation. Secured Tax Claims will be prorated depending on the date when the tax arises: Taxes arising before the Petition Date will be treated under Class 2. Secured Tax Claims arising after the Petition Date but before the Effective Date will be treated as unclassified Administrative Claims. Secured Tax Claims that arise on or after the Effective Date will be paid in the ordinary course of business of the Reorganized Debtor. Class 2 Claims may be determined by the Bankruptcy Court notwithstanding the existence of any appeals to state or local taxing authorities of property tax or assessment determinations on the Petition Date.

c.     Treatment. Allowed Class 2 Claims will bear interest from and after the Effective Date until they are paid in full at the rate of two percent (2%) per annum and will be paid in three (3) equal installments, with the first (1st) installment paid on the first Business Day that is ninety (90) days after the Effective Date or applicable Claim Payment Date, the second (2nd) installment paid on the first Business Day after the first (1st) anniversary of the Effective Date or the applicable Claim Payment Date, and the third (3rd) and last installment paid on the first Business Day after the

27

second (2nd) anniversary of the Effective Date or the applicable Claim Payment Date.

2.     Class 3:  Secured Claims of Ally Bank - Impaired and Entitled to Vote.

    a.     The Secured Claims of Ally Bank will be treated as Allowed, fully Secured Claims.  Each Secured Claim of Ally Bank secured by a vehicle identified below will be classified as a subclass in Class 3 as subclass 3A, 3B, 3C, and 3D, respectively, and will be paid fully and in Cash as follows:

      i.     The Allowed Class 3 Secured Claims in each subclass will bear interest from and after the Effective Date until they are paid in full at the rate of four percent (4%) per annum or such other rate as ordered by the Bankruptcy Court.

      ii.     Each Class 3 Secured Claim in the subclasses, including interest thereon from and after the Effective Date, will be paid in forty (40) equal monthly installments, commencing on the first Business Day which is thirty (30) days after the Effective Date or the Claim Payment Date.

      iii.     No penalties will be paid on any of the Allowed Class 3 Secured Claims.

      iv.     Except to the extent necessary to modify the current documents evidencing the Class 3 Secured Claims to conform to the treatment of the Class 3 Allowed Secured Claims under the Plan, the prepetition loan documents for each subclass of Class 3 will remain in full force and effect.

      v.     Retention of Liens.  The holder of the Class 3 Secured Claims will retain its lien(s) on its collateral to the extent of its Class 3 Secured Claims.

      vi.     Specific Provisions Relating to Value of Collateral:

        (a)     Subclass 3A - <u>2012 CHEVROLET MALIBU; VIN: 1G1ZC5E09CF299583</u>.  The value of this vehicle will be deemed to be $14,384.60 subject to reduction for adequate protection payments made during the Reorganization Cases prior to the Effective Date for purposes of the subclass 3A Allowed Secured Claim.

        (b)     Subclass 3B - <u>2011 JEEP WRANGLER; VIN: 1J4BA6H11BL548106</u>.  The value of this vehicle will be deemed to be $23,808.29 subject to

28

reduction for adequate protection payments made during the Reorganization Cases prior to the Effective Date for purposes of the subclass 3B Allowed Secured Claim.

(c)    Subclass 3C - <u>2012 CHEVROLET MALIBU; VIN: 1G1ZC5EU0CF125601</u>. The value of this vehicle will be deemed to be $14,384.60 subject to reduction for adequate protection payments made during the Reorganization Cases prior to the Effective Date for purposes of the subclass 3C Allowed Secured Claim.

(d)    Subclass 3D - <u>2012 CHEVROLET MALIBU; VIN: 1G1ZC5EUXCF255711</u>. The value of this vehicle will be deemed to be $13,770.37 subject to reduction for adequate protection payments made during the Reorganization Cases prior to the Effective Date for purposes of the subclass 3D Allowed Secured Claim.

3.    Class 4: Pinnacle Bank Secured Claim - Impaired and Entitled to Vote.

a.    This Class includes the Claim of Pinnacle Bank, which is at least partially secured by the collateral of Pinnacle Bank, the Chancery. The Class 4 Claim is a Disputed Claim. When the Class 4 Claim becomes an Allowed Secured Claim, it will be paid the amount of its Allowed Secured Claim as follows:

i.    The Allowed amount of the Class 4 Secured Claim will be determined in accordance with Bankruptcy Code § 506. The Allowed Class 4 Secured Claim will be paid in monthly installments of principal amortized over twenty-five (25) years from the Effective Date plus interest at the rate of three percent (3%) from the date the Class 4 Claim becomes an Allowed Secured Claim and thereafter until the tenth (10th) anniversary of the Claim Payment Date applicable to the Allowed Class 4 Secured Claim at which time all principal and accrued interest thereon will be fully due and payable. The first payment on the Class 4 Claim when and if it becomes an Allowed Secured Claim will be due on or before the first Business Day that is ninety (90) days after the Claim Payment Date and continuing on the first (1st) day of each month thereafter until the tenth (10th) anniversary of the Claim Payment Date.

29

ii.       Alternatively, if Pinnacle Bank agrees to reduce its Claim to the amount of $_____, the Class 4 Secured Claim will be an Allowed Secured Claim in such amount. In that event, thirty (30) days after the Effective Date, the Reorganized Debtor will commence interest only payments at the rate of three percent (3%) per annum which will continue to be paid on the first (1st) day of each month thereafter until the collateral securing the Allowed Class 4 Claim is sold at which time the full amount of the Allowed Class 4 Secured Claim (as voluntarily reduced by the holder of the Class 4 Claim) shall be fully due and payable.

iii.     The Pinnacle Bank Loan Documents will be modified to the extent necessary to conform to the Plan. Notwithstanding anything in the prepetition loan documents to the contrary, if Pinnacle Bank does not agree to reduce its Claim as provided in subparagraph ii above, the Pinnacle Loan Documents will be further modified to allow the Reorganized Debtor to sell the Chancery subject to the Pinnacle Bank Loan and to grant additional liens so long as such liens are junior and subordinate to the Pinnacle Bank Loan. If the Chancery is sold subject to the Pinnacle Bank Loan, the repayment terms will be as provided in the Plan.

b.     Retention of Liens. The holder of the Class 4 Claim will retain its lien(s) on the Chancery to the extent of its Class 4 Claim until Pinnacle Bank is paid as provided in the Plan.

4.     Class 5:  General Unsecured Convenience Claims - Impaired and Entitled to Vote.

a.     This is a Class in which holders of General Unsecured Claims in an amount less than $500, inclusive of interest, will receive full payment; or into which holders of General Unsecured Claims in excess of $500 may elect to reduce their Claims to $500. Any general unsecured creditor may, through its Ballot, elect to waive its General Unsecured Claim, and instead obtain payment as a General Unsecured Convenience Claim holder, meaning that it will be paid a total of $500 in two equal installments, without interest. The first (1st) installment will be paid on the first Business Day which is six (6) months after the Effective Date or the Claim Payment Date. The second (2nd) installment will be paid on the first Business Day after the first (1st) anniversary of the Effective Date or the applicable Claim Payment Date.

30

5. Class 6: Phoenix Diocese Unsecured Claims - Impaired and Entitled to Vote.

   a. The holder of the Class 6 Claim(s) has voluntarily agreed to waive and release its Class 6 Unsecured Claim as set forth in the Phoenix Diocese Settlement Agreement.

6. Class 7: General Unsecured Claims - Impaired and Entitled to Vote.

   a. Class 7 includes every Claim against the Debtors (including, but not limited to, every such Claim arising from the rejection of an Executory Contract and every Claim which is the undersecured portion of any Secured Claim), which (1) is not an unclassified claim, and (2) is not classified in any other Class under the Plan.

   b. Each holder of a Class 7 General Unsecured Claim, as and when such General Unsecured Claim is or becomes an Allowed Claim, will be paid the full amount of its Claim (without interest or penalties) in Cash in five (5) annual installments with the first (1st) installment to be paid on the first Business Day that is nine (9) months after the Effective Date (or the Claim Payment Date), and each installment thereafter on the first Business Day that is twelve (12) months after the previous payment.

7. Class 8: Other Tort and Employee Claims - Impaired and Entitled to Vote.

   a. Class 8 includes any and all Unsecured Claims against the Debtors for property damage, liability or workers compensation, whether arising from tort, contract, or workers compensation, for which there is Insurance Coverage or a self-insured retention, but excluding Tort Claims and any Claims of employees entitled to priority pursuant to Bankruptcy Code § 507.

   b. Each holder of a Class 8 Other Tort and Employee Claim, as and when such Claim becomes an Allowed Claim, will be paid solely from any Insurance Coverage applicable to such Other Tort and Employee Claim, except to the extent that any such Insurance Policies have been purchased and released by a Settling Insurer pursuant to an Insurance Settlement Agreement, the Plan and the Confirmation Order. To the extent that such Claims may not be satisfied in full by the foregoing, or if such Insurance Policies have been sold and released, then such Other Tort and Employee Claims, to the extent not so satisfied, will be a Disallowed Claim.

8. Class 9: Tort Claims - Impaired and Entitled to Vote.

   a. Class 9 includes any and all Claims for damages, including punitive damages for attorneys' fees and other expenses, fees or costs for any equitable remedy asserted against the Debtors, any

31

Protected Parties, the Trustee, or the Trust, related to bodily injuries or personal injuries, including:

    i.        Acts of Abuse committed by any cleric, employee, volunteer or other Person associated with the Debtors, the Diocese, any Parish or any affiliated Entity within the territory of the Diocese;

    ii.       The failure of the Debtors or the Diocese to properly hire, install and/or supervise any cleric, any volunteer, or any other employee of, or Person associated with, the Debtors, the Diocese, a Parish or any affiliated Entity within the territory of the Diocese;

    iii.     The processing, adjustment, defense, settlement, payment, negotiation or handling of any Claims, demands, suits, proceedings or causes of action based upon or relating in any way to the Claims made as a result of any Abuse or other Tort Claim asserted by a Tort Claimant; or

    iv.     The failure to warn, disclose or provide information concerning the Abuse or other misconduct of clergy, other employees or volunteers or persons associated with the Debtors, the Diocese, the Parishes or any affiliated entities within the territory of the Diocese.

b.    On the Effective Date, the Trust shall assume all liability for and the Trust will pay all Class 9 Claims pursuant to the provisions of the Plan, Plan Documents, Confirmation Order, and Trust Documents. Tort Claimants shall have their Class 9 Claims treated pursuant to the Tort Claims Allocation Protocol, including review of such Tort Claims by the Abuse Claims Reviewer in accordance with the Tort Claims Allocation Protocol.

c.    Except with respect to any Participating Parties and Settling Insurers, nothing in the Plan is intended to affect, diminish or impair any Tort Claimant's rights against any Co-Defendant, but solely with respect to any direct liability of such Co-Defendant (other than as against Participating Parties, Settling Insurers, the Debtors or the Reorganized Debtor against whom all such rights and/or Claims shall be and are hereby released and enjoined as provided in Section 28 of the Plan).

d.    **The right of any Tort Claimant to a trial by jury or otherwise against the Debtors, Reorganized Debtor, and any of the Participating Parties and Settling Insurers is waived and released upon the occurrence of the Effective Date, and the Tort Claim of a Tort Claimant will be solely determined by the**

32

**Abuse Claims Reviewer in accordance with the Tort Claims Allocation Protocol, and shall be a Channeled Claim to be paid solely from the Trust and/or Trust Assets.**

e.     Debtors, the Reorganized Debtor, and their counsel shall reasonably cooperate with the Abuse Claims Reviewer or the Trustee as requested by the Abuse Claims Reviewer or the Trustee by only in connection with any reasonable inquiries by either in the administration of the Tort Claim Allocation Protocol.

f.     No Tort Claimant may challenge the merit, validity, or amount of any Class 9 Claim.  If any objection to a Class 9 Claim pending as of the Effective Date, such objection is deemed withdrawn with prejudice on or after the Effective Date.  The Trustee shall have the sole and exclusive right to object to a Class 9 Claim.

g.     The Trustee shall pay Class 9 Claims in accordance with the terms of the Plan, Plan Documents, Allocation Protocols, Confirmation Order, and Trust Documents.  Notwithstanding the foregoing, **no Tort Claimant shall receive any payment from the Trust unless and until the Tort Claimant has executed a written release of any and all past, present, and future Claims in the form provided for in the Ballot, against the Protected Parties, any Entity insured by any of the Settling Insurers or Participating Parties, and any of the Settling Insurers' or Participating Parties' reinsurers or retrocessionaires;** provided, however, that nothing in Article 15 of the Plan shall require any Tort Claimant to release any Claims against any Co-Defendants except as expressly provided in Article 15 of the Plan.

h.     If a Tort Claim is denied payment pursuant to the Tort Claims Allocation Protocol, the holder of such Tort Claim will have no further rights against the Debtors, the Reorganized Debtor, the Trust, Trustee, Participating Parties, or Settling Insurers arising out of, relating to, or in connection with such Tort Claim and such Tort Claim shall be a Disallowed Claim and shall be discharged and subject to the Channeling Injunction as provided in the Plan.

i.     Before any distribution(s) to Tort Claimants, the Trustee will subtract all Qualified Counsel Fees from the balance of the Trust Assets in an amount equal to:  (a) the total fees payable to Qualified Counsel by the beneficiaries of the Trust based on the reserves or distributions calculated under the Allocation Protocols; and (b) an amount equal to the unpaid reimbursable expenses (prepetition and post-petition through the Effective Date) payable to Qualified Counsel by the beneficiaries of the Trust.  The Trust

33

shall pay fees to Qualified Counsel as and when the Tort Claimant receives a distribution from the Trust.

j.     Subject to the treatment of Qualified Counsel Fees pursuant to the Plan, the fees and expenses of attorneys representing Tort Claimants who receive distributions will be borne by such Tort Claimants based on applicable state law and individual arrangements made between such Tort Claimants and their respective attorneys. Debtors, the Reorganized Debtor, the Participating Parties, or the Settling Insurers will not have any liability for any fees and expenses of attorneys representing any of the Tort Claimants or for any Qualified Counsel Fees. The Trust and the Trustee will not have any liability for any fees and expenses of attorneys representing any of the Tort Claimants, except to the extent that the Trust or the Trustee is required to make payments pursuant to the provisions herein relating to Qualified Counsel Fees.

k.     Penalty Claims relating to Tort Claims will receive no distribution and will be Disallowed Claims.

l.     A Tort Claimant may withdraw a Tort Claim at any time on written notice to the Trustee. If withdrawn:

    i.     The Tort Claim will be withdrawn with prejudice and may not be reasserted against the Debtors, the Reorganized Debtor, the Trustee, the Trust, any Participating Party, or any Settling Insurer, including as an Unknown Tort Claim;

    ii.     As a condition to withdrawal of the Tort Claim, any funds paid to the Tort Claimant by the Trust (inclusive of attorneys' fees and costs) shall be returned to the Trust; and

    iii.     Any reserve maintained by the Trust on account of such Claim shall revert to the non-reserved assets of the Trust for distribution in accordance with the Plan.

    iv.     Withdrawal of any Tort Claim by a Tort Claimant shall be without prejudice to such Tort Claimant's rights against any Co-Defendant but subject to the limitations contained in the Plan and the Confirmation Order.

QB\38986160.5

9.      Class 10:  Unknown Tort Claims - Impaired and Entitled to Vote.

        a.      Definition.

                i.      Class 10 includes any Tort Claim for which no Proof of Claim is filed or deemed filed on or before the Bar Date by a Tort Claimant (as opposed to the Proof of Claim filed by the Unknown Claims Representative) or for which a Proof of Claim is filed after the Bar Date if the Person asserting the Tort Claim:

                        a.      Has a Tort Claim that was barred by the applicable statute of limitations as of the Bar Date but is no longer barred by the applicable statute of limitations for any reason, including for example the passage of legislation that revives such previously time-barred Tort Claims; or

                        b.      Turns 18 on or after July 11, 2014 (the date which is thirty (30) days prior to the generally applicable Bar Date in the Reorganization Cases of August 11, 2014); or

                        c.      As to which the applicable Arizona or New Mexico tort claim statute of limitations, for any reason, has not expired or has been tolled as of July 11, 2014, as determined under applicable Arizona or New Mexico federal law, but without regard to federal bankruptcy law; and

                        d.      Submits a Proof of Claim in accordance with the procedures set forth in the Plan.

        b.      Treatment.

                i.      On the Effective Date, the Trust shall assume all liability for and the Trust will pay all Unknown Tort Claims pursuant to the provisions of the Plan, Plan Documents, Confirmation Order, and Trust Documents.  Unknown Tort Claimants shall have their Claims treated pursuant to the Unknown Tort Claims Allocation Protocol, including review of such Claims by the Abuse Claims Reviewer in accordance with the Unknown Tort Claims Allocation Protocol.

ii.     Nothing in the Plan is intended to affect, diminish or impair any Unknown Tort Claimant's or any Person's rights against any Co-Defendant (other than as against Participating Parties, Settling Insurers, the Debtors or the Reorganized Debtor if a Co-Defendant, against whom all such rights and/or Claims shall be and are hereby released and enjoined) but solely with respect to any direct liability of such Co-Defendant. **The right of any Unknown Tort Claimant to a trial by jury or otherwise against the Debtors, Reorganized Debtor, and any of the Participating Parties and Settling Insurers is waived and released upon the occurrence of the Effective Date, and the Tort Claim of an Unknown Tort Claimant will be solely determined by the Abuse Claims Reviewer and in accordance with the Unknown Tort Claims Allocation Protocol.**

iii.    The Debtors, the Reorganized Debtor, and their counsel shall cooperate with reasonable requests from the Abuse Claims Reviewer or the Trustee for information requested by the Abuse Claims Reviewer or the Trustee but only with respect to reasonable inquiries regarding the determination of Tort Claims (including Unknown Tort Claims) and in the administration of the Unknown Tort Claims Allocation Protocol.

iv.     The Trustee shall have the sole and exclusive right to object to an Unknown Tort Claim.

v.      The Trust shall pay Unknown Tort Claims in accordance with the terms of the Plan, Plan Documents, Confirmation Order, and Trust Documents; the Trust's ability to seek funding and reimbursement to the Trust for Unknown Tort Claims and related expenses paid shall be governed by the Unknown Claims Certificate. Notwithstanding the foregoing, **no Unknown Tort Claimant shall receive any payment from the Trust unless and until the Tort Claimant has executed a written release of any and all past, present, and future Claims in the form provided for in the Ballot, against the Protected Parties, any Entity insured by any of the Settling Insurers or Participating Parties, and any of the Settling Insurers' or Participating Parties' reinsurers or retrocessionaires;** provided, however, that nothing in Article 16 of the Plan shall require any Unknown Tort Claimant to release any Claims against any Co-Defendants except as expressly provided in Article 16 of the Plan.

36

vi. In the event all Allowed Unknown Tort Claims to be paid by the Trust pursuant to the Plan and the Unknown Claims Certificate are less than the face amount of the Unknown Claims Certificate, in the aggregate, no additional amounts will be paid to the Trust at the expiration of the Certificate. If all Allowed Unknown Tort Claims to be paid by the Trust pursuant to the Plan and the Unknown Claims Certificate are greater than the face amount of the Unknown Claims Certificate, no further payment or compensation will be paid to the Trust or to the Unknown Tort Claimants by the Debtors, the Reorganized Debtor or any other Protected Parties, including CM. All Unknown Tort Claims to be paid by the Trust pursuant to the Plan and the Unknown Claims Certificate must be made before the date of expiration of the Unknown Claims Certificate, to the extent that date occurs before exhaustion of the face amount of the Unknown Claims Certificate, and must be determined by the Abuse Claims Reviewer within thirty (30) days of expiration of the Unknown Claims Certificate.

vii. Although CM will require the Debtors to pay for the Unknown Claims Certificate, the Unknown Claims Certificate cannot be revoked for non-payment.

viii. If an Unknown Tort Claim is denied payment pursuant to the Unknown Tort Claims Allocation Protocol, the holder of such Unknown Tort Claim will have no further rights against the Debtors, Reorganized Debtor, the Trust, Trustee, Participating Parties, or Settling Insurers arising out of, relating to, or in connection with such Unknown Tort Claim.

ix. The fees and expenses of attorneys representing Unknown Tort Claimants who receive payment from the Trust will be borne by such Unknown Tort Claimants based on applicable state law and individual arrangements made between such Unknown Tort Claimants and their respective attorneys. The Participating Parties, Settling Insurers, the Debtors, the Reorganized Debtor, the Trust, and the Trustee will not have any liability for any fees and expenses of attorneys representing any of the Unknown Tort Claimants and any Claims for such fees and expenses will be disallowed.

c. Penalty Claims relating to Unknown Tort Claims will receive no distribution and will be Disallowed Claims.

37

d.      An Unknown Tort Claimant may withdraw an Unknown Tort Claim at any time on written notice to the Trustee.  If withdrawn:

     i.      The Unknown Tort Claim will be withdrawn with prejudice and may not be reasserted against the Debtors, the Reorganized Debtor, the Trustee, the Trust, any Participating Party, or any Settling Insurer;

     ii.      As a condition to withdrawal of the Unknown Tort Claim, any funds paid to the Unknown Tort Claimant by the Trust (inclusive of attorneys' fees and costs) shall be returned to the Trust; and

     iii.      Any reserve maintained by the Trust on account of such Claim shall revert to the non-reserved assets of the Trust for distribution in accordance with the Plan.

     iv.      Withdrawal of any Unknown Tort Claim by an Unknown Tort Claimant shall be without prejudice to such Person's rights against any Co-Defendant but subject to the limitations contained in the Plan and Confirmation Order.

10.     Class 11:  Insurance and Benefit Claims - Impaired and Entitled to Vote.

     1.     The Class 11 Claims will be treated by the Reorganized Debtor in accordance with the past practices and policies of the Debtors.

11.     Class 12:  St. Bonaventure Claims - Impaired and Entitled to Vote.

     a.     The holder of the Class 12 Claims will be treated in accordance with the St. Bonaventure Settlement Agreement which will, among other things, provide for the Debtors to sell the Disputed Property to St. Bonaventure in full satisfaction of the Class 12 Claims, pursuant to a sale ordered by the Bankruptcy Court (which may be ordered as part of the Confirmation Order) free and clear of all liens, claims, interests and encumbrances and further subject to the St. Bonaventure Settlement Agreement.  The conveyance will be pursuant to a quit claim deed from the Debtors (or the Reorganized Debtor) to St. Bonaventure and the property will be sold "as is, where is" with no representations and warranties.

     b.     There will be no Cash distribution to the holder of the St. Bonaventure Claim.

QB\38986160.5

12.    Class 13:  Penalty Claims - Deemed to Reject Plan and Not Entitled to Vote.

    a.    Class 13 includes any Claims for any fine, penalty, forfeiture, multiple damages, punitive damages, or exemplary damages, including, but not limited to, any such Claims not meant to compensate the claimant for actual pecuniary loss, and including, but not limited to, any Claims created by the Patient Protection and Affordable Care Act, 42 U.S.C. § 18001 et seq., and related regulations.

    b.    All Penalty Claims will be Disallowed Claims and there will be no distribution to the holders of any Penalty Claims.

## VIII.   MEANS FOR EXECUTION OF THE PLAN

### A.    Establishment of Plan Implementation Account.

After the Confirmation Date, the Debtors will establish the Plan Implementation Account which will be held and administered in accordance with the Plan, the Insurance Settlement Agreements, the Participating Party Agreements and the Confirmation Order.   The Plan Implementation Account will include the following:

1.    Debtors' Funding.  The Debtors will transfer $3,020,000 or so much as is necessary to satisfy the Debtors' obligations under the Plan to the Plan Implementation Account.

2.    Pursuant and subject to the CM Settlement Agreement between the Debtors and CM, CM will transfer $11,550,000 to the Plan Implementation Account and deliver the Unknown Claims Certificate to the Debtors.

3.    Franciscan Settlement Agreements.   Pursuant and subject to the Franciscan Settlement Agreements, Franciscans (Guadalupe) will transfer $300,000 to the Plan Implementation Account and Franciscans (St. John) and its insurer, United States Fidelity & Guaranty Company, will transfer $1,850,000 to the Plan Implementation Account.

4.    Home Liquidation Allowed Claim.  Pursuant and subject to the Home Settlement Agreement, the Liquidator will seek allowance of the Home Liquidation Allowed Claim in the amount of $5,600,000 which, after reduction in the amount of NMPCIGA's subrogation claim of $1,850,000, will equal $3,750,000.  The Liquidator has already approved a distribution equal to 25% of the amount of the allowed claims in the Home Liquidation, which amount will be paid after the Home Liquidation Allowed Claim is allowed by the Court overseeing the Home Liquidation. This and any other distributions or dividends previously authorized by the Liquidator to be paid on account of the Home Liquidation Allowed Claim

39

will be paid to the Trustee; or, if received by the Debtors prior to the Effective Date, will be transferred to the Plan Implementation Account. There is a potential market in which the Home Liquidation Allowed Claim could be liquidated by sale to a third party rather than distribution over time. Sale of the Home Liquidation Allowed Claim could occur in the Trustee's sole discretion. All costs and expenses of marketing and selling the Home Liquidation Allowed Claim will be subtracted from the proceeds received and will not otherwise be paid by the Debtors or the Reorganized Debtor. There is no guaranty as to the ultimate amount that will be received on account of the Home Liquidation Allowed Claim.

5.   NMPCIGA Funding. Pursuant and subject to the NMPCIGA Settlement Agreement, NMPCIGA will transfer $1,850,000 to the Plan Implementation Account.

6.   Parish Funding. Pursuant and subject to the Parish Settlement Agreement, the Parishes will transfer $500,000 to the Plan Implementation Account.

7.   St. Bonaventure Purchase. Pursuant and subject to the St. Bonaventure Settlement Agreement, St. Bonaventure will transfer $550,000 to the Plan Implementation Account.

8.   Phoenix Diocese Funding. Pursuant and subject to the Phoenix Diocese Settlement Agreement, the Phoenix Diocese will transfer $300,000 to the Plan Implementation Account.

9.   SWIF Sale. Pursuant and subject to the SWIF Sale Agreement, SWIF will transfer $515,000 to the Plan Implementation Account.

10.  CPF Funding. Pursuant and subject to the CPF Settlement Agreement, CPF will transfer $665,000 to the Plan Implementation Account.

**B.   Establishment of Disputed Claims Reserve.**

The Debtors shall establish and fund the Disputed Claims Reserve, if required, as of the Effective Date.

**C.   Payment and Treatment of Claims Other Than Tort Claims and Unknown Tort Claims.**

Payments due to creditors on account of Allowed Claims other than Tort Claims or Unknown Tort Claims will be paid pursuant to the terms of the Plan from the Reorganized Debtor's Revested Assets and ongoing operations.

**D.   Dissolution of Arizona Entity.**

On or before the Effective Date, the Arizona Entity will assign all its Assets (including without limitation any contractual rights) to RCCDG. Any obligations of the Arizona Entity will

be paid, channeled, assigned, or discharged under the Plan and the Arizona Entity will be dissolved.

## E. Retained Claims.

On or before the Effective Date, all Retained Claims will be assigned by the Debtors to the Reorganized Debtor. The Reorganized Debtor may pursue any Retained Claims at its discretion and will retain the proceeds of all such Retained Claims, if any. The Retained Claims are defined in the Plan, and mainly consist of claims against third parties, including the Sisters and Corpus Christi. Retained Claims also include any Claims the Debtors may have for indemnity, contribution, fault allocation, and certain other Claims as set forth in the Plan.

## F. Unknown Claims Certificate.

On or before the Effective Date, the Unknown Claims Certificate shall be delivered and become effective.

## G. Approval of 363 Sales, Foresters Financing, and Settlement Agreements In Confirmation Order.

On or before the Effective Date, the Court shall have approved the sale under Bankruptcy Code § 363 of (i) any Insurance Policies to be purchased by a Settling Insurer pursuant to the requirements of the applicable Insurance Settlement Agreement, and (ii) any property to be purchased by a Participating Party under a Participating Party Agreement. The Court shall have granted the purchasers the protections available under Bankruptcy Code § 363(m). The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Bankruptcy Code § 363 sales free and clear of all liens, Claims, and Interests, and grant of Bankruptcy Code § 363(m) protections.

On or before the Effective Date, the Court shall have approved the financing under Bankruptcy Code § 364 that the Debtors or Reorganized Debtor may receive from Foresters. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Bankruptcy Code § 364 financing.

Additionally, the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the various compromises and settlements contained in the Plan and shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Estates, Participating Parties, Settling Insurers, and creditors, and are fair, equitable and within the range of reasonableness.

## H. Debtors' Waiver and Release of Claims Against Settling Insurers.

As set forth in the Insurance Settlement Agreements, upon the occurrence of the Effective Date and payment by each Settling Insurer of such Settling Insurer's settlement amount pursuant to the applicable Insurance Settlement Agreement, the Debtors, on behalf of themselves, their Estates, successors and assigns, their Representatives and affiliates, fully, finally, and completely remise, release, acquit, and forever discharge and release the corresponding Settling Insurer (and any property thereof) and any of their reinsurers or retrocessionaires from any and all past or

present Claims, causes of action, rights and remedies, including all Claims that relate to Tort Claims and Unknown Tort Claims, the Released Insurance Policies issued by such Settling Insurer, or any other binder, certificate, or policy or certificate of insurance issued by such Settling Insurer, including any Channeled Claims, all Extra-Contractual Claims and all Related Insurance Claims that, directly or indirectly, arise from, relate to, or are in connection with the Reorganization Cases. This release specifically includes all Unknown Tort Claims that are based in whole or in part on the Tort Claims, the Released Insurance Policies, or any other binder, certificate, or policy of insurance issued by such Settling Insurer, with all Tort Claims and Unknown Tort Claims channeled to the Trust, pursuant to the Plan, and with no liability to such Settling Insurer. Notwithstanding the foregoing release, if any Insurance Policies or Insurance Coverage is reserved and not released or sold in an applicable Insurance Settlement Agreement, then this release shall only apply to those Insurance Policies and/or Insurance Coverage specifically exhausted, sold or released under an applicable Insurance Settlement Agreement. Also, if there is any conflict between an Insurance Settlement Agreement and the Plan (including the foregoing release), the terms of the applicable Insurance Settlement Agreement shall prevail.

I.    **Debtors' Waiver and Release of Claims Against Participating Parties.**

In consideration of the terms of the Participating Party Agreements and other consideration, upon the Effective Date and the Participating Party's performance under their respective Participating Party Agreements, including without limitation delivery of any dismissal orders or stipulations that may be required thereunder, the Debtors, on behalf of themselves, their Estates, successors and assigns, their Representatives and affiliates fully, finally, and completely remise, release, acquit, and forever discharge and release each Participating Party (and any property thereof) from any and all liability to the Debtors for past or present Tort Claims and Unknown Tort Claims and any contribution, indemnity, or allocation of fault Claims related to such Tort Claims and Unknown Tort Claims.

## IX.    CONDITIONS PRECEDENT TO EFFECTIVE DATE

### A.    Conditions Precedent.

The Effective Date will occur when each of the following conditions have been satisfied or waived by the Debtors in accordance with Section 27.1 of the Plan:

1.    The Bankruptcy Court shall have entered a Final Order or Final Orders approving all Insurance Settlement Agreements and any appropriate judgments consistent therewith, in form and substance reasonably acceptable to the Settling Insurer with respect to that Settling Insurer's Insurance Settlement Agreement and consistent with the requirements of such Settling Insurer's applicable Insurance Settlement Agreement, and no stay of such order(s) is in effect;

2.    The Bankruptcy Court shall have entered a Final Order or Final Orders approving all Participating Party Agreements and any appropriate judgments consistent therewith, in form and substance reasonably acceptable to the Participating Party with respect to that Participating

42

Party's Participating Party Agreement and consistent with the requirements of the such Participating Party's applicable Participating Party Agreement, and no stay of such order(s) is in effect;

3. The Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Reorganized Debtor, the Committee, the Settling Insurers, the Participating Parties and the Confirmation Order is a Final Order and no stay of the Confirmation Order is in effect;

4. The Trustee and the Reorganized Debtor have signed the Trust Agreement;

5. All of the Settling Insurers and the Participating Parties have transferred their applicable amounts into the Plan Implementation Account;

6. CM shall have delivered the Unknown Claims Certificate to the Debtors; and

7. The Debtors have transferred $_____ from the Plan Implementation Account to the Trust.

### B. <u>Waiver Of Conditions</u>.

Any condition set forth in Section 27.1 of the Plan may be waived by the mutual written consent of the Debtors, the Committee, the Settling Insurers with respect to any conditions affecting such Settling Insurer's obligations and the Participating Parties with respect to any conditions affecting such Participating Party's obligations.

### C. <u>Non-Occurrence Of Effective Date</u>.

Subject to further order of the Bankruptcy Court, in the event that the Effective Date does not occur within ninety (90) days of entry of the Confirmation Order (as a Final Order) or the Final Order approving an Insurance Settlement Agreement or Participating Party Agreement (as the case may be), the Plan shall become null and void unless agreed otherwise by the Debtors, the Committee, the Settling Insurers and the Participating Parties. A statement shall be filed with the Court within three (3) Business Days after the occurrence of any event that renders the Plan null and void.

## X. <u>REORGANIZATION OF THE DEBTORS AND PARISHES</u>

### A. <u>Reorganization of Debtors</u>.

After assigning all of its Assets or the transfer of such Assets pursuant to the Confirmation Order, the Arizona Entity will be dissolved and shall no longer have any corporate existence. RCCDG will, as a Reorganized Debtor, continue to exist after the Effective Date as a separate legal entity, with all powers of a religious corporation sole under the laws of the State of New Mexico and without prejudice to any right to alter or terminate such existence under

43

applicable state law but subject to applicable Canon Law. On and after the Effective Date, the Reorganized Debtor and the Diocese may operate their respective businesses and carry on the ministry and the mission of the Roman Catholic Church and may use, acquire, or dispose of property, and compromise or settle any Claims without supervision or approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order. The Reorganized Debtor will continue to be managed in accordance with the principles of Canon Law and applicable state law.

### B. Reorganization of Parishes.

After the Confirmation Date and after consultation with the Parishes, all real property, legal title to which is held in the name of the Debtors in trust for the benefit of the Parishes will be transferred into a separate express trust. At that time or thereafter, the civil structure of the Parishes may be further reorganized. Notwithstanding the structure of such reorganization, such reorganization will comply, in all respects, with Canon Law. Any disputes regarding the interpretation and governance of the legal structure and operation of a Parish will be referred for determination to the appropriate agency or tribunal provided for under Canon Law. Such transfer may occur before or after the Effective Date, and, although it will be approved in the Confirmation Order, is not a condition precedent to the Effective Date.

## XI. POST-EFFECTIVE DATE EVENTS AND PERFORMANCE BY THE REORGANIZED DEBTOR

A. The funds necessary to ensure continuing performance under the Plan after the Effective Date will be (or may be) obtained from:

    1. Proceeds of the Unknown Claims Certificate (but only for the purpose of compensating Unknown Tort Claimants);

    2. Liquidation or financing of any and all Retained Assets;

    3. Cash generated by the post-Effective Date operations of the Reorganized Debtor; and

    4. Any reserves established by the Debtors or the Reorganized Debtor; provided, however, that no part of the Trust may be used to pay creditors other than Tort Claimants, Unknown Tort Claimants, and Trust administrative expenses under the Plan, and only those Assets to be paid or contributed to the Trust, pursuant to the Plan, will be used to pay the allowed Claims of Tort Claimants and Unknown Tort Claimants and Trust administrative expenses.

B. The Committee will be dissolved upon occurrence of the Effective Date; provided, however, that the Committee may continue to exist after the Effective Date with respect to any and all applications for Professional Charges, but not for any other purpose.

C. Post-Effective Date, the Reorganized Debtor will:

1. In the exercise of its respective business judgment, review all Claims filed against the Estates except for Tort Claims and Unknown Tort Claims and, if advisable, object to such Claims;

2. Honor the Debtors' obligations arising under each Participating Party Agreement and Insurance Settlement Agreement and any other agreement that has been approved by the Bankruptcy Court as part of the Plan;

3. Transfer the Home Liquidation Allowed Claim to the Trust;

4. If not previously completed, transfer $_____ from the Plan Implementation Account to the Trust within two (2) Business Days after the Effective Date and such other funds received and which are to be paid to the Trust, pursuant to the terms of the Plan within three (3) Business Days after receipt thereof; and,

5. Perform all of its obligations under the Plan and Plan Documents, in each case, as and when the same become due or are to be performed.

**D.** No professional fees or expenses incurred by a Tort Claimant will be paid by the Debtors, the Reorganized Debtor, the Settling Insurers, Participating Parties or the Trustee with respect to any Claim except as specified in the Plan or the Trust Documents.

**E.** As soon as practicable after the Effective Date, when the Reorganized Debtor deems appropriate, the Reorganized Debtor will seek authority from the Bankruptcy Court to close the Reorganization Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules; provided, however, that entry of a final decree closing the Reorganization Cases shall, whether or not specified therein, be without prejudice to the right of the Reorganized Debtor, the Trustee, or any other party in interest to reopen the Reorganization Cases for any matter over which the Bankruptcy Court or the U.S. District Court for the District of New Mexico has retained jurisdiction under the Plan. Any order closing these Reorganization Cases will provide that the Bankruptcy Court or the U.S. District Court for the District of New Mexico, as appropriate, will retain (a) jurisdiction to enforce, by injunctive relief or otherwise, the Confirmation Order, any other orders entered in the Reorganization Cases, and the obligations created by the Plan and the Plan Documents; and (b) all other jurisdiction and authority granted to it under the Plan and the Plan Documents.

**F.** The Reorganized Debtor shall retain and exclusively enforce the Retained Claims, whether arising before or after the Petition Date, in any court or other tribunal, including, without limitation, a Bankruptcy Court adversary proceeding filed in these Reorganization Cases. The Reorganized Debtor shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such Retained Claims, without obtaining Bankruptcy Court approval.

**G.** Except for Tort Claimants, any person to whom the Debtors have incurred an obligation (whether on account of the provision of goods, services or otherwise), or who has received goods or services from the Debtors or a transfer of money or property of the Debtors, or

45

who has transacted business with the Debtors, or leased equipment or property from the Debtors should assume that such obligation, transfer, or transaction may be reviewed by the Reorganized Debtor, subsequent to the Effective Date and may, if appropriate, be the subject of an action after the Effective Date, regardless of whether (i) such Person or Entity has filed a Proof of Claim against the Debtors in these Reorganization Cases; (ii) such Person's or Entity's Proof of Claim has been objected to; (iii) such Person's or Entity's Claim was included in the Schedules; or (iv) such Person's or Entity's scheduled Claims have been objected to or have been identified as disputed, Contingent, or unliquidated.

## XII.    <u>POST-CONFIRMATION MANAGEMENT</u>

**A.**    The Reorganized Debtor will continue to be managed in accordance with the principles of Canon Law and applicable state law, and the Bishop will be the sole director of the Reorganized Debtor.

**B.**    The Committee has designated the Hon. William L. Bettinelli (Ret.) as the person who shall serve as the Abuse Claims Reviewer. The Abuse Claims Reviewer's *curriculum vitae* will be filed with the Court, along with a proposal from the Abuse Claims Reviewer with respect to his or her service as the Abuse Claims Reviewer including the proposed Allocation Protocols and proposed fees with respect to his or her service as the Abuse Claims Reviewer.

**C.**    On or before the Effective Date, the Committee will designate the person who shall serve as the Trustee. The Trustee's *curriculum vitae* will then be filed with the Court, along with a copy of the rate schedule or other fee agreement that will apply to his or her service as the Trustee.

## XIII.    <u>LIQUIDATION OF TORT CLAIMS AND UNKNOWN TORT CLAIMS</u>

**A.**    The Trustee shall pay Tort Claims in accordance with the terms of the Plan, Confirmation Order, the Plan Documents, Trust Documents and Allocation Protocols and without regard to the Debtor against which the Tort Claimant or Unknown Tort Claimant filed his or her Proof of Claim.

**B.**    The amount of the Trust's distributions/reserves on account of the Tort Claims shall not be binding upon any Non-Settling Insurer or any Co-Defendant in connection with a Co-Defendant's liquidation of any contribution or indemnity claim.

**C.**    Nothing in the Trust Documents shall (i) impose any costs, directly or indirectly, upon the Estates, the Reorganized Debtor, any Participating Party or any Settling Insurer relating to the treatment of Tort Claims or (ii) otherwise modify the rights or obligations of the Estates, the Reorganized Debtor, any Participating Party or any Settling Insurer as otherwise set forth in the respective Insurance Settlement Agreement, Participating Party Agreement, Unknown Claims Certificate, the Plan or a Plan Document.

**D.**    Because Tort Claims are being paid by the Trustee without regard to whether those Claims are covered by Insurance Policies issued by Settling Insurers or Participating Parties: (a) the Trust shall be deemed to be subrogated to the Claims of the Tort Claimants paid by the Trust to the extent of those payments and (b) the Trust may pursue such subrogation

46

Claim and any Contribution Claim unless such Claim is against the Debtors, the Reorganized Debtor, any Participating Party or any Settling Insurer. The Trust or Trustee may not bring any action against the Debtors, the Reorganized Debtor, any Participating Party, or any Settling Insurer and/or their respective successors, assigns or assets; provided, however, that the Trust may bring an action against any of the foregoing Entities to enforce the Plan or Plan Documents.

   **E.**  If a Tort Claim or Unknown Tort Claim is denied payment pursuant to the applicable Tort Claim Allocation Protocol or Unknown Tort Claim Allocation Protocol, the holder of such Tort Claim or Unknown Tort Claim will have no further rights against the Debtors, Reorganized Debtor, the Trust or Trustee relating to such Tort Claim and such Tort Claim shall be a Disallowed Claim.

## XIV.  NON-MONETARY COMMITMENTS

   In order to further promote healing and reconciliation, and in order to continue efforts to prevent Abuse from occurring in the Diocese in the future, the Reorganized Debtor agrees that beginning within thirty (30) days after the Effective Date, it will undertake the commitments set forth in Exhibit "R" to the Plan.

## XV.  INSURANCE MATTERS

   **A.**  **Settlement with Non-Settling Insurers.**

   Following the Effective Date, the Reorganized Debtor shall not enter into a settlement agreement affecting any Insurance Policy or Insurance Policies with any Non-Settling Insurer solely with respect to any Insurance Coverage for Tort Claims without the express written consent of the Trust, which consent may be granted or withheld at the Trust's sole and absolute discretion. Following the Effective Date, the Reorganized Debtor authorizes the Trust to exclusively act on its behalf to negotiate a settlement with any Non-Settling Insurer on account of such Insurance Claims. Such settlements may provide for the Non-Settling Insurer to become a Settling Insurer.

   **B.**  **Insurance Neutrality.**

   1.  Nothing in the Plan, the Confirmation Order or in any Plan Document modifies any of the terms of any: (i) Non-Settling Insurer's Insurance Policies, (ii) those Insurance Policies issued by a Settling Insurer with respect to the Debtors that are not Released Insurance Policies pursuant to an Insurance Settlement Agreement, or (iii) or the statutory liability of the Arizona Fund or any other Person against whom the Debtors or Reorganized Debtors may have Retained Claims.

   2.  Subject only to Sections 24.1 and 24.3 of the Plan, nothing in the Plan, the Confirmation Order or any Plan Document shall impair or diminish any Non-Settling Insurer's legal, equitable, or contractual obligations relating to the Insurance Policies, or the Insurance Claims against the Non-Settling Insurers in any respect. Subject to collateral estoppel and res judicata, in the event that any court determines that any provision of the Plan impairs

47

or diminishes any Non-Settling Insurer's obligations with respect to Insurance Claims, Insurance Recoveries or Insurance Policies, such provision of the Plan shall be given effect only to the extent that it shall not cause such impairment or diminishment.

3.　　Except as otherwise provided in the Insurance Settlement Agreements or the Plan, the fact that the Trust is liquidating and paying or reserving monies on account of the Tort Claims and Unknown Tort Claims shall not be construed in any way to diminish any obligation of any Insurer under any Insurance Policy to provide Insurance Coverage to the Debtors, the Debtors' Estates or the Reorganized Debtor for Tort Claims or Unknown Tort Claims.　The duties and obligations, if any, of the Non-Settling Insurers under each Non-Settling Insurer's Insurance Policy shall not be impaired, altered, reduced or diminished by: (a) the discharge granted to the Debtors under the Plan pursuant to Bankruptcy Code § 1141(d), (b) the exonerations, exculpations and releases contained in the Plan, or (c) the Channeling Injunction.

4.　　Neither the Trust's payment or reservation of monies on account of the Tort Claims or Unknown Tort Claims nor the Abuse Claims Reviewer's review of a Tort Claim or Unknown Tort Claim shall: (1) constitute a trial, an adjudication on the merits or evidence of liability or damages in any litigation with Non-Settling Insurers, or (2) constitute, or be deemed, a determination of the reasonableness of the amount of any Tort Claim or Unknown Tort Claim, either individually or in the aggregate with other Tort Claims or Unknown Tort Claims, in any litigation of Insurance Claims with any Non-Settling Insurers.

5.　　Notwithstanding any other provision in the Plan, the Confirmation Order or any Plan Document the transfer of rights or the appointment of the Trustee as a representative to enforce Insurance Claims and obtain Insurance Recoveries, as the case may be, shall not be asserted as a defense to coverage under any Non-Settling Insurer's Insurance Policy.

6.　　Subject to Section 24.3 of the Plan, no provision of the Plan, the Confirmation Order or any Plan Document shall diminish or impair the rights of any Non-Settling Insurer under its Insurance Policy or the rights of a Non-Settling Insurer to assert any defense to any Insurance Claims.

7.　　A Non-Settling Insurer's obligations, with respect to any Tort Claim or Unknown Tort Claim, shall be determined by and in accordance with the terms of the Insurance Policies and with applicable non-bankruptcy law.

8.　　Nothing in the Plan, Confirmation Order or any Plan Document, shall impose any obligation on any Participating Party, Non-Settling Insurer or Settling Insurer to provide a defense for, settle, or pay any judgment with respect to, any Tort Claim or Unknown Tort Claim.

48

9. Nothing in the Plan, in the Confirmation Order or in any Plan Document shall grant to any Person any right to sue any Insurer directly, in connection with a Tort Claim, Unknown Tort Claim or any Insurance Policy (including a Released Insurance Policy). To the extent that an Insurance Policy continues in effect after the Effective Date because it is not a Released Insurance Policy, the terms of the Insurance Policy and applicable non-bankruptcy law will govern the rights and obligations of the Persons with rights and obligations in, to, or arising from the Insurance Policy; provided, however, that pursuant to the Plan and the Insurance Settlement Agreements, no Person shall have any right to sue any Settling Insurer directly or indirectly in connection with a Tort Claim, Unknown Tort Claim, or Released Insurance Policy.

10. Subject to Section 24.3 of the Plan, nothing in the Plan, in the Confirmation Order or in any Plan Document shall constitute a finding or determination that any Debtor and/or third party is a named insured, additional insured or insured in any other way under any Insurance Policy; or that any Insurer has any defense or indemnity obligation with respect to any Tort Claim or Unknown Tort Claim. Subject to Section 24.3 of the Plan, no defense, denial or position of a Non-Settling Insurer shall be impaired or prejudiced in any insurance coverage dispute.

11. Nothing in Plan Section 24.2 negates or undoes the voluntary alteration of an Insurer's rights should it elect to become a "Settling Insurer" under the Plan.

12. Nothing in the Plan is intended to affect the governing law of any Insurance Policy.

### C. Judgment Reduction.

In connection to any action by the Trust to enforce Insurance Claims with respect to an Insurance Policy issued by a Non-Settling Insurer, in the event that any Insurer obtains a judicial determination or binding arbitration award that, but for Article 28 of the Plan, it would be entitled to obtain a sum certain from a Settling Insurer as a result of a Contribution Claim, or a Claim for subrogation, indemnification, or other similar Claim against a Settling Insurer for such Settling Insurer's alleged share or equitable share, or to enforce subrogation rights, if any, of the defense and/or indemnity obligation of such Settling Insurer for any Claims released or resolved pursuant to any settlement agreement with a Settling Insurer, the Debtors, the Trustee or other Participating Party, as applicable, shall be deemed to have reduced its judgment or Claim against, or settlement with, such other Insurer to the extent necessary to satisfy such contribution, subrogation, indemnification, or other Claims against such Settling Insurer. To ensure that such a reduction is accomplished, and in addition to invoking the protection afforded it under Article 28 of the Plan in the Bankruptcy Court, such Settling Insurer shall be entitled to assert Section 24.3 of the Plan as a defense to any action against it brought by any other Insurer for any such portion of the judgment or Claim and shall be entitled to request that the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect such Settling

49

Insurer and the Released Parties pursuant to a settlement agreement with a Settling Insurer from any liability for the judgment or Claim. Moreover, if a Non-Settling Insurer asserts that it has a Claim for contribution, indemnity, subrogation, or similar relief against a Settling Insurer, such Claim may be asserted as a defense against the Trust or Debtors in any litigation of Insurance Claims (and the Trust or Debtors may assert the legal and equitable rights of such Settling Insurer in response thereto); and to the extent such a Claim is determined to be valid by the court presiding over such action, the liability of such Non-Settling Insurer to the Trust, the Debtors or other Participating Party shall be reduced dollar for dollar by the amount so determined. The Diocese and the Trust further agree that, in order to effectuate this clause in any action against a Non-Settling Insurer where the Settling Insurers or Participating Parties are not parties, or the Trust, as applicable, shall obtain a finding from that court of what amount the Settling Insurers or Participating Parties would have been required to pay such Non-Settling Insurer under its Contribution Claim, before entry of judgment against such Non-Settling Insurer. The Bankruptcy Court shall retain non-exclusive jurisdiction to determine the amount, if any, of any judgment reduction pursuant to the terms of Plan Section 24.3. In addition, any court of competent jurisdiction may determine the amount, if any, of any judgment reduction pursuant to the terms of Plan Section 24.3.

Notwithstanding any other provision of the Plan, Sections 24.2 and 24.3 of the Plan shall not (i) affect or be construed to restrict or limit the scope or application of the Settling Insurer Injunction or (ii) alter, impair, or diminish any of the protections afforded to Settling Insurers and Participating Parties under the Plan and Confirmation Order, the Insurance Settlement Agreements or the orders approving such settlement agreements.

## XVI.  TREATMENT OF EXECUTORY CONTRACTS

A.  In accordance with the provisions and requirements of Bankruptcy Code §§ 365 and 1123, all Executory Contracts of RCCDG will be assumed on the Confirmation Date, and all Executory Contracts of the Arizona Entity will be assumed and assigned to RCCDG (other than those Executory Contracts that have already been rejected by order of the Bankruptcy Court or are subject to a motion to reject Executory Contracts that is pending on the Confirmation Date). Each Executory Contract assumed pursuant to this Section will vest or revest in, and be fully enforceable by, the Reorganized Debtor in accordance with its terms.

B.  With respect to indemnification obligations of RCCDG to any Person serving at any time on or prior to the Effective Date as one of its officers, employees, council members or volunteers, to the extent provided in any of RCCDG's constituent documents or by a written agreement with RCCDG or under the laws of the State of New Mexico pertaining to RCCDG, those obligations will be deemed and treated as Executory Contracts that are assumed by the Reorganized Debtor, pursuant to the Plan and Bankruptcy Code § 365 as of the Effective Date; provided, however, that under no circumstances will the Reorganized Debtor assume or be responsible for any alleged indemnification obligations of the Franciscans or any priests or others against whom the Debtors have determined or may, in the future, determine, that there are credible allegations of Abuse asserted against such Person(s) or such Person has or may have engaged in some other conduct that would excuse the Reorganized Debtor from providing any indemnification to such Person.

50

**C.** The Debtors, as trustees, hold certain grazing permits to which the federal Bureau of Land Management or the State of Arizona are counterparties. These grazing permits are held in trust by the Debtors for the benefit of the St. John the Baptist Parish in St. Johns, Arizona. It is the position of the Debtors that the grazing permits are licenses, not Executory Contracts that could be assumed; however, to the extent such grazing permits are deemed to be Executory Contracts, they will also be assumed and, to the extent vested in the Arizona Entity, assigned to RCCDG, as of the Effective Date.

**D.** Every Claim asserted by a creditor arising from the rejection of an Executory Contract pursuant to the Plan must be filed with the Bankruptcy Court no later than the first Business Day which is thirty (30) days after the Confirmation Date or the first Business Day that is thirty (30) days after entry of the Final Order of the Bankruptcy Court approving rejection if such Final Order is entered after the Confirmation Date. Every such Claim which is timely filed, as and when it becomes an Allowed Claim, will be treated under Class 7 General Unsecured Claims. Every such Claim which is not timely filed by the deadline stated above will be forever barred, unenforceable, and discharged.

## XVII. EFFECT OF CONFIRMATION

### A. Discharge.

Except as otherwise expressly provided in the Plan or in the Confirmation Order, on the Effective Date, the Debtors and the Diocese will be discharged and their liability will be extinguished completely in respect of any Claim and debt, whether reduced to judgment or not, liquidated or unliquidated, Contingent or noncontingent, asserted or unasserted, fixed or not, matured or unmatured, disputed or undisputed, legal or equitable, known or future, that arose from any agreement the Debtors or the Diocese entered into or obligation of the Debtors or the Diocese incurred before the Confirmation Date, or from any conduct of the Debtors or the Diocese prior to the Confirmation Date, or that otherwise arose before the Confirmation Date, including, without limitation, all interest, if any, on any such Claims and debts, whether such interest accrued before or after the Petition Date, including all Claims and debt of the kind specified in Bankruptcy Code §§ 502(g), 502(h), and 502(i), whether or not a Proof of Claim is filed or is deemed filed under Bankruptcy Code § 501, such Claim is Allowed under Bankruptcy Code § 502, or the holder of such Claim has accepted the Plan.

### B. Vesting.

Except as otherwise expressly provided in the Plan or in the Confirmation Order, on the Effective Date, the Reorganized Debtor will be vested with all of the Assets, including all property of the Estates free and clear of all Claims, liens, encumbrances, charges and other Interests of creditors, including, without limitation, all Assets of the Arizona Entity, and the Reorganized Debtor will, thereafter, hold, use, dispose or otherwise deal with such property, operate its business and conduct its ministry and mission free of any restrictions imposed by the Bankruptcy Code or by the Court. All Retained Claims are preserved under the Plan for the benefit of the Reorganized Debtor. Any Claims, causes of action or demands transferred to the Trust are preserved for the benefit of the Trustee under the Trust.

C.     <u>Exculpation And Limitation Of Liability</u>.

Except as expressly provided in the Plan, none of the Released Parties will have or incur any liability to, or be subject to any right of action by, any claimant, any other party in interest, or any of their respective Representatives, financial advisors, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the Reorganization Cases, including the exercise of their respective business judgment and the performance of their respective fiduciary obligations, the pursuit of confirmation of the Plan, or the administration of the Plan or the property to be distributed under the Plan or the Trusts created thereunder, except for their willful misconduct or gross negligence (provided, however, the Debtors, Reorganized Debtor, the Committee, and its members will be discharged from any such liability for such acts or omissions occurring prior to the Effective Date) and in all respects such parties will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan or in the Reorganization Cases. Without limiting the generality of the foregoing, the Debtors and their financial advisors and other professionals shall be entitled to and granted the benefits of Bankruptcy Code § 1125(e).

D.     <u>Limitation of Liability</u>.

The Protected Parties, the Trust, the Trustee, and professionals employed by the foregoing shall not have any liability to any Entity, including any governmental entity or insurer, on account of payments made to a Tort Claimant, including any liability under the MSPA.

E.     <u>Channeling Injunction</u>.

1.     In consideration of the undertakings of the Protected Parties pursuant to the Plan, and other consideration, and to further preserve and promote the agreements between and among the Participating Parties, the Settling Insurers, and the Debtors which also benefit the Tort Claimants and Unknown Tort Claimants, and the protections afforded the Protected Parties under the Bankruptcy Code, including Bankruptcy Code § 105:

a.     Any and all Channeled Claims are channeled into the Trust and shall be treated, administered, determined, and resolved under the procedures and protocols and in the amounts as established under the Plan, the Unknown Claims Certificate, the Allocation Protocols and the Trust Documents as the sole and exclusive remedy for all holders of Channeled Claims; and

b.     All Entities who have held or asserted, hold or assert, or may in the future hold or assert, any Channeled Claim are hereby permanently stayed, enjoined, barred and restrained from taking any action, directly or indirectly, for the purposes of asserting, enforcing, or attempting to assert or enforce any

52

Channeled Claim against any of the Protected Parties, including:

    i.    **Commencing or continuing in any manner any action or other proceeding of any kind with respect to any Channeled Claim against any of the Protected Parties or against the property of any of the Protected Parties;**

    ii.    **Enforcing, attaching, collecting or recovering, by any manner or means, from any of the Protected Parties, or from the property of any of the Protected Parties, with respect to any such Channeled Claim, any judgment, award, decree, or order against any Protected Parties; and**

    iii.    **Creating, perfecting or enforcing any lien of any kind against any Protected Parties, or the property of any Protected Parties with respect to any such Channeled Claim.**

c.    **Asserting, implementing or effectuating any Channeled Claim of any kind against:**

    i.    **Any obligation due any of the Protected Parties;**

    ii.    **Any Protected Party; or**

    iii.    **The property of any Protected Party.**

d.    **Taking any act, in any manner, in any place whatsoever that does not conform to, or comply with, the provisions of the Plan; and**

e.    **Asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against any obligation due any of the Protected Parties or the property of any of the Protected Parties.**

**F.    The provisions of this Section XVII.F will further operate, as between all Protected Parties, as a mutual release of all Claims relating to the Debtors, the Claims against the Debtor and the Insurance Policies, which any Protected Party may have against another Protected Party except as may be specifically reserved or set forth in a Participating Party Agreement, an Insurance Settlement Agreement, or the Plan. The foregoing channeling provisions are an integral part of the Plan and are essential to its implementation.**

**G.** **Supplemental Injunction Preventing Prosecution Of Claims Against Settling Insurers.**

1. Pursuant to Bankruptcy Code §§ 105(a) and 363 and in consideration of the undertakings of the Settling Insurers pursuant to the Insurance Settlement Agreements, including any of the Settling Insurers' purchases of Insurance Policies from the parties listed on Exhibit M to the Plan free and clear of all interests pursuant to Bankruptcy Code § 363(f), any and all Entities who have held, now hold or who may in the future hold any Interests (including all debt holders, all equity holders, all Persons holding a Claim, governmental, tax and regulatory authorities, lenders, trade and other creditors, Tort Claimants, Unknown Tort Claimants, perpetrators, Non-Settling Insurers, and all others holding Interests of any kind or nature whatsoever, including those Claims released or to be released pursuant to the Insurance Settlement Agreements) against any of the Protected Parties, Insured Entities, or the Insurance Policies, which, directly or indirectly, relate to any of the Insurance Policies, any Tort Claims or any Related Insurance Claims, are hereby permanently stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Interest against the Settling Insurers, Insured Entities, and/or the Insurance Policies, including:

   a. Commencing or continuing in any manner any action or other proceeding against the Settling Insurers or the Insured Entities or the property of the Settling Insurers or the Insured Entities;

   b. Enforcing, attaching, collecting, or recovering, by any manner or means, any judgment, award, decree or order against the Settling Insurers or the Insured Entities or the property of the Settling Insurers or the Insured Entities;

   c. Creating, perfecting, or enforcing any lien of any kind against the Settling Insurers or the Insured Entities or the property of the Settling Insurers or the Insured Entities;

   d. Asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against any obligation due the Settling Insurers or the Insured Entities or the property of the Settling Insurers or the Insured Entities; and

   e. Taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan.

**H.** **Permanent Injunction Against Prosecution of Released and Channeled Claims.**

    1.    **Except as otherwise expressly provided in the Plan and the Unknown Claims Certificate, for the consideration described herein or in the Plan, or described in any agreement by which a Person becomes a Settling Insurer or a Participating Party, or if such Person is a Released Party on the Effective Date, all Persons who have held, hold, or may hold Channeled Claims or Claims against the Protected Parties, whether known or unknown, and their respective civil law and Canon Law officers, directors, officials, Representatives, council members, employees, accountants, agents, attorneys, and all others acting for or on their behalf, will be permanently enjoined on and after the Effective Date from:**

        a.    **Commencing or continuing in any manner any action or any other proceeding of any kind with respect to any Claim, including, but not limited to, any Tort Claim or any Unknown Tort Claim against the Protected Parties or the property of the Protected Parties;**

        b.    **Asserting a Claim against any Person if as a result of such Claim such Person has or may have a Claim against one or more of the Protected Parties;**

        c.    **Seeking the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree, or order against the Protected Parties or the property of the Protected Parties, with respect to any discharged Claim or Channeled Claim;**

        d.    **Creating, perfecting, or enforcing any encumbrance of any kind against the Protected Parties or the property of the Protected Parties with respect to any discharged Claim or Channeled Claim;**

        e.    **Asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due to the Protected Parties with respect to any discharged Claim or Channeled Claim; and**

        f.    **Taking any act, in any manner and in any place whatsoever, that does not conform to or comply with provisions of the Plan or the Plan Documents, including the Trust Agreement.**

    2.    **The foregoing injunctive provisions are an integral part of the Plan and are essential to its implementation. Any and all currently pending court proceedings, the continuation of which would violate the provisions of Plan Article 28, shall be dismissed with prejudice.**

55

I.      __Term Of Injunctions Or Stays And Confirmation Of Settlements__.

On the Effective Date, the injunctions provided for in the Plan shall be deemed issued, entered, valid and enforceable according to their terms and shall be permanent and irrevocable.  All injunctions and/or stays provided for in the Plan, the injunctive provisions of Bankruptcy Code §§ 524 and 1141, and all injunctions or stays protecting any Settling Insurer that has purchased its Insurance Policies in a Bankruptcy Code § 363 sale are permanent and will remain in full force and effect following the Effective Date and are not subject to being vacated or modified.

J.      __Retention of Jurisdiction__.

After the Effective Date, the Bankruptcy Court will retain jurisdiction for the purposes expressly set forth in Article 30 of the Plan, which generally relate to enforcement and implementation of the Plan, including without limitation, allowance or disallowance of Claims, matters relating to Tort Claims and Unknown Tort Claims so long as such jurisdiction is consistent with the terms of the Trust, approval of post-Effective Date agreements of Persons who may become Participating Parties or Settling Insurers, and other matters set forth in the Plan.

XVIII. __FEDERAL TAX CONSEQUENCES__

THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN MANY AREAS, UNCERTAIN.  ACCORDINGLY, ALL HOLDERS OF CLAIMS ARE STRONGLY URGED TO CONSULT THEIR TAX ADVISORS WITH SPECIFIC REFERENCE TO THE FEDERAL, STATE, AND LOCAL TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO SUCH HOLDER.  NEITHER THE DEBTORS NOR THE DEBTORS' COUNSEL MAKE ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO THE DEBTORS OR ANY CREDITOR.  THE FOLLOWING IS ONLY PROVIDED AS A GENERAL DISCUSSION OF POTENTIAL TAX CONSEQUENCES OF THE PLAN AND IS NOT MEANT AS AN ANALYSIS OF HOW ANY PARTICULAR CREDITOR OR PARTY IN INTEREST MAY BE AFFECTED BY ANY TAX IMPLICATIONS OF THE PLAN.

Under the Internal Revenue Code of 1986, as amended (the "**Code**"), there may be significant federal income tax issues arising under the Plan described in this Disclosure Statement that affect creditors in the Reorganization Cases.

A.      __The Trust__.

The Trust is intended to be classified as a "qualified settlement fund" ("**QSF**") within the meaning Treasury Regulations enacted under the Internal Revenue Code at 26 U.S.C. § 468B(g). The Trust is intended to be classified as a QSF because:

1.      The Trust is established pursuant to an order of, or is approved by, the United States, any state, territory, possession or political subdivision thereof, or any agency or instrumentality (including a court of law) of any

56

of the foregoing and is subject to the continuing jurisdiction of that governmental authority;

2.    The Trust is established to resolve or satisfy one or more contested or uncontested claims that has resulted or may result from an event (or related series of events) that has occurred and that has given rise to at least one claim asserting liability arising out of, among other things, a tort, breach of contract, or violation of law related to Abuse (but excluding non-tort obligations of the Debtors to make payments to its general trade creditors or debt holders that relate to a case under Title 11 of the United States Code, a receivership, foreclosure of similar proceeding in a Federal or State court, or a workout); and

3.    The Trust is a trust under applicable state law.

The primary tax consequences of the trust being characterized as a QSF are the following:

1.    The Trust must use a calendar taxable year and the accrual method of accounting.

2.    If the Debtors fund the Trust with appreciated property, the Debtors are deemed to sell the property to the Trust.  Accordingly, any gain or loss from the deemed sale must be reported by the Debtors.

3.    The Trust takes a fair market value basis in property contributed to it by the Debtors.

4.    The Trust's gross income less certain modifications is taxable at the highest federal tax rate applicable to trusts and estates (currently 35%). The Debtors' funding of the Trust with Cash and other property is not reported by the Trust as taxable income.  However, earnings recognized from, for example, the short-term investment of the Trust's funds will be subject to tax.

5.    The Trust may deduct from its gross income a limited number of administrative expenses; the Trust is not entitled to deduct distributions paid to its beneficiaries.

6.    The Trust will have a separate taxpayer identification number and will be required to file annual tax returns (which are due on March 15, or later if an extension is granted under applicable law).  The Trust will also be required to comply with a number of other administrative tax rules including filing informational returns (generally IRS Form 1099) when approved payments are made to Claimants and, where applicable, certain withholding requirements.

57

### B.    Federal Income Tax Consequences To Holders Of Claims.

The federal income tax consequences to a holder of a Claim receiving, or entitled to receive, a distribution in partial or total satisfaction of a Claim may depend on a number of factors, including the nature of the Claim, the claimants' method of accounting, and their own particular tax situation.  Because each claimant's tax situation differs, claimants should consult their own tax advisors to determine how the Plan affects it for federal, state and local tax purposes, based on its particular tax situations.

Among other things, the federal income tax consequences of a distribution to a claimant may depend initially on the nature of the original transaction pursuant to which the Claim arose.  For example, a distribution in repayment of the principal amount of a loan is generally not included in the claimant's gross income.  Distributions to Tort Claimants may or may not be taxable depending on whether the payment may be considered compensation for personal physical injuries.

The federal income tax consequences of a distribution to a claimant may also depend on whether the item to which the distribution relates has previously been included in the claimant's gross income or has previously been subject to a loss or bad debt deduction.  For example, if a distribution is made in satisfaction of a receivable acquired in the ordinary course of the claimant's trade or business, and the claimant had previously included the amount of such receivable distribution in his or her gross income under his or her method of accounting, and had not previously claimed a loss or bad debt deduction for that amount, it is possible that the receipt of the distribution may not result in additional income to the claimant but may, as discussed below, result in a loss.  Conversely, if the claimant had previously claimed a loss or bad debt deduction with respect to the item previously included in income, the claimant may be required to include the amount of the distribution in income when received.

In general, a claimant receiving a distribution in satisfaction of his or her Claim generally may recognize taxable income or loss measured by the difference between (i) the cash and the fair market value (if any) of the property received and (ii) its adjusted tax basis in the Claim.  For this purpose, the adjusted tax basis may include amounts previously included in income (less any bad debt or loss deduction) with respect to that item.  This income or loss may be ordinary income or loss if the distribution is in satisfaction of accounts or notes receivable acquired in the ordinary course of the claimant's trade or business for the performance of services or for the sale of goods or merchandise.  In addition, if a claimant had claimed an ordinary bad debt deduction for the worthlessness of his or her Claim in whole or in part in a prior taxable year, any income realized by the claimant as a result of receiving a distribution may be taxed as ordinary income to the extent of the ordinary deduction previously claimed.  It is possible that the income or loss may be a capital gain or loss if the Claim is a capital asset in the claimant's hands.

## XIX.    MODIFICATION OF PLAN

The Debtors and the Committee or the Reorganized Debtor (as applicable) may modify the Plan or Plan Documents from time to time in accordance with, and pursuant to, Bankruptcy Code § 1127.  The Plan may be modified by the Debtors and the Committee at any time before the Confirmation Date, provided that the Plan, as modified, meets the requirements of

58

Bankruptcy Code §§ 1122 and 1123, and the Debtors and the Committee have complied with Bankruptcy Code § 1125. Each holder of a Claim that has accepted the Plan will be deemed to have accepted such Plan as modified if the proposed alteration, amendment or modification does not adversely change the treatment of the Claim of such holder. Each holder of a Claim that votes in favor of the Plan authorizes the Debtors to modify, at any time prior to the Effective Date and without the requirement of further solicitation, the treatment provided to the Class of Claims such Claims are classified in, provided that the Bankruptcy Court determines that such modification is not material.

From and after the Effective Date, the Trustee, the Reorganized Debtor, Participating Parties and the Settling Insurers shall be authorized to enter into, execute, adopt, deliver and/or implement all contracts, leases, instruments, releases, and other agreements or documents necessary to effectuate or memorialize the settlements contained in the Plan, and Plan Documents without further order of the Bankruptcy Court. Additionally, the Trustee, the Reorganized Debtor, Participating Parties and the Settling Insurers may make technical and/or immaterial alterations, amendments, modifications or supplements to the terms of any settlement, subject to Bankruptcy Court approval, provided that the amendment or modification does not materially and adversely change the treatment of any holder of a Class 9 Claim without the prior written agreement of such holder. A Class of Claims that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified or supplemented hereunder, if the proposed alteration, amendment, modification or supplement does not materially and adversely change the treatment of the Claims within such Class. An order of the Bankruptcy Court approving any amendment or modification made pursuant to Article 29 of the Plan shall constitute an order in aid of consummation of the Plan and shall not require the re-solicitation of votes on the Plan.

## XX. ACCEPTANCE AND CONFIRMATION

### A. Voting Procedures.

1. Generally.

   a. Only those Classes that are impaired under the Plan are entitled to vote to accept or reject the Plan. The Debtors reserve the right to supplement this Disclosure Statement (if necessary) and to solicit any of those Classes which may later prove to be impaired or if circumstances so warrant. The Debtors will send notices of non-voting status to holders of Claims in Classes that are not entitled to vote.

   b. Ballots will be sent to the known holders of Claims who are entitled to vote. For **voting purposes only**, Tort Claims will be estimated at $1.00 and the Debtors have requested that the Court approve this estimation of Tort Claims. The holder of a Claim to which an objection has been filed, including any Tort Claims that are the subject of a pending objection as of the date of approval of this Disclosure Statement, is not entitled to vote on the Plan unless

59

they request on or before _____, 2016, that the Bankruptcy Court, pursuant to Bankruptcy Rule 3018, temporarily allow the Claim in an appropriate amount solely for the purpose of enabling the holder of such Disputed Claim to vote on the Plan, and the Bankruptcy Court does so.

2.      Form of Ballots.

a.      Ballots for Class 9 Claims include certain releases and certifications that are required to be executed before a Class 9 Claimant may receive funds from the Trust. Any Class 9 Ballot received after the voting deadline, while it may not be counted as a vote for or against the Plan, shall be effective as to the releases, certifications, and elections contained in such Ballot.

b.      Ballots for Class 7 General Unsecured Claims include two separate elections to opt into the General Unsecured Convenience Class and to waive the holder's Claim against the Diocese. A timely-submitted Ballot will be counted in accordance with the procedures and limitations herein, regardless whether the holder of the Claim makes either election. Any Class 7 Ballot received after the voting deadline but before commencement of payment on the Claim to which the Ballot pertains, while it may not be counted as a vote for or against the Plan, shall be effective as to the elections contained in such Ballot.

3.      Ballot Tabulation.

a.      Any Ballot that is properly completed, executed and timely returned to counsel to the Debtors but does not indicate an acceptance or rejection of the Plan, or that indicates both an acceptance and rejection of the Plan, shall not be counted;

b.      If no votes to accept or reject the Plan are received with respect to a particular Class that is entitled to vote, such Class shall be deemed to have voted to accept the Plan;

c.      If a creditor, or any Person acting on behalf of a creditor under applicable law, casts more than one Ballot voting the same Claim or Interest before the voting deadline, the latest dated Ballot received before the voting deadline shall be deemed to reflect the voter's intent and thus to supersede any prior Ballots;

d.      Creditors must vote all of their Claims within a particular Class either to accept or reject the Plan and may not split their votes within a particular Class;

e.    The Person signing the creditor's Proof of Claim may complete and sign the creditor's Ballot, except that creditors holding Class 9 Claims are required to sign his or her own Ballot except that a legal guardian or executor may sign on behalf of the claimant if proof of legal standing to do so is provided; and

f.    Any Class 9 Ballot that indicates either acceptance or rejection of the Plan shall be counted as a vote to accept or reject the Plan regardless of whether the releases and certification portions of the Ballot are completed.

g.    The following Ballots shall not be counted or considered in determining whether the Plan has been accepted or rejected:

   i.    any Ballot received after the voting deadline unless the Debtors shall have granted in writing an extension of the voting deadline with respect to such Ballot;

   ii.    any Ballot that is illegible or contains insufficient information to permit the identification of the creditor;

   iii.    any Ballot cast by a Person or Entity that does not hold a Claim in a Class that is entitled to vote to accept or reject the Plan;

   iv.    any Ballot cast for a Claim scheduled at zero or as unliquidated, Contingent, or disputed for which no Proof of Claim was timely filed;

   v.    any unsigned Ballot;

   vi.    any Ballot that does not indicate an acceptance or rejection or indicates both; and

   vii.    any Ballot transmitted to counsel to the Debtors by facsimile, email or other electronic means unless the Debtor has previously authorized such means in writing.

h.    The Debtors and the Committee shall be permitted to contact creditors in an attempt to cure the deficiencies specified herein.

4.    Submission of Ballots.

a.    A pre-printed form of Ballot for each of the Classes entitled to vote on the Plan will be sent to all creditors along with a copy of this Disclosure Statement, approved by the Court which will have attached as an exhibit, a copy of the Plan. Creditors should read the Ballot carefully. The Bankruptcy Court has approved the form

61

of Ballot and it contains specific instructions as to the deadline for its submission and the place where it must be submitted. If any creditor has any questions concerning voting procedures, it may contact:

QUARLES & BRADY LLP
One South Church Avenue, Suite 1700
Tucson, AZ 85701-1621
Attention: Elizabeth Fella
Telephone: (520) 770-8755
E-mail: elizabeth.fella@quarles.com

## B. Feasibility.

The Bankruptcy Code requires, as a condition to confirmation, that the Bankruptcy Court find that liquidation of the Debtors, or the need for future reorganization, is not likely to follow after confirmation. For the purpose of determining whether the Plan meets this requirement, the Reorganized Debtor's ability to meet its obligations under the Plan has been analyzed. The Debtors have prepared projections of the cash flow for the ministries and operations of the Diocese and the Debtors. The projections were prepared by management and are attached as **Exhibit 3** to this Disclosure Statement. The Debtors reasonably believe that they will be able to fund the Plan on the Effective Date, and the Reorganized Debtor will be able to make all payments required pursuant to the Plan.

## C. Best Interests Of Creditors And Liquidation Analysis.

Under Bankruptcy Code § 1129(a)(7), the Plan must provide that creditors receive no less under the Plan than they would receive in a Chapter 7 liquidation of the Debtors. The Debtors have included a hypothetical liquidation (attached as **Exhibit 4** to this Disclosure Statement) Thus, the Debtors' liquidation analysis excludes property that is not property of the Debtors' Estates. Specifically, Parish real and personal property, the priests' retirement fund, and custodial funds are excluded from the liquidation analysis. The liquidation analysis also excludes other property which is property of the Estate, but which is not "capable of liquidation under Chapter 7" pursuant to the Religious Freedom Restoration Act and other reasons, including the Gallup School campus and related personal property. The Committee disagrees with the Debtors over whether the property excluded from the liquidation analysis is properly excluded, and the Plan settles that dispute.

Additionally, Chapter 7 liquidation carries potential costs and risks that are resolved through the Plan, as follows:

1.   The Plan incorporates the Allocation Protocols. There is likelihood that a Chapter 7 Trustee will be unable to implement the Allocation Protocols or a similar process in the absence of a confirmed Chapter 11 Plan. As such, substantial resources of the Estates would likely be expended adjudicating or analyzing Tort Claims in a Chapter 7 case.

62

2.      A Chapter 7 Trustee would be entitled to compensation of a percentage of all funds distributed to parties in interest, excluding the Debtors, pursuant to 11 U.S.C. § 326. Any such payment would dilute the amount of funds available to pay creditors.

3.      The Settling Insurers and Participating Parties would not obtain a channeling or supplemental injunction or the releases provided under the Plan, and therefore would not make the substantial contributions they are making under the Plan.

**D.      Confirmation Over Dissenting Class.**

1.      In the event that any impaired Class of Claims does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the request of the Debtors if all other requirements under Bankruptcy Code § 1129(a) are satisfied, and if, as to each impaired Class which has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such non-accepting Classes. Each of these requirements is discussed below.

2.      No Unfair Discrimination.

a.      The Plan "does not discriminate unfairly" if:

i.      The legal rights of a dissenting Class are treated in a manner that is consistent with the treatment of other Classes whose legal rights are similar to those of the dissenting Class; and

ii.      No Class receives payments in excess of those which it is legally entitled to receive for its Claims. Under the Plan:

(a)      all Classes of impaired Claims are treated in a manner that is consistent with the treatment of other similar Classes of Claims; and

(b)      no Class of Claims will receive payments or property with an aggregate value greater than the aggregate of the Allowed Claims in such Class. Accordingly, the Debtors believe that the Plan does not discriminate unfairly as to any impaired Class of Claims.

3.      Fair and Equitable Test.

a.      The Bankruptcy Code establishes different "fair and equitable" tests for Secured Claims, Unsecured Claims, and holders of equity interests, as follows:

63

i.    <u>Secured Creditors</u>.  Either:

    (a)    each impaired Secured Creditor retains its liens securing a Secured Claim and receives on account of its Secured Claim deferred Cash payments having a present value equal to the amount of its Allowed Secured Claim;

    (b)    each impaired Secured Creditor realizes the "indubitable equivalent" of its Allowed Secured Claim; or

    (c)    the property securing the Claim is sold free and clear of liens with such liens to attach to the proceeds, and the liens against such proceeds are treated in accordance with clause (a) or (b) of this subparagraph (i).

ii.    <u>Unsecured Creditors</u>.  Each impaired Unsecured Creditor receives or retains under the Plan property of a value equal to the amount of its Allowed Claim.  There is no absolute priority rule issue in the Reorganization Cases because there are no equity interests or junior creditors; or the holders of Claims and equity interests that are junior to the Claims of the non-accepting Class do not receive any property under the Plan on account of such Claims and equity interests.

iii.    <u>Equity Interests</u>.  Either:

    (a)    each holder will receive or retain under the Plan property of a <u>value</u> equal to or greater than (I) the fixed liquidation preference or redemption price, if any, of such interest or (II) the value of such interest; or

    (b)    the holders of interests that are junior to the non-accepting Class will not receive any property under the Plan.  The Debtors believe that the Plan satisfies the "fair and equitable" test with respect to all impaired Classes.

4.    As with the best interests of creditors test, the fair and equitable test is applied differently in the Reorganization Cases than in most reorganization cases because the Debtors are not moneyed corporations.  This is the situation because the members of a non-profit, in this case, the Bishop, have no personal interest in the property of the corporation.  Accordingly, there is effectively no equity interest in the Diocese.

64

Therefore, what is commonly referred to as the "absolute priority rule" embodied by Bankruptcy Code § 1129(b)(2)(B) is not relevant here.

## XXI.   ALTERNATIVES TO THE JOINT PLAN

### A.   If The Plan Is Not Confirmed, Several Different Events Could Occur:

1.   The Debtors could propose another plan providing for different treatment of certain creditors; or the Bankruptcy Court (after appropriate notice and hearing) could dismiss the Reorganization Cases if the Debtors are unable to confirm an alternative plan in a reasonable period of time.

2.   Under the second scenario, creditors of the Debtors would recover significantly less (and perhaps nothing) than they will under the Debtors' Plan.  Without the protections, including the Channeling Injunction, available under a confirmed Plan, the Settling Insurers and Participating Parties have little or no incentive to provide funding for the Debtors to pay creditors.  Absent the contributions of the Settling Insurers and Participating Parties that are only available through a confirmed Plan, the Debtors would not be able to contribute more than $24 million to the Plan. Rather, they could, at most, contribute $3,020,000 million, almost all of which would pay for the Professional Charges incurred in the Debtors' Reorganization Cases.  Even if the Committee prevailed in litigation with the Debtors regarding the Parishes' real property, such real property is likely worth very little, as evidenced by the sale of real property that the Debtors conducted in September, 2015, as described above.  Dismissal is therefore a poor alternative for creditors.

Therefore, the Debtors strongly recommend that creditors vote to accept the Plan, as set forth below.

## XXII.  RECOMMENDATIONS OF THE DEBTORS AND CONCLUSION

**THE DEBTORS RECOMMEND THAT ALL CREDITORS VOTE TO ACCEPT THE PLAN.  THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST POSSIBLE RETURN TO CREDITORS UNDER THE CIRCUMSTANCES.**

RESPECTFULLY SUBMITTED this 21st day of March, 2016.

ROMAN CATHOLIC CHURCH OF THE
DIOCESE OF GALLUP, a New Mexico religious
corporation sole,

and

BISHOP OF THE ROMAN CATHOLIC CHURCH
OF THE DIOCESE OF GALLUP, an Arizona
religious corporation sole

By _____
   Bishop James S. Wall

Responsible Person for the Roman Catholic Church
of the Diocese of Gallup and the Bishop of the
Roman Catholic Church of the Diocese of Gallup


Prepared and Submitted By:


/s/ Susan G. Boswell
Susan G. Boswell (AZ Bar No. 004791)
Lori L. Winkelman (AZ Bar No. 021400)
Elizabeth S. Fella (AZ Bar No. 025236)
*Admitted Pro Hac Vice*
QUARLES & BRADY LLP
One S. Church Ave., Suite 1700
Tucson, Arizona 85701
-and-
Thomas D. Walker
WALKER & ASSOCIATES, P.C.
500 Marquette N.W., Suite 650
Albuquerque, New Mexico 87102
*Counsel for the Debtors*